Judge Berman

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

 

| | |
|---|---|
| ─────────────────────────── x | |
| THE BOARD OF TRUSTEES OF THE | Civil Action No. |
| SOUTHERN CALIFORNIA IBEW-NECA | |
| DEFINED CONTRIBUTION PLAN, On | CLASS ACTION COMPLAINT |
| Behalf of Itself and All Others Similarly | |
| Situated, | |
| | |
| Plaintiff, | |
| | |
| vs. | **JURY TRIAL DEMANDED** |
| | |
| THE BANK OF NEW YORK MELLON | |
| CORPORATION and BNY MELLON, | |
| NATIONAL ASSOCIATION, formerly known | |
| as MELLON BANK, N.A., | |
| | |
| Defendants. | |
| | |
| ─────────────────────────── x | |

Plaintiff The Board of Trustees ("Plaintiff") of the Southern California IBEW-NECA Defined Contribution Plan, (the "Plan"), on behalf of itself, the Plan, and a class of all other similarly situated trustees, administrators, and other fiduciaries ("Class Members") of other similarly situated retirement plans ("Class Plans") (the Plan and the Class Plans may collectively be referred to as the "Plans"), brings this class action against The Bank of New York Mellon Corporation ("BNY Mellon Corp.") and BNY Mellon, National Association, formerly known as Mellon Bank, N.A. ("BNY Mellon, N.A.") (hereinafter collectively "BNY Mellon" or "Defendant")[1] and states as follows:

## SUMMARY OF THE ACTION

1.    Defendant is a fiduciary under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001, *et seq.*, and various agreements between Plaintiff and BNY Mellon. Defendant, in violation of its inherent fiduciary duties and those fiduciary duties set forth under ERISA, has engaged in imprudent and disloyal investment activities, namely, a securities lending program, which caused substantial losses to the Plans. This action seeks to recover losses caused by Defendant's breaches of its fiduciary duty to the Plans and for Defendant's violations of ERISA's prohibited transaction provisions.

2.    Specifically, Defendant, in its capacity as agent and fiduciary for the Plans, invested collateral posted by investors who borrowed securities from the Plans in high risk securities in direct violation of express guidelines that required Defendant to safeguard principal over all other considerations. When these high risk securities collapsed in value, the Plans lost principal and

---

[1]    On July 7, 2007, The Bank of New York Company, Inc. ("BNY") and Mellon Financial Corporation merged into The Bank of New York Mellon Corporation with BNY Mellon being the surviving entity. On July 1, 2008 BNY Mellon completed the process of consolidating and renaming the principal United States bank and trust company subsidiaries into two principal banks: The Bank of New York Mellon and BNY Mellon, National Association, formerly known as Mellon Bank, N.A.

suffered substantial losses. Defendant made these high risk investments in an attempt to earn substantial profits for itself in dereliction of its duties to the Plans.

3. Defendant's acts and omissions, as hereinafter described, are breaches of fiduciary duty under ERISA §404(a) and are prohibited transactions that violate ERISA §406, which entitle the Plans, pursuant to ERISA §502(a)(2), to recover appropriate relief under ERISA §409 and, pursuant to ERISA §502(a)(3), to enjoin acts which violate ERISA. *See* 29 U.S.C. §§1104(2), 1106, 1132(a)(2)-(3), and 1109(2).

## PARTIES

4. Plaintiff is the trustee and plan administrator of the Southern California IBEW-NECA Defined Contribution Plan which was established on June 1, 1985 and is located at 6023 Garfield Avenue, City of Commerce, California. The Plan currently has 15,221 participants.

5. Defendant, BNY Mellon Corp., is a holding company headquartered in New York, New York and was established in 2007 after the merger of Mellon Financial Corporation and The Bank of New York Company, Inc. BNY Mellon Corp. is a leading asset management and securities services company, providing investment management asset and fund administration, and fiduciary and banking solutions for corporations, institutions and affluent individuals worldwide. BNY Mellon Corp., through its division called BNY Mellon Asset Servicing, managed the Plans' cash investments that are at issue in this case. BNY Mellon Corp. has offices in 27 U.S. states, as well as international offices in Europe, South America, the Middle East and Africa, and the Asia-Pacific region, among other international locations, serving more than 100 markets worldwide. As of

March 31, 2009, BNY Mellon Corp. has $19.5 trillion in assets under custody or administration and $881 billion under management.[2]

6.     Defendant BNY Mellon, N.A., formerly known as Mellon Bank, N.A., is a fully owned subsidiary of BNY Mellon and a nationally-chartered bank which houses BNY Mellon's Wealth Management business.

## JURISDICTION AND VENUE

7.     Plaintiff seeks relief under the civil enforcement remedies provided by ERISA against fiduciaries pursuant to ERISA §§404, 406, 409 and 502(a) (29 U.S.C. §§1104, 1106, 1109, 1132). This Court has exclusive jurisdiction over this action and the Defendant pursuant to 28 U.S.C. §§1331, 1332, and ERISA §§502(e)(1) and (2) (29 U.S.C. §§1132(e)(1) and (2)).

8.     Venue of this action in the Southern District of New York is proper pursuant to ERISA §502(e)(2) (29 U.S.C. §1132(e)(2)) and 28 U.S.C. §1391 because Defendant maintains its headquarters in the district, Defendant's breaches took place in the district, and because Plaintiff consented to venue in New York City, New York pursuant to the Securities Lending Agreement and Guaranty dated May 29, 1998.

## FACTUAL ALLEGATIONS

### A.     BNY Mellon's Securities Lending Program

9.     Securities Lending refers to the lending of securities by one party to another. The terms of the loan are governed by a "Securities Lending Agreement," which requires that the borrower provide the lender with collateral in the form of cash, government securities or a letter of

---

[2]     The Bank of New York Mellon, About Us, At a Glance, http://www.bnymellon.com/about/ ataglance.html (last visited June 1, 2009).

- 3 -

credit of value equal to or greater than the loaned securities. The primary reason for borrowing securities are market making, hedging, and arbitrage trading purposes.

10.     As an intermediary between the lender and the borrower and as an agent on behalf of the lender, BNY Mellon invests the collateral provided by the borrower in accordance with specific investment guidelines agreed upon between BNY Mellon and the lender which require BNY Mellon to invest the collateral in investments which provide a "steady return while focusing upon the preservation of principal, interest rate sensitivity and credit risk."[3]

11.     BNY Mellon encourages investors to participate in its securities lending program in order to offset custody fees and administrative expenses and to enhance portfolio returns.[4] BNY Mellon states that it delivers value to its clients through "a disciplined process of generating returns and managing risk, while focusing on maximizing client flexibility."[5]

12.     According to BNY Mellon, its securities lending program will add value to your portfolio while operating within strict risk parameters and fiduciary responsibilities by:

- Lending to only the most credit worthy borrowers at equal or better than prevailing market rates;
- Maintaining minimum collateral levels through a daily mark-to-market process;
- Conservative investment of cash collateral with goals of optimizing returns while preserving principal;

---

[3] The Bank of New York Mellon, Securities Lending, http://www.mellon.com/securitieslending/ index.html (last visited May 13, 2009).

[4] The Bank of New York Mellon, Securities Lending, http://www.mellon.com/securitieslending/ lendingprocess.html (last visited May 13, 2009).

[5] The Bank of New York Mellon, Securities Lending, http://www.mellon.com/securitieslending/ index.html (last visited May 13, 2009).

- 4 -

*   ☐ Equitable, systemic allocation of lending opportunities, regardless of portfolio size.[6]

13. Despite the potential risks involved in securities lending, including borrower bankruptcy, collateral deficiencies, and challenges with settlements, corporate actions, or dividends and interest, BNY Mellon nevertheless extolled that a main objective of its program is "the preservation of principal by maintaining a prudent level of liquidity, implementing policies and procedures to monitor and control our investment guidelines, monitoring the quality of our issuers, and performing regularly scheduled tests to identify the interest rate sensitivity of our investment portfolio."[7]

14. BNY Mellon began its securities lending program in 1977, and as of June 2006, BNY Mellon's securities lending program had more than $1 trillion in lendable securities.

**B.      Plaintiff's and the Class Members' Securities Lending Agreements and Guaranties**

15. On or about May 29, 1998, Plaintiff, on behalf of the Plan, entered into a Securities Lending Agreement and Guaranty with BNY Mellon (the "Securities Lending Agreement" or the "Agreement"). A true and correct copy of the Securities Lending Agreement is attached hereto as **Exhibit A**.

16. The Agreement concerns BNY Mellon's standardized securities lending program. Upon information and belief, the Agreement executed by and between Plaintiff and Defendant is

---

[6] The Bank of New York Mellon, Securities Lending, http://www.mellon.com/securitieslending/about.html (last visited May 13, 2009).

[7] The Bank of New York Mellon, Securities Lending, http://www.mellon.com/securitieslending/index.html (last visited May 13, 2009).

- 5 -

materially similar to Securities Lending Agreements ("Agreements") executed by and between Defendant and the members of the Class on behalf of the Class Plans.

17. On or about June 20, 2008, Plaintiff, on behalf of the Plan, BNY, and BNY Mellon, N.A. executed an Assignment, Assumption, and Consent Agreement (the "Assignment"). A true and correct copy of the Assignment is attached hereto as **Exhibit B**.

18. The Assignment concerns BNY Mellon's standardized securities lending program. Upon information and belief, the Assignment executed by and between Plaintiff and Defendant is materially similar to Assignments executed by and between Defendant and the members of the Class on behalf of the Class Plans.

19. Under the terms of the Agreement, Defendant, as agent for the Plans, agreed to lend and loaned securities owned by the Plans to "credit-worthy" borrowers pursuant to a securities borrowing agreement.

20. In order to protect the Plans' securities from a borrower's default, the terms of the Agreements required borrowers to post collateral which, at all times, had a market value of not less than 102% of the then current market value of the loaned securities as of the close of the preceding business day (the "Collateral Requirement"). If the market value of the collateral received from the borrower fell below the 102% Collateral Requirement, BNY Mellon was required to demand additional collateral from the borrower in order to assure the market value of the collateral was never less than the Collateral Requirement.

21. Pursuant to the Collateral Requirement, borrowers provided both cash and non-cash collateral ("Collateral") to BNY Mellon, as agent for the Plans, as security for the return of the loaned securities.

- 6 -

22. Defendant, as agent for the Plans, held the Collateral in approved collateral accounts (the "Collateral Account"). The Plans each held an interest in the Collateral Account based on their outstanding loan balances. Exhibit A, Article IV 2(a).

23. Pursuant to the Agreement, BNY Mellon agreed to invest the Collateral held in the Collateral Account as agent for the Plans. In connection with Defendant's agreement to invest the Collateral, Plaintiff and BNY executed Security Lending Guidelines (the "Guidelines") which specifically prescribed how Defendant was to invest the Collateral pursuant to the Agreement. A true and correct copy of the Guidelines is attached hereto as **Exhibit C**.

24. Upon information and belief, the Guidelines executed by and between Plaintiff and Defendant are materially similar to the Securities Lending Guidelines executed by and between Defendant and members of the Class on behalf of the Class Plans.

25. The Guidelines provided that Defendant had "full investment discretion." Exhibit C, Article III. Accordingly, Defendant had complete authority or control over the management or disposition of the Collateral, a Plan asset.

26. The Guidelines provided that "[a]bsolute safety of principal is paramount over all other considerations." Exhibit C, Article II. In that regard, they also provided that "[t]he portfolio manager shall not use derivatives to increase portfolio risk above the level that could be achieved in the portfolio using only traditional investment securities." Exhibit C, Article III.

27. In order to assure diversification of investment of the Collateral, the Guidelines include a requirement that "[n]o more than 5% of the fixed income portfolio based on market value shall be invested in securities in any one issuing entity at the time of purchase." Exhibit C, Article III.

- 7 -

28. The Agreement clearly provides that BNY Mellon would not share in any losses on Collateral investments. Rather, "[a]ll Approved Investments shall be for the account and risk of Lender [the Plans]. To the extent any loss arising out of Approved Investments results in a deficiency in the amount of Collateral available for return to a Borrower, Lender Agrees to pay Bank on demand cash in an amount equal to such deficiency." *See* Exhibit A, Article IV.2.(c).

29. Although BNY Mellon does not share in any Collateral investment losses, under the terms of the Agreement, BNY Mellon collects a fee, "accrued daily, equal to 40% of the sum of all interest, dividends and other distributions earned from Approved Investments and Securities Loan Fees paid or payable by the relevant Borrowers, net of Rebates paid by Bank to relevant Borrowers and brokerage commissions incurred in making Approved Investments." *See* Exhibit A, Article V ¶8. In other words, BNY Mellon receives 40% of the profits from Collateral investments even though it bears none of the losses.

30. Further, the Standard of Care section of the Agreement provides that, "Bank shall not be liable for any costs, expenses, damages, liabilities or claims (including attorneys' and accountants' fees) incurred by Lender, *except those costs, expenses, damages, liabilities or claims arising out of the negligence, bad faith or willful misconduct of Bank, or any failure by Bank to act in accordance with Prohibited Transaction Class Exemption 81-6.*". *See* Exhibit A, Article V.1.(a).

## DEFENDANT'S FIDUCIARY DUTIES

31. BNY Mellon is a fiduciary in that it exercised authority or control over the management or disposition of the assets of the Plan and, upon information and belief, the Class Plans. ERISA §3 (21)(29 U.S.C. §1102 (21).

32. Pursuant to ERISA §404(a)(1) (29 U.S.C. §1104(a)(1)), Defendant had the following duties:

- 8 -

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

> (A) for the exclusive purpose of:
>
>> (i) providing benefits to participants and their beneficiaries; and
>>
>> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent wit the provisions of this title and title IV.

33.     Defendant also had the duty to refrain from engaging in prohibited transactions.

Section 406(b)(1) of ERISA (29 U.S.C. §1106(b) (1)) provides, in pertinent part, that

> (b)     Transactions between plan and fiduciary
>
> A fiduciary with respect to a plan shall not-
>
> (1)     deal with the assets of the plan in his own interest or for his own account, . . .

## C.     BNY Mellon Breached its Fiduciary Duties

34.     Despite its fiduciary obligations to Plaintiff, the Plan, the Class Plans, and members of the Class, BNY Mellon invested the Collateral in investments that were risky in light of known existing market conditions, knowing that regardless of the investment outcome, the loss would be borne by the lender (*i.e.*, the Plan and Class Plans).

35.     BNY Mellon invested a large percentage of the Collateral in risky investments such

as asset-backed securities, floating rate notes, and investment vehicles that invested in asset-backed

securities themselves.

36.     For example, one of many securities purchased by BNY Mellon purportedly for the

benefit of the Plans and held in the Collateral Account was a Lehman floating rate note purchased on

or about March 23, 2007. It was widely known that Lehman itself invested in risky asset-backed

securities. On September 15, 2008, Lehman filed for bankruptcy.

37.     BNY Mellon made these perilous and improper investments despite myriad news

accounts chronicling the risky nature of asset-backed securities.

38.     For example, on December 12, 2006 – just over two years ago – *The Wall Street*

*Journal* raised red flags about investments in asset-backed securities:

> THE CRACK in the debt market's otherwise-strong foundation could be subprime
> mortgages.
>
> Investors have been gobbling up risky debt lately, from junk bonds issued by
> struggling auto makers to loans used to finance mega-buyouts. But in subprime
> mortgages -- an especially risky corner of the debt market -- worries are keen.
>
> The $1.3 trillion subprime mortgage market, which is a bit more than a tenth of the
> overall mortgage market, caters to home buyers with scuffed credit records or who
> might have trouble paying off their mortgages. Delinquencies on some of these loans
> are rising and some smaller lenders are folding, which affects debt that is backed by
> the loans.

39.     On February 13, 2007, *The Wall Street Journal* again wrote:

> ***While investing in asset-backed derivatives isn't new, the stakes are getting higher***
> ***as a steady stream of negative news around these riskier investments is hammering***
> ***this small corner of the credit markets.***
>
> The rising inability of subprime-mortgage borrowers to meet their payments amid
> higher interest rates has caused sharp spikes in the ABX index, the derivative index
> tracking subprime mortgages, as well as individual asset-backed derivatives linked to
> specific loan deals. That's because the cost of protecting these asset-backed securities
> against a possible default increases, leading to wider trading levels on the index.

- 10 -

40. On April 4, 2007, *The Wall Street Journal* warned specifically about the types of

risky investments utilized by BNY Mellon:

> Mutual funds are increasingly using complex financial products called derivatives to hedge their bets or boost their returns -- and that's raising concerns among regulators and fund watchdogs.
>
> Institutional investors such as hedge funds have long used derivatives, which include options, futures, swaps and other, more exotic fare. But now these instruments are increasingly appearing in ordinary diversified stock and bond funds that often serve as core holdings for small investors.
>
> \*       \*       \*
>
> *Funds' use of derivatives -- which Warren Buffett once called "financial weapons of mass destruction" -- is growing as the instruments become easier to trade and as mutual funds aim to stand out in a crowded field*. More automated trading of derivatives and increased use by fast-growing hedge funds have helped make the market more accessible to mutual funds. And with more than 8,000 mutual funds on the market, many managers believe it's not enough to match a market index. They want to beat the market -- and derivatives often help.
>
> While many newer, more-exotic mutual funds plainly advertise their derivatives strategies, the instruments may play an equally important, but less obvious, role in some plain-vanilla funds. The AIM Income and Fidelity Investment Grade Bond funds, for example, have been around for decades and, at first glance, may look like straightforward bond portfolios. But as of the end of February, the Fidelity fund had invested about 18% of its assets in futures, options and swaps, while roughly 70% of the AIM fund's assets were in derivatives.
>
> Derivatives can be used to boost returns, increase yield, get access to more-exotic asset classes like commodities or simply reduce risk. Indeed, many types of derivative-heavy funds thrived in recent years amid relatively placid markets. But in recent weeks, as markets have gyrated more wildly, the vulnerability of some of these funds has become more apparent.
>
> Many of these funds use an options strategy that generally works best in relatively flat markets, not one that's moving sharply up or down. And some funds that use derivatives to produce returns that are a multiple of a selected market index saw sharp declines during the recent broad market downturn.
>
> Another concern: Many funds that employ derivatives strategies can hit fund investors with hefty tax bills, since these funds tend to trade often and can generate more short-term capital gains.
>
> At the same time, the people responsible for overseeing mutual funds are raising concerns about derivatives. *"I am not trying to say that funds should not invest in*

- 11 -

*these instruments, but I am saying that you should do a lot of work up front before you wade into uncharted territory,"* said Securities and Exchange Commission investment-management division head Andrew Donohue last week, addressing a mutual-fund industry group, noting that "funds very often are newcomers" to derivative and other sophisticated instruments.

41. News accounts continued throughout 2007 warning investors about the risks associated with asset-backed securities. On August 13, 2007 – over one year before BNY Mellon "broke the buck" (that is, the Collateral Account net asset value fell below $1 per share) – *The Wall Street Journal* wrote that "[e]xotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to banks to insurers."

42. Despite the avalanche of warnings about the risky nature of these investments and in contrast to the stated and agreed investment goals and objectives of the Agreements and the Guidelines, BNY Mellon continued to invest in these risky investment vehicles well into 2008.

43. In stark contrast to and in violation of its express duty to use expertise in investing, BNY Mellon invested the Collateral in ventures such as Lehman, despite wide spread public knowledge that such investments were inherently risky beyond that sanctioned under the Agreements and Guidelines.

44. Under these circumstances, when the overarching goal was to preserve principal and maintain adequate liquidity to be able to return Collateral to borrowers – an expected and inevitable requirement in any securities lending program – a reasonably prudent fiduciary would not have made the hazardous investment decisions made by BNY Mellon. Indeed, in the face of known market conditions, a reasonably prudent fiduciary would not have had such a large exposure to asset-backed securities and floating rate notes, and instead would have invested in safer vehicles. Moreover, a reasonably prudent fiduciary would have ensured that liquidity standards were maintained to further reduce the potential downside exposure to the Plans.

45. Finally, when it became obvious that the Collateral was at risk of loss and in danger of losing principal or becoming illiquid, a reasonably prudent fiduciary would have taken affirmative steps to preserve the Collateral to protect the Plans.

46. Contrary to these duties, as a result of BNY Mellon's risky investment strategy, on or about September 15, 2008, BNY Mellon "broke the buck," when Lehman filed for bankruptcy, with unit prices falling below $1.00, eventually falling to $0.89 on March 31, 2009.

47. BNY Mellon knew that it had no risk of loss but was paid 40% of any profit and, therefore, had placed the entire risk of its reckless investment strategy on the Plans. Because of this "head I win, tails you lose" paradigm, BNY Mellon had no incentive to modify its unauthorized and risky investment strategy, and made not one attempt to do so, because it was the beneficiary of all profits, and would not be responsible for any losses.

48. BNY Mellon's incentives were diametrically opposed to BNY Mellon's fiduciary obligations to Plaintiff, the Plan, the Class Plans, and Class Members.

49. BNY Mellon made the foregoing high risk investments solely to maximize its own profits and in express dereliction of its fiduciary duties.

50. Defendant's failure to comply with its obligations set forth in the Agreements and Guidelines, in direct violation of Defendant's duties of loyalty and prudence under ERISA, directly harmed the Plan and, upon information and belief, the Class Plans, in that the Collateral not only earned less than it would have earned if invested by a reasonably prudent fiduciary, but also lost principal.

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all trustees, administrators, and other fiduciaries of retirement plans which entered into Securities Lending Authorization Agreements with BNY

- 13 -

Mellon whose Collateral was invested by BNY Mellon (the "Class"). Excluded from the Class are: (a) Defendant; (b) the subsidiaries and affiliates of Defendant; (c) any person or entity who is a partner, executive officer, director or controlling person of Defendant; (d) any entity in which Defendant has controlling interest; (e) Defendant's directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (f) the legal representatives, heirs, successors and assigns of any such excluded party.

52.     As of 2006, the market value of the securities available to be loaned and managed by BNY Mellon totaled approximately $1 trillion. While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff believes and therefore avers that Class Members number in the thousands.

53.     Plaintiff's claims are typical of the claims of the members of the Class in that, upon information and belief, all Class Members entered into identical or virtually identical Securities Lending Agreements with BNY Mellon on behalf of Class Plans which held Collateral in the Collateral Account and sustained damages as a result of Defendant's wrongful conduct complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation. Plaintiff has no interests that are adverse or antagonistic to the Class.

55.     Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by any individual Class Plan may be relatively small, and Plaintiff seeks injunctive relief, the expense and burden of individual litigation make it impracticable for Class Members individually to seek redress for the wrongful conduct

- 14 -

alleged herein. Further, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and the Class Plans which would establish incompatible standards of conduct for the party opposing the Class.

56. Defendant has acted on grounds generally applicable to the Class and the Class Plans with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

57. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (1) whether Defendant is a fiduciary; (2) whether Defendant violated its obligations set forth in the Securities Lending Agreement and Guaranty, and the Guidelines; (3) whether Defendant violated its fiduciary duties of prudence and/or loyalty; (4) whether Defendant engaged in prohibited transactions in connection with Collateral investments; (5) whether the Plan and the Class Plans suffered any losses as a result of Defendant's actions; and (6) whether Plaintiff and the Class would suffer irreparable injury by the continuation of Defendant's conduct complained of herein.

58. On information and belief, the names and addresses of those persons and entities that held shares in the Collateral Account are available from Defendant. Notice may be provided to such Class Members via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## COUNT I

## Violation of ERISA §404 (29 U.S.C.§1104)

59. Plaintiff repeats and realleges the allegations contained in paragraphs 1-58 as if fully set forth herein.

- 15 -

60. At all relevant times, Defendant acted as a fiduciary within the meaning of ERISA §3(21)(A) (29 U.S.C. §1002(21)(A)) by exercising authority or control with respect to the management or disposition of the Collateral, a Plan asset.

61. Defendant had a duty to invest the Collateral prudently based on the standards of a reasonably prudent fiduciary.

62. Defendant had a duty of loyalty to invest the Collateral solely in the exclusive interests of the Plans and their participants and beneficiaries and for the exclusive purpose of providing retirement benefits.

63. To the extent that the Agreements or the Guidelines required Defendant to invest the Collateral imprudently, Defendant also had a duty to disregard those requirements and invest the Collateral prudently. Defendant could not blindly follow those requirements if doing so would cause harm to the Plans.

64. Defendant had a duty to monitor the Collateral investments continuously to ensure that they were at all times proper. If a Collateral investment became imprudent or improper, Defendant had a duty to act immediately to protect the Plans from any investment harm.

65. Defendant failed to invest the Collateral in safe and prudent investments as required by the Agreements and the Guidelines. Instead, Defendant invested the Collateral in highly risky investments in direct violation of the Agreements and the Guidelines.

66. Defendant also failed to monitor the Collateral investments to ensure they were at all times proper investments in accordance with the Agreements and Guidelines and, therefore, improperly maintained the imprudent Collateral investments.

67. No reasonably prudent fiduciary would have invested the Collateral in the investments selected by Defendant in its complete and sole discretion under the Agreement, the

Guidelines, or reasonably known market conditions. Further, no reasonably prudent fiduciary would have maintained those investments.

68.     Defendant's failure to invest the Collateral in a prudent manner constitutes, pursuant to ERISA §404(a)(1), a breach of Defendant's fiduciary duty of prudence.

69.     Moreover, Defendant's actions were designed to increase profits earned by Defendant from securities lending in disregard of the risk of losses that could be suffered by the Plans.

70.     Defendant favored its own interests in gambling to make profits without any reasonable regard to losses that could be suffered by the Plans.

71.     Defendant earned substantial fees and profits as a result of acting in its own self-interest.

72.     By employing its "heads I win, tails you lose" investment strategy that was highly risky to the Plans for its own benefit, Defendant violated the duty of loyalty under ERISA §404(a)(1).

73.     Defendant is liable under ERISA §409, which provides:

[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

74.     Defendant is liable under ERISA §502(a)(2) to restore to the Plans all losses due to Defendant's breaches, as well as any profits that would have been earned had the Collateral been prudently invested.

75.     The Plans face significant, irreparable harm if Defendant is permitted to continue to violate duties owed to Plaintiff and the Class.

- 17 -

## COUNT II

### Violation of ERISA §406 (29 U.S.C. §1106)

76.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-58 as if fully set forth herein.

77.    At all relevant times, Defendant acted as a fiduciary within the meaning of ERISA §3(21)(A) (29 U.S.C. §1002(21)(A)) by exercising authority or control concerning the management or disposition of the Collateral, a Plan asset.

78.    Defendant dealt with the Collateral, a Plan asset, in its own interest or for its own account in that it invested the Collateral for the express purpose of making investments for its own financial benefit and earning profits for itself and at the expense of the Plans in violation of ERISA §406.

79.    By the acts, transactions and courses of conduct alleged herein, Defendant caused losses to the Plans.

80.    Under ERISA §502(a)(2), Defendant is required to pay damages to the Plans.

81.    The Plans face significant, irreparable harm if Defendant is permitted to continue to violate duties owed to Plaintiff and the Class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, in Plaintiff's favor and in favor of the Class and against Defendant as follows:

A.    Declaring that this action is properly maintainable as a class action, and certifying Plaintiff as class representative and Plaintiff's counsel as class counsel;

B.    Declaring that Defendant's conduct complained of herein was in violation of Defendant's fiduciary duties;

- 18 -

C.      Declaring that Defendant has engaged in prohibited transactions in violation of §406 of ERISA;

D.      Issuing an order, pursuant to ERISA §§409(a) and 502(a)(2), compelling disgorgement and/or restitution and all other remedial relief as the Court may deem appropriate;

E.      Issuing an order enjoining Defendant from any further violations of its fiduciary obligations;

F.      Ordering Defendant to pay Plaintiff, the Plan, the Class Plans, and the Class such damages as Plaintiff and the Class sustained as a result of Defendant's misconduct, including losses and lost profits, and damages based on the profits Defendant earned from its improper investment of the Collateral;

G.      Ordering an accounting;

H.      Imposing a constructive trust, in favor of Plaintiff and the Class, upon any amounts by which Defendant was unjustly enriched at the expense of Plaintiff and the Class as a result of Defendant's breaches of fiduciary obligations and wrongful conduct;

I.      Awarding attorney's fees pursuant to §502(g) of ERISA (29 U.S.C. §1132(g)) and/or the Common Fund Doctrine; and

J.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of all members of the proposed class, hereby demands a trial by jury on all issues so triable.

- 19 -

DATED: July 13, 2009

COUGHLIN STOIA GELLER RUDMAN &
  ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER RUDMAN &
  ROBBINS LLP
PAUL J. GELLER
STEPHEN R. ASTLEY
HOLLY KIMMEL
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

IZARD NOBEL LLP
ROBERT A. IZARD
29 South Main Street, Suite 215
West Hartford, CT 06107
Telephone: 860/493-6295
860/493-6290 (fax)

Attorneys for Plaintiff and Proposed Class

- 20 -

# EXHIBIT A

28 SEP '98 PM12:26

## SECURITIES LENDING AGREEMENT AND GUARANTY

AGREEMENT, dated as of May 29, 1998, between Board of Trustees of "Lender" (the "Committee"), as plan administrator and on behalf of Southern California IBEW-NECA Health Trust Fund ("Lender"), and The Bank of New York ("Bank").

### ARTICLE I
### DEFINITIONS

Whenever used in this Agreement, unless the context otherwise requires, the following words shall have the meanings set forth below:

1.     "Act of Insolvency" shall mean, (i) the filing by a Borrower of a petition in bankruptcy or a petition seeking reorganization, liquidation or similar relief, or the filing of any such petition against a Borrower which is not dismissed or stayed within 60 calendar days, (ii) the adjudication of a Borrower as bankrupt or insolvent, (iii) the seeking or consenting to the appointment of a trustee, receiver or liquidator by a Borrower, or (iv) the making of a general assignment for the benefit of creditors by a Borrower or a Borrower's admission in writing of its inability to pay its debts as they become due.

2.     "Account" shall mean the custodial account established and maintained by Bank on behalf of Lender for the safekeeping of Securities and monies received by Bank from time to time.

3.     "Approved Investment" shall mean any type of security, instrument, participation or interest in property in which Cash Collateral may be invested or reinvested, as set forth on Schedule I hereto (which may be amended from time to time by execution of a revised Schedule I).

4.     "Authorized Person" shall mean any member of the Committee and any other person duly authorized by the Committee to give Oral and/or Written Instructions on behalf of Lender, such persons to be designated in a Certificate which contains a specimen signature of such person.

5.     "Book-Entry System" shall mean the Treasury/Reserve Automated Debt Entry System maintained at The Federal Reserve Bank of New York.

6.     "Borrower" shall mean any entity named on a list supplied to Lender by Bank (as such list may be amended from time to time), other than any entity deleted from such list pursuant to a Certificate.

7.     "Business Day" shall mean any day on which Bank is open for business and on which the Book-Entry System and/or the applicable Depositories are open for business.

8. "Cash Collateral" shall mean either fed funds or New York Clearing House funds, as applicable for a particular Loan.

9. "Certificate" shall mean any notice, instruction, schedule or other instrument in writing, authorized or required by this Agreement to be given to Bank, which is actually received by Bank and signed on behalf of Lender by an Authorized Person or a person reasonably believed by Bank to be an Authorized Person.

10. "Collateral" shall mean Government Securities, Letters of Credit and/or Cash Collateral.

11. "Collateral Account" shall mean an account established and maintained by Bank for the purpose of holding Collateral, Approved Investments, Proceeds and any Securities Loan Fee paid by Borrowers in connection with Loans hereunder.

12. "Collateral Requirement" shall mean with respect to Loans an amount equal to 102% of the then current Market Value of Loaned Securities which are the subject of Loans as of the close of trading on the preceding Business Day.

13. "Depository" shall mean the Depository Trust Company, Participants Trust Company and any other securities depository or clearing agency (and their respective successors and nominees) registered with the Securities and Exchange Commission or otherwise authorized to act as a securities depository or clearing agency.

14. "Distributions" shall mean interest, dividends and other payments and distributions payable by Borrowers in respect of Loaned Securities.

15. "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

16. "Government Security" shall mean Book-entry Securities as defined in 31 C.F.R. Part 357.2 and any other securities issued or fully guaranteed by the United States government or any agency, instrumentality or establishment of the United States government.

17. "Letter of Credit" shall mean a clean, unconditional and irrevocable letter of credit in favor of Bank as agent for Lender issued by a bank named on a list supplied to Lender by Bank (as such list may be amended from time to time), other than a bank deleted from such list pursuant to a Certificate.

18. "Loan" shall mean a loan of Securities hereunder.

19. "Loaned Security" shall mean any Security which is subject to a Loan.

20. "Market Value" shall mean (a) with respect to Government Securities, the price of such Securities as quoted by a recognized

- 2 -

pricing information service at the time the determination of Market Value is made, plus accrued but unpaid interest, if any, on the particular Security, (b) with respect to other Securities, the price of such Securities as quoted by a recognized pricing information service at the time such determination is made, plus accrued but unpaid interest, if any, to the extent not included in the price as quoted, (c) with respect to Cash Collateral, its amount, and (d) with respect to Letters of Credit, the amount of such Letters of Credit.

21. "Oral Instructions" shall mean verbal instructions actually received by Bank from an Authorized Person or from a person reasonably believed by Bank to be an Authorized Person.

22. "Proceeds" shall mean any interest, dividends and other payments and distributions received by Bank in respect of Collateral and Approved Investments.

23. "Rebate" shall mean the amount payable by Lender to a Borrower in connection with Loans at any time collateralized by Cash Collateral.

24. "Receipt" shall mean an advice or confirmation setting forth the terms of a particular Loan.

25. "Securities Borrowing Agreement" shall mean the agreement pursuant to which Bank lends securities to a Borrower as agent for its customers (including Lender) from time to time.

26. "Securities Loan Fee" shall mean the amount payable by a Borrower to Bank pursuant to the Securities Borrowing Agreement in connection with Loans collateralized by Collateral other than Cash Collateral.

27. "Security" shall include Government Securities, common stock and other equity securities, bonds, debentures, corporate debt securities, notes, mortgages or other obligations, and any certificates, warrants or other instruments representing rights to receive, purchase, or subscribe for the same, or evidencing or representing any other rights or interests therein.

28. "Written Instructions" shall mean written communications actually received by Bank from an Authorized Person or from a person reasonably believed by Bank to be an Authorized Person by letter, memorandum, telegram, cable, telex, telecopy facsimile, computer, video (CRT) terminal or other on-line system, or any other method whereby Bank is able to verify with a reasonable degree of certainty the identity of the sender of such communications or the sender is required to provide a password or other identification code.

- 3 -

ARTICLE II
APPOINTMENT OF BANK; SCOPE OF AGENCY AUTHORITY

1.   <u>Appointment</u>.  Lender hereby appoints Bank as its agent to lend Securities in the Account to Borrowers from time to time (except Securities which Lender has advised Bank in a Certificate are no longer subject to the representations set forth in Article III, sub-paragraph (d) hereof), and Bank hereby accepts appointment as such agent and agrees to so act.

2.   <u>Securities Borrowing Agreement</u>.  Lender hereby acknowledges receipt of Bank's standard form(s) of Securities Borrowing Agreement and authorizes Bank to lend Securities in the Account to Borrowers pursuant to agreements substantially in the form thereof.  Bank is hereby authorized to negotiate with each Borrower the amount of Rebates payable in connection with particular Loans.  Bank shall deliver to Lender a Receipt relating to each Loan.

3.   <u>Loan Opportunities</u>.  Bank shall treat Lender equitably with other lenders of like circumstances in making lending opportunities available to it hereunder, taking into account the demand for specific securities, availability of securities, types of collateral, eligibility of borrowers, limitations on investments of cash collateral and such other factors as Bank deems appropriate. Bank shall nevertheless have the right to decline to make any Loans pursuant to any Securities Borrowing Agreement and to discontinue lending under any Securities Borrowing Agreement in its sole discretion and without notice to Lender.

4.   <u>Use of Book-Entry System and Depositories</u>.  Lender hereby authorizes Bank on a continuous and on-going basis, to deposit in the Book-Entry System and the applicable Depositories all Securities eligible for deposit therein and to utilize the Book-Entry System and Depositories to the extent possible in connection with its receipt and delivery of Securities, Collateral, Approved Investments and monies under this Agreement. Where Securities, Collateral and Approved Investments eligible for deposit in the Book-Entry System or a Depository are transferred to Lender hereunder, Bank shall identify as belonging to Lender a quantity of securities in a fungible bulk of securities shown on Bank's account on the books of the Book-Entry System or the applicable Depository. Securities, Collateral and Approved Investments deposited in the Book-Entry System or a Depository will be represented in accounts which include only assets held by Bank for customers, including but not limited to accounts in which Bank acts in a fiduciary or agency capacity.

- 4 -

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES

Lender hereby represents and warrants to Bank, which representations and warranties shall be deemed to be continuing and to be reaffirmed on any day that a Loan is outstanding, that:

(a) This Agreement is, and each Loan will be, legally and validly entered into, does not, and will not, violate any statute, regulation, rule, order or judgment binding on Lender, or any provision of Lender's plan document, or any agreement binding on Lender or affecting its property, and is enforceable against Lender in accordance with its terms, except as may be limited by bankruptcy, insolvency or similar laws, or by equitable principles relating to or limiting creditors' rights generally;

(b) The person executing this Agreement and all Authorized Persons acting on behalf of Lender has and have been duly and properly authorized to do so;

(c) It is lending Securities as principal for its own account and will not transfer, assign or encumber its interest in, or rights with respect to, any Loans;

(d) All Securities in the Account are free and clear of all liens, claims, security interests and encumbrances and no such Security has been sold. Lender shall promptly deliver to Bank a Certificate identifying any and all Securities which are no longer subject to the representations contained in this sub-paragraph (d);

(e) The Committee is an "authorizing fiduciary" within the meaning of Prohibited Transaction Exemption 82-63, issued by the U.S. Department of Labor on April 6, 1982, under ERISA; and

(f) No Borrower nor any affiliate of any Borrower has discretionary authority or control with respect to the investment of Lender's assets involved in Loans hereunder, or renders investment advice (within the meaning of 29 CFR 2510.3-21(c)) with respect to those assets.

### ARTICLE IV
### SECURITIES LENDING TRANSACTIONS

1. <u>General Bank Responsibilities</u>. (a) Bank shall enter Loans pursuant to the Securities Borrowing Agreement and take all actions deemed necessary or appropriate in order to perform on Lender's behalf thereunder, including receiving Collateral having a Market Value of not less than the Collateral Requirement, collecting Distributions and applicable Securities Loan Fees, and demanding additional Collateral from the appropriate Borrowers when the Market Value of Collateral received by Bank from such Borrowers is less than the then current Market Value of all of the

- 5 -

Loaned Securities. Whenever Bank demands additional Collateral pursuant to the foregoing, such additional Collateral together with the Collateral then held by Bank in connection with Loans shall have a Market Value of not less than the Collateral Requirement.

(b) Bank shall administer all Loans in accordance with ERISA Prohibited Transaction Class Exemption 81-6 issued by the Department of Labor, as amended.

2. Approved Investments. (a) Bank is hereby authorized and directed, without obtaining any further approval from Lender, to invest and reinvest all or substantially all of the Cash Collateral received in any Approved Investment. Bank shall credit all Collateral, Approved Investments and Proceeds received with respect to Collateral and Approved Investments to the Collateral Account and mark its books and records to identify Lender's interest therein as appropriate, it being understood that all monies credited to the Collateral Account may for purposes of investment be commingled with cash collateral held for other lenders of securities for whom Bank acts as their respective agent. Bank reserves the right, in its sole discretion, to liquidate any Approved Investment and credit the net proceeds to the Collateral Account.

(b) Lender may deliver to Bank a Certificate from time to time instructing Bank not to make Approved Investments with particular financial institutions or issuers.

(c) All Approved Investments shall be for the account and risk of Lender. To the extent any loss arising out of Approved Investments results in a deficiency in the amount of Collateral available for return to a Borrower, Lender agrees to pay Bank on demand cash in an amount equal to such deficiency.

(d) Except as otherwise provided herein, all Collateral, Approved Investments and Proceeds credited to the Collateral Account shall be controlled by, and subject only to the instructions of, Bank, and Bank shall not be required to comply with any instructions of Lender with respect to the same.

3. Termination of Loans. (a) Bank shall terminate any Loan as soon as practicable (but no later than five Business Days) after:

(i) receipt by Bank of a notice of termination from a Borrower;

(ii) receipt by Bank of Written Instructions to do so;

(iii) receipt by Bank of a Certificate instructing it to delete the Borrower to whom such Loan was made from the list referred to in Article I, paragraph 6 hereof;

(iv) receipt by Bank of a Certificate advising that the Loaned Security is no longer subject to the representations contained in Article III, sub-paragraph (d) hereof;

(v) receipt by Bank of notice or a Certificate advising that an Event of Default (as defined in the Securities Borrowing Agreement) has occurred and is continuing beyond any applicable grace period;

(vi) whenever Bank, in its sole discretion, elects to terminate such Loan; or

(vii) termination of this Agreement.

(b) Upon termination of any Loan (which shall be effected according to the standard settlement time for trades in the particular Loaned Security) and receipt from the Borrower of the Loaned Securities (or the equivalent thereof in the event of reorganization, recapitalization or merger of the issuer of the Loaned Securities) and any Distributions then due, Bank shall return to the Borrower such amount of Collateral as is required by the Securities Borrowing Agreement and pay the Borrower any Rebates then payable.

(c) In order for Bank to timely settle the sale of Loaned Securities, it shall be Lender's responsibility to ensure prompt notification to Bank regarding any such sale.

4.   Securities Loan Fee. Bank shall receive any applicable Securities Loan Fee paid by Borrowers and credit all such amounts received to the Collateral Account.

5.   Guarantee and Subrogation. (a) If as a result of an Act of Insolvency or any other reason a Borrower fails to return any Loaned Securities, Bank shall take all actions which it deems necessary or appropriate to liquidate Approved Investments and Collateral in connection with Loans to such Borrower and, unless advised by Lender to the contrary, shall make a reasonable effort for two Business Days (the "Replacement Period") to apply the proceeds thereof to the purchase of Securities identical to the Loaned Securities (or the equivalent thereof in the event of a reorganization, recapitalization or merger of the issuer) not returned. If during the Replacement Period the Collateral liquidation proceeds are insufficient to replace any of the Loaned Securities not returned, Bank shall, subject to satisfaction of Lender's obligations under paragraph 2(c) of this Article, pay such additional amounts as are necessary to make such replacement. Purchases of replacement Securities shall be made only in such markets, in such manner and upon such terms as Bank shall consider appropriate in its sole discretion. Replacement Securities shall be credited to the Account upon receipt by Bank. If Bank is unsuccessful in purchasing any replacement Securities during the Replacement Period, the proceeds of the liquidation of Approved Investments and Collateral pursuant hereto shall be credited to

- 7 -

the Account, and Bank shall, subject to satisfaction of Lender's obligations under paragraph 2(c) of this Article, credit to the Account cash in an amount (if any) equal to (X) the Market Value of the Loaned Securities not returned, minus (Y) the Collateral liquidation proceeds, such calculation to be made on the date of such credit.

(b) Lender agrees, without the execution of any documents or the giving of any notice, that Bank is and will remain subrogated to all of Lender's rights under the Securities Borrowing Agreement or otherwise (to the extent of any credit pursuant to paragraph 5(a) above), including but not limited to, Lender's rights with respect to Loaned Securities and Distributions, and Collateral, Approved Investments and Proceeds. Lender agrees to execute and deliver to Bank such documents as Bank may require and to otherwise fully cooperate with Bank to give effect to its rights of subrogation hereunder.

(c) Bank shall have no obligation to take any actions pursuant to Section 5(a) above if it believes that such action will violate any applicable statute, regulation, rule, order or judgment. Furthermore, except as provided in Section 5(a), Bank shall have no other liability to Lender relating to any Borrower's failure to return Loaned Securities and no duty or obligation to take action to effect payment by a Borrower of any amounts owed by such Borrower pursuant to the Securities Borrowing Agreement.

(d) Either party may terminate the provisions of paragraph 5(a) above with respect to any Borrower at any time by delivery of a notice to the other party specifying a termination date not earlier then the date of receipt of such notice by the other party. No such termination shall be effective with respect to then existing rights of either party under this Section 5 or outstanding Securities Loans hereunder.

(e) Bank may offset any amounts payable by Lender under this Agreement against amounts payable by Bank under paragraph 5(a) of this Article.

ARTICLE V
CONCERNING BANK

1. <u>Standard of Care; Reimbursement</u>. (a) Bank shall not be liable for any costs, expenses, damages, liabilities or claims (including attorneys' and accountants' fees) incurred by Lender, except those costs, expenses, damages, liabilities or claims arising out of the negligence, bad faith or wilful misconduct of Bank, or any failure by Bank to act in accordance with Prohibited Transaction Class Exemption 81-6. Bank shall have no obligation hereunder for costs, expenses, damages, liabilities or claims (including attorneys' and accountants' fees), which are sustained or incurred by reason of any action or inaction by the Book-Entry System or any Depository or their respective successors or nominees. To the extent permitted by ERISA, Bank shall not be

liable for special, indirect or consequential damages, or lost profits or loss of business, arising under or in connection with this Agreement, even if previously informed of the possibility of such damages and regardless of the form of action.

(b)  Except for any costs or expenses incurred by Bank in performing its obligations pursuant to paragraph 5(a) of Article IV hereof, Lender agrees to reimburse Bank and to hold it harmless from and against any and all costs, expenses, damages, liabilities or claims, including reasonable fees and expenses of counsel, to the extent permitted by applicable laws and regulations including Prohibited Transaction Class Exemption 82-63, which Bank may sustain or incur or which may be asserted against Bank by reason of or as a result of any action taken or omitted by Bank in connection with operating under this Agreement, other than those costs, expenses, damages, liabilities or claims arising out of the negligence, bad faith or wilful misconduct of Bank. The foregoing shall be a continuing obligation of Lender, its successors and assigns, notwithstanding the termination of any Loans hereunder or of this Agreement. Bank may charge any amounts to which it is entitled hereunder against the Account. Actions taken or omitted in reliance upon Oral or Written Instructions, any Certificate, or upon any information, order, indenture, stock certificate, power of attorney, assignment, affidavit or other instrument reasonably believed by Bank to be genuine or bearing the signature of a person or persons reasonably believed to be authorized to sign, countersign or execute the same, shall be conclusively presumed to have been taken or omitted in good faith.

2.   No Obligation to Inquire.  Without limiting the generality of the foregoing, Bank shall be under no obligation to inquire into, and shall not be liable for, the validity of the issue of any Securities, Collateral or Approved Investments held in the Account or Collateral Account, or the legality or propriety of any Loans hereunder.

3.   Reliance on Borrowers' Statements, Representations and Warranties.  Provided that it acts with reasonable care, Bank shall be entitled to rely upon the most recently available audited and unaudited statements of financial condition and representations and warranties made by Borrowers, and Bank shall not be liable for any loss or damage suffered as a result of any such reliance.

4.   Advances; Credits to Account.  (a) Bank may, in its sole discretion, advance funds to Lender in order to pay to Borrowers any Rebates or to return to Borrowers Cash Collateral to which they are entitled. Bank may also credit the Account or Collateral Account with Securities Loan Fees payable by Borrowers prior to its receipt thereof. Any such credit shall be conditional upon receipt by Bank of final payment and may be reversed to the extent final payment is not received.

(b) Lender agrees to repay Bank on demand the amount of any advance or any other amount owed by Lender hereunder plus accrued interest at a rate per annum (based on a 360-day year for the actual number of days involved) not to exceed the fed funds rate as publicly announced to be in effect from time to time, such rate to be adjusted on the effective date of any change in such fed funds rate, but in no event less than 6% per annum.

5. <u>Advice of Counsel</u>. Bank may, with respect to questions of law, apply for and obtain the advice and opinion of counsel and shall be fully protected with respect to anything done or omitted if said action or omission is otherwise within the standard of care and obligations set forth elsewhere within this Agreement and done in conformity with such advice or opinion, provided Bank has selected such counsel in accordance with such standard of care.

6. <u>No Collection Obligations</u>. Bank shall be under no obligation or duty to take action to effect collection of, or be liable for, any amounts payable in respect of Securities or Approved Investments if such Securities or Approved Investments are in default, or if payment is refused after due demand and presentation. Bank shall, at Lender's costs and expense, take reasonable action to assist Lender's collecting any such amounts payable.

7. <u>Pricing Services</u>. Bank is authorized to utilize any recognized pricing information service in order to perform its valuation responsibilities with respect to Loaned Securities, Collateral and Approved Investments, and Lender agrees to hold Bank harmless from and against any loss or damage suffered or incurred as a result of errors or omissions of any such pricing information service.

8. <u>Agent's Fee</u>. For its performance as Lender's agent in making and administering Loans, Lender shall pay to Bank a fee, accrued daily, equal to 40% of the sum of all interest, dividends and other distributions earned from Approved Investments and Securities Loan Fees paid or payable by the relevant Borrowers, net of Rebates paid by Bank to relevant Borrowers and brokerage commissions incurred in making Approved Investments. Bank is authorized, on a monthly basis, to charge its fees and any other amounts owed by Lender hereunder against the Account and/or Collateral Account.

9. <u>Reliance On Certificates and Instructions</u>. Bank shall be entitled to rely upon any Certificate, Written or Oral Instruction actually received by Bank and reasonably believed by Bank to be duly authorized and delivered. Lender agrees to forward to Bank Written Instructions confirming Oral Instructions in such manner so that such Written Instructions are received by Bank by the close of business of the same day that such Oral Instructions are given to Bank. Lender agrees that the fact that such confirming Written Instructions are not received or that contrary instructions are received by Bank shall in no way affect

the validity or enforceability of the transactions authorized by Lender. In this regard, the records of Bank shall be presumed to reflect accurately any Oral Instructions given by an Authorized Person or a person believed by Bank to be an Authorized Person.

10. Disclosure of Account Information. It is understood and agreed that Bank is authorized to supply any information regarding the Account or Collateral Account which is required by any statute, regulation, rule or order now or hereafter in effect.

11. Statements. Bank will at least monthly furnish Lender with statements relating to Loans hereunder.

12. Force Majeure. Bank shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, acts of God; earthquakes; fires; floods; wars; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, transportation, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority; governmental actions; or inability to obtain labor, material, equipment or transportation.

13. No Implied Duties. Bank shall have no duties or responsibilities whatsoever except such duties and responsibilities as are specifically set forth in this Agreement, and no covenant or obligation shall be implied against Bank in connection with this Agreement.

## ARTICLE VI
## TERMINATION

This Agreement may be terminated at any time by either party upon delivery to the other party of a written notice specifying the date of such termination, which shall be not less than 5 days after the date of receipt of such notice. Any termination shall be without penalty to Lender. Notwithstanding any such notice, this Agreement shall continue in full force and effect with respect to all Loans outstanding on the date of termination.

## ARTICLE VII
## MISCELLANEOUS

1. Exclusivity. Lender agrees that it shall not enter into any other agreement with any third party whereby such third party is permitted to make loans on behalf of Lender of Securities held by Bank from time to time.

2. Certificates. Lender agrees to furnish to Bank a new Certificate in the event that any present Authorized Person ceases to be an Authorized Person or in the event that any other Authorized Persons are appointed and authorized. Until such new

- 11 -

Certificate is received, Bank shall be fully protected in acting upon Oral Instructions or signatures of the present Authorized Persons.

3. <u>Notices</u>. (a) Any notice or other instrument in writing, authorized or required by this Agreement to be given to Bank, shall be sufficiently given if addressed to Bank and received by it at its offices at 101 Barclay Street, New York, New York 10286, Attention: Securities Lending Division, or at such other place as Bank may from time to time designate in writing.

(b) Any notice or other instrument in writing, authorized or required by this Agreement to be given to Lender shall be sufficiently given if addressed to Lender and received by it at its office at 515 South Avenue 19, P.O. Box 31915, Los Angeles, CA 90031-0915, or at such other place as the Committee may from time to time designate in writing.

4. <u>Cumulative Rights and No Waiver</u>. Each and every right granted to Bank hereunder or under any other document delivered hereunder or in connection herewith, or allowed it by law or equity, shall be cumulative and may be exercised from time to time. No failure on the part of Bank to exercise, and no delay in exercising, any right will operate as a waiver thereof, nor will any single or partial exercise by Bank of any right preclude any other or future exercise thereof or the exercise of any other right.

5. <u>Severability</u>. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations shall not in any way be affected or impaired thereby, and if any provision is inapplicable to any person or circumstances, it shall nevertheless remain applicable to all other persons and circumstances.

6. <u>Amendments</u>. This Agreement may not be amended or modified in any manner except by a written agreement executed by both parties.

7. <u>Successors and Assigns</u>. This Agreement shall extend to and shall be binding upon the parties hereto, and their respective successors and assigns; provided, however, that this Agreement shall not be assignable by either party without the written consent of the other.

8. <u>Governing Law; Consent to Jurisdiction; Waiver of Immunity</u>. Except to the extent superseded by federal law, this Agreement shall be construed in accordance with the laws of the State of New York, without regard to conflict of laws principles thereof. Lender hereby consents to the jurisdiction of a state or federal court situated in New York City, New York in connection with any dispute arising hereunder. To the extent that in any jurisdiction Lender may now or hereafter be entitled to claim, for

itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, Lender irrevocably agrees not to claim, and it hereby waives, such immunity.

9.  <u>No Third Party Beneficiaries</u>. In performing hereunder, Bank is acting solely on behalf of Lender and no contractual or service relationship shall be deemed to be established hereby between Bank and any other person.

·10.  <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument.

11.  <u>SIPA NOTICE</u>. THE PROVISIONS OF THE SECURITIES INVESTOR PROTECTION ACT OF 1970 MAY NOT PROTECT LENDER WITH RESPECT TO LOANS HEREUNDER AND, THEREFORE, THE COLLATERAL DELIVERED TO BANK AS AGENT FOR LENDER MAY CONSTITUTE THE ONLY SOURCE OF SATISFACTION OF A BORROWER'S OBLIGATION IN THE EVENT SUCH BORROWER FAILS TO RETURN THE LOANED SECURITIES.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective corporate officers, thereunto duly authorized, as of the day and year first above written.

By: _____James Willson_____       By: _____Marvin Kropke_____

Title: _____Chairman_____          Title: _____Secretary_____

THE BANK OF NEW YORK

By: _____

Title: _____

erisasl.
(7/96)

# EXHIBIT B

## ASSIGNMENT, ASSUMPTION, AND CONSENT AGREEMENT
(Securities Lending Agreement and Guaranty and
Global Securities Lending Supplement)

THIS ASSIGNMENT, ASSUMPTION AND CONSENT AGREEMENT (the "Assignment"), effective as of _June 02_ 2008 (the "Effective Date"), among SOUTHERN CALIFORNIA IBEW-NECA DEFINED CONTRIBUTION PLAN (the "Lender"), THE BANK OF NEW YORK, (the "Assignor") and MELLON BANK, N.A., (the "Assignee").

### WITNESSETH:

WHEREAS, the Board of Trustees of the Southern California IBEW-NECA Pension Trust (the Pension Trust") and the Assignor have entered into a Securities Lending Agreement and Guaranty dated as of May 29, 1998 (each as amended, restated or otherwise modified from time to time, the "Agreement") pursuant to which the Assignor has been appointed by as agent for the purpose of lending securities (i) from the Account of the Pension Trust; and, (ii) separately, from the account of the Southern California IBEW -NECA Defined Contribution Plan ; and

WHEREAS, the Assignee has been appointed as agent and/or subcustodian of the Assignor with respect to the securities of the Lender; and

WHEREAS, the Lender wishes to appoint the Assignee as agent for the purpose of lending securities from the account of the Lender and, for such purpose, the Assignor wishes to assign to the Assignee, and the Assignee to assume from Assignor, all of the Assignor's interest in and to, and rights and obligations under, the Agreement to the extent of, and with respect to , the Lender (but not the Pension Trust which shall remain with the Assignor) to the same extent as though separate Agreements had been executed with respect to each of the Pension Trust and the Lender; and .

NOW, THEREFORE, the parties hereto, each intending to be legally bound, do hereby agree as follows:

1.    Definitions; Separate Agreements. Capitalized terms used in this Assignment which are not otherwise defined herein shall have the meaning assigned to such terms in the Agreement, provided, however, that, there shall be deemed to exist separate agreements between the Assignor and the Pension Trust on the one hand and the Assignor and the Lender on the other and references herein to the "Agreement" shall be deemed to refer to the Agreement as between the Assignor and the Lender and "Lender" as used in such Agreement shall be deemed to refer to the Southern California IBEW -NECA Defined Contribution Plan to the same extent as though a direct party thereto.

2.    Assignment and Assumption.   From and after the Effective Date, the Assignor hereby irrevocably assigns and transfers to the Assignee, and the Assignee hereby takes and

assumes from the Assignor all of the Assignor's right, title and interest in and to, together with all of the Assignor's duties, liabilities and obligations under and in connection with, the Agreement with respect to the Lender..

3.  Consent. Acknowledgment.  The Lender hereby consents to the assignment and assumption of the Agreement with respect to the Lender as contemplated hereby.  The Assignee acknowledges and agrees to be bound in all respects to the terms of the Agreement with respect to the Lender (to the same extent as though separate from the Agreement as it pertains to the Pension Trust) from and after the Effective Date to the same extent as though an original signatory thereto. From and after the Effective Date, all references in the Agreement to "Bank" shall be deemed to refer to the Assignee to the same extent as though a signatory thereto with respect to the Lender.

4.  Authority.  Each of the parties represents and warrants to the other that it has full authority to enter into this Assignment, Assumption, and Consent upon the terms and conditions hereof, waives any applicable notice requirements in the Agreement with respect to this Assignment, and that the individual executing this Assignment on its behalf has the requisite authority to bind the parties to this Assignment.

IN WITNESS WHEREOF, the parties hereto, by their duly authorized officers, have executed this Assignment, Assumption, Consent and Amendment Agreement as of the date listed above.

SOUTHERN CALIFORNIA IBEW-
NECA DEFINED CONTRIBUTION
PLAN

By: _____
Name: _____
Title: _____
Date: _____

MELLON BANK, N.A.

By: _____
Name:  DAVID C. WHITNEY
Title:  First Vice President
Date:  JUNE 24, 2008

THE BANK OF NEW YORK

By: _____
Name:  NADI P. DUNLEAVY
Title:  VICE PRESIDENT
Date:  JUNE 24, 2008

# EXHIBIT C

## BANK OF NEW YORK

Securities Lending Guidelines

I.   **Investment Assignment**

Bank of New York will be given full discretion within the scope of these mutually agreed upon investment guidelines. Bank of New York will be responsible for reviewing these guidelines with the Board of Trustees at least annually to assure they remain prudent. Bank of New York shall discharge its management in a prudent manner, always keeping the best interest of the participants clearly in mind.

II.   **Investment Objectives**

The investment objectives for Bank of New York will be to earn a sufficient return necessary to profit from the lending of securities.  Absolute safety of principal is paramount over all other considerations.

III.   **Investment Guidelines**

It is the intention of the Board of Trustees to allow the investment manager full investment discretion within the scope of these mutually agreed upon investment guidelines.   The investment manager must adhere to the following investment guidelines unless explicitly authorized in writing by the Board of Trustees to do otherwise.

**Fixed Income Securities:** shall be comprised of U.S. Government and Federally Sponsored Agency Securities; Corporate Notes/Bonds rated A or higher by at least one major credit agency; Asset Backed Securities rated A or higher  by at least one major credit agency, commercial paper rated A1/P1; domestic certificates of deposit and time deposits rated A1/P1; repurchase agreements collateralized at a minimum of 102% with securities allowed under this investment policy statement.   All securities must be dollar denominated.

**Derivatives:** The portfolio manager shall not use derivatives to increase portfolio risk above the level that could be achieved in the portfolio using only traditional investment securities. Moreover, the portfolio manager will not use derivatives to acquire exposure to changes in the value of assets or indexes that by themselves would not be purchased for the portfolio.  Under no circumstances will the portfolio manager undertake an investment that is non-covered or leveraged to the extent that it would cause portfolio duration to exceed limits specified above. The portfolio manager will report on the use of derivatives on a quarterly basis to the Board of Trustees.

**Diversification:** The fixed income securities should be well diversified to avoid undue exposure to any single economic sector, industry, or individual security. Except for securities issued by the U.S. Government, its agencies, and repurchase agreements, no more than 5% of the fixed income portfolio based on market value shall be invested in securities of any one issuing entity at the time of purchase.

**Prohibited Investments:** The Portfolio will not engage in investment transactions involving derivative instruments as defined in the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards No. 133, including but not limited to: stock options, short sales, futures, forwards, SWAPs, purchase on margin, letter stocks, private placement securities, commodities, Inverse Interest only CMO's, Inverse Floater CMO's, and Z Bonds. No investments shall be made in foreign securities, except American Depository Receipts (ADRs) or foreign securities listed in U.S. exchanges. Further, no investment transactions shall occur outside the United States and no asset of the Fund shall be held outside the jurisdiction of the United States District Courts.

**Quality and Marketability:** Short Term securities (1 year or less) shall be limited to those issuers who have a minimum short-term credit rating of A1/P1 by Standard & Poor's and Moody's respectively. Longer Term Fixed income securities, unless specifically noted otherwise, shall have a minimum credit rating of A or better by at least one credit agency. Should the rating on any bond purchased subsequently be reduced below " investment grade" or cease to be rated, sale of the issue shall not be required except as warranted by investment considerations.

**Maturity:** The maximum weighted maturity of the portfolio may not exceed 90 days and the final maturity of any single security may not exceed 2 years.

IV. **Maximum Lending Term:** Securities within the portfolio can not be lent for a period to exceed two days.

V. **Prohibited Borrowers:** Securities within the portfolio cannot be lent to Wertheim Schroder & Company, Inc.

VI. **Statement of Acknowledgment**

As an authorized representative of Bank of New York, provider of investment management services to the Southern California I.B.E.W. - N.E.C.A. Defined Contribution Plan, I hereby acknowledge receipt on behalf of Bank of New York and agree on behalf of Bank of New. York to conduct the investment management services in accordance with the terms of this addendum as well as the Investment Policy Statement as set by the Board of Trustees.

Date: _9 - 13 . ?✓_          Signature