UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- X

                                                     :

THE BOARD OF TRUSTEES OF THE SOUTHERN    :
CALIFORNIA IBEW-NECA DEFINED CONTRIBUTION  :
PLAN, *on behalf of itself and all others similarly situated,*  :
                                                     :   09-CV-6273 (RMB) (AJP)

                             Plaintiff,        :

                                                       :   **Electronically filed**

        vs.                                                       :

                                                       :

THE BANK OF NEW YORK MELLON CORPORATION  :
and BNY MELLON, NATIONAL ASSOCIATION,        :
*formerly known as* MELLON BANK, N.A.,             :
                                                       :

                            Defendants.     :

                                                       :

------------------------------------------------------------------------- X

## MEMORANDUM OF LAW OF DEFENDANTS THE BANK OF NEW YORK MELLON CORPORATION AND BNY MELLON, N.A. <u>IN SUPPORT OF RULE 12(b)(6) MOTION TO DISMISS AMENDED COMPLAINT</u>

 

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York , New York  10022
Telephone:  (212) 446-2300

*Attorneys for Defendants The Bank of New York*
*Mellon Corporation and BNY Mellon, N.A.*

November 9, 2009

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................1

THE ALLEGATIONS IN THE AMENDED COMPLAINT .......................................................3

A.      The Securities Lending Agreement Between the Bank and the Board .............................3

        1.      The Board Authorized the Investment Guidelines, and Retained
                the Power to Direct and Control the Investments of Its Collateral. ........................4

        2.      The Board Willingly Agreed to the Fee Arrangement, and
                Retained the Right to Terminate the Agreement at any Time. ...............................5

B.      The Investment of Collateral ............................................................................................5

LEGAL STANDARD ...........................................................................................................7

ARGUMENT .......................................................................................................................7

I.      THE AMENDED COMPLAINT LACKS FACTUAL
       CONTENT THAT WOULD PERMIT A REASONABLE INFERENCE
       THAT THE BANK IS LIABLE FOR THE ALLEGED MISCONDUCT .........................7

        A.      The Amended Complaint Does Not
               Give Rise to a Reasonable Inference that the Bank's
               Investment of Collateral in a Lehman Bond Was Unlawful. ...................................8

        B.      The Amended Complaint Does Not Give Rise to a
               Reasonable Inference that the Bank Unlawfully Invested
               Plan Assets in Generically Defined "Risky Investments." ...................................11

        C.      The Amended Complaint Alleges in Only the Most
               Conclusory Fashion that the Fee Arrangement Constituted Misconduct. .............13

II.     THE *IN PARI DELICTO* DOCTRINE BARS THE BOARD'S CLAIMS. .....................13

        A.      Courts Regularly Apply the *In Pari*
               *Delicto* Doctrine to Dismiss Federal Claims. .......................................................14

        B.      The Amended Complaint Makes Clear that the
               Board's Culpability for Any Losses to the Plan Is at
               Least Substantially Equal to the Alleged Culpability of the Bank. .......................15

1.    If the Allegations in the Amended Complaint Are Credited, then the Board Bears Primary Culpability for Permitting Plan Assets to Be Placed in Allegedly Imprudent Investments. ................15

2.    If the Allegations in the Amended Complaint Are Credited, then the Board Bears Primary Culpability for Agreeing to the Fee Arrangement. ....................................18

C.    Public Policy Considerations Militate in Favor of Applying the *In Pari Delicto* Doctrine to Bar the Board's Claims........................19

III.    THE COURT SHOULD DISMISS COUNT II BECAUSE THE LIMITATIONS PERIOD EXPIRED BEFORE THE BOARD FILED ITS COMPLAINT..........................................................20

IV.    COUNT II FAILS TO STATE A CLAIM BECAUSE ERISA § 406 IS INAPPLICABLE TO THE FEE ARRANGEMENT. ............................21

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

### Cases

*Alter v. Bogoricin*,
No. 97 CIV. 0662 (MBM), 1997 WL 691332 (S.D.N.Y. Nov. 6, 1997)................................10

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009).............................................................1, 2, 7, 8, 9, 15, 16, 24

*ATSI Comms., Inc. v. Shaar Fund. Ltd.*,
493 F.3d 87 (2d Cir. 2007)..................................................................................7

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985)...............................................................................13, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2006)...........................................................................2, 7, 9, 11

*BrandAid Mktg. Corp. v. Bliss*,
462 F.3d 216 (2d Cir. 2006).................................................................................15

*Carey v. IBEW Local 363 Pension Plan*,
201 F.3d 44 (2d Cir. 1999)..................................................................................21

*Chao v. Merino*,
452 F.3d 174 (2d Cir. 2006).................................................................................9

*In re Dublin Secs., Inc.*,
133 F.3d 377 (6th Cir. 1997) ...............................................................................20

*First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*,
No. C-03-02013RMW, 2006 WL 2228941 (N.D. Cal. Aug. 3, 2006) ......................................9

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998)......................................................................16

*Jiminez v. Pioneer Diecasters*,
549 F. Supp. 677 (C.D. Cal. 1982) ........................................................................19

*Ladouceur v. Credit Lyonnais*,
--- F.3d ----, No. 07-4040-cv, 2009 WL 3104039 (2d Cir. Sep. 30, 2009)...........................3, 15

*Liss v. Smith*,
991 F. Supp. 278 (S.D.N.Y. 1998)....................................................................15, 17, 19

*Marshall County Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ........................................................................................22

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985) ........................................................................................................20

*Nisselson v. Lernout*,
  469 F.3d 143 (1st Cir. 2006) .....................................................................................14, 20

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
  322 F.3d 147 (2d Cir. 2003) ............................................................................................14

*Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*,
  437 F.3d 1145 (11th Cir. 2006) .......................................................................................14

*Oechsner v. Connell Ltd. P'ship*,
  283 F. Supp. 2d 926 (S.D.N.Y. 2003) .............................................................................21

*Rogers v. McDorman*,
  521 F.3d 381 (5th Cir. 2008) ...........................................................................................14

*Ross v. Bolton*,
  904 F.2d 819 (2d Cir. 1990) ............................................................................................14

*Schoenholtz v. Doniger*,
  657 F. Supp. 899 (S.D.N.Y. 1987) ..................................................................................19

*UCAR Int'l Inc. v. Union Carbide Corp.*,
  119 Fed. Appx. 300 (2nd Cir. 2004) ...............................................................................14

*United States v. Ho*,
  94 F.3d 932 (5th Cir. 1996) ...............................................................................................9

<u>Rules and Statutes</u>

Fed. R. Civ. P. 8 .........................................................................................................................7

Fed. R. Civ. P. 12 ..................................................................................................................1, 14

29 U.S.C. § 1002 ....................................................................................................................3, 18

29 U.S.C. § 1104 ..................................................................................................1, 6, 17, 18, 19

29 U.S.C. § 1105 ....................................................................................................16, 17, 18, 19

29 U.S.C. § 1106..................................................................1, 3, 6, 18, 21, 22, 23, 24, 25

29 U.S.C. § 1107.......................................................................................................23

29 U.S.C. § 1108.......................................................................................................22

29 U.S.C. § 1109...................................................................................................18, 20

29 U.S.C. § 1113.....................................................................................................2, 20

29 U.S.C. § 1132.......................................................................................................20

U.S. Dept. of Labor, Prohibited Transaction Exemption 81-6,
    46 F.R. 7527 (Jan. 23, 1981).................................................................................5, 22

U.S. Dept. of Labor, Prohibited Transaction Exemption, 82-63
    47 F.R. 14804 (Apr. 6, 1982)................................................................................22

U.S. Dept. of Labor, Prohibited Transaction Exemption 2006-16,
    71 F.R. 63786 (Oct. 31, 2006) ..............................................................22, 23, 24, 25

Pursuant to Fed. R. Civ. P. 12(b)(6), defendants The Bank of New York Mellon Corporation and BNY Mellon, N.A. (together, the "Bank") respectfully request that the Court dismiss the Amended Complaint of plaintiff The Board of Trustees (the "Board") of the Southern California IBEW-NECA Defined Contribution Plan (the "Plan"). The dismissal should be with prejudice, as the Board has already amended its original pleading.

## PRELIMINARY STATEMENT

This is a putative class action lawsuit brought by a large, sophisticated investor that, in the wake of the unprecedented events of the financial crisis, is attempting to recoup an alleged loss through litigation. The Board's two-count Amended Complaint (abbreviated herein as "AC") purports to state claims for violations of the Employee Retirement Income Security Act of 1974 ("ERISA") alleging (1) that the Bank's placement of the Board's assets in what the Board generically calls "risky investments" constitutes a violation of ERISA § 404(a)(1) (Count I); and (2) that the compensation arrangement between the Board and the Bank – under which the Bank receives compensation only if the Bank generates revenue for the Board – violates ERISA § 406(b)(1) (Count II).[1] The Court should dismiss both Counts.

The Amended Complaint lacks the "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). It alleges that the Bank's investment of a portion of the Plan's assets in a Lehman Brothers bond has decreased in value by approximately $2.5 million, but does not allege that the Bank knew or should have known that the market value of the Lehman

---

[1] ERISA § 404(a)(1) requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," and to act "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. §§ 1104(a), (a)(1). ERISA § 406(b)(1) prohibits a plan fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

bond would drop.  The Amended Complaint's glib allegations regarding Lehman – and other unidentified investments that are not even alleged to have lost value – are the sort of "naked assertions devoid of further factual enhancement" that the Supreme Court has deemed insufficient to state a claim for relief.  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557; internal alteration and quotation marks omitted).

Even if the Amended Complaint's conclusory allegations could be viewed as stating claims for violations of ERISA, it should nevertheless be dismissed under the doctrine of *in pari delicto*, because the Amended Complaint makes clear that Board itself bears primary responsibility for the alleged violations.  Throughout the Amended Complaint, the Board alleges that the "risky investments" violated ERISA, but simultaneously acknowledges that the Board (1) agreed to the investment guidelines pursuant to which the Bank invested the Plan's assets, and (2) maintained complete authority at all times to monitor, direct and control the Bank's investment of the Plan's assets.  Likewise, the Board alleges that the compensation arrangement between the Board and the Bank violates ERISA, but admits that the Board, while acting as a Plan fiduciary, knowingly entered into that arrangement more than eleven years ago, and – to this day – never terminated it despite the Board's undisputed authority to do so.  Thus, the Board, itself an ERISA fiduciary, seeks to shift the blame to the Bank for acts which, if improper as alleged, the Board had the authority and fiduciary duty to prevent.  In such circumstances, dismissal is appropriate under the *in pari delicto* doctrine.

Count II of the Amended Complaint should be dismissed for two additional reasons.  First, Count II is untimely.  The challenged fee arrangement is in a contract executed by the Board more than eleven years ago, but the limitations period for ERISA fiduciary duty claims is three years after a plaintiff had knowledge of a breach.  *See* 29 U.S.C. § 1113(2).  Second, Count

II fails because, pursuant to a Department of Labor exemption, ERISA § 406(b)(1) does not apply to securities lending transactions.

**THE ALLEGATIONS IN THE AMENDED COMPLAINT**

**A.      The Securities Lending Agreement Between the Bank and the Board**

The Board's Complaint arises from a contractual relationship between the Board and the Bank, pursuant to which the Board became a lender in a securities lending program (the "Program") administered by the Bank.  AC ¶¶ 15-19.  The Board is the trustee and plan administrator of the Plan, which currently has 15,211 participants, and the Board itself is a fiduciary of the Plan under ERISA.  *Id.* ¶ 4; *see also id.*, p. 1 (alleging in preamble that Board is member of purported class of "fiduciaries ('Class Members') of other similarly situated retirement plans"); 29 U.S.C. § 1002(21)(A) ("a person is a fiduciary with respect to a plan to the extent … he has any discretionary authority or discretionary responsibility in the administration of such plan."); *Ladouceur v. Credit Lyonnais*, --- F.3d ----, No. 07-4040-cv, 2009 WL 3104039, at *2 (2d Cir. Sep. 30, 2009) (stating that "ERISA imposes a fiduciary duty on plan administrators").

The Amended Complaint admits that there are "potential risks involved in securities lending, including borrower bankruptcy, collateral deficiencies, and challenges with settlements, corporate actions, or dividends and interest."  AC ¶ 13.  With knowledge of these risks, the Board enrolled in the Program in 1998 by entering into a Securities Lending Agreement (the "Agreement") with the Bank, pursuant to which the Bank agreed to act as the Board's agent and lend securities owned by the Plan (the "Loaned Securities") to "approved 'credit-worthy' borrowers."  *Id.* ¶¶ 15, 19.  In a lending transaction under the Program, the Bank, as agent for the

3

Board, collects collateral from the borrower worth at least 102% of the market value of the Loaned Securities (the "Collateral").  *Id.* ¶ 20.

> **1.    The Board Authorized the Investment Guidelines, and Retained the Power to Direct and Control the Investment of Its Collateral.**

The Agreement requires the Bank to invest the entire cash portion of the Plan's Collateral in "Approved Investments" in accordance with the terms of the "Securities Lending Guidelines" (the "Guidelines").  AC ¶ 23; *id.* at Ex. A, Art. IV.2(a); *id.* at Ex. C.  The Bank must adhere to the Guidelines "unless explicitly authorized in writing by the Board of Trustees to do otherwise." *Id.* at Ex. C, p. 1.  The Guidelines require the Bank to invest the Collateral in "Fixed Income Securities," which "shall" be composed of securities in each of several sub-categories:

1. U.S. Government and Federally Sponsored Agency Securities;

2. Corporate Notes/Bonds rated A or higher by at least one major credit agency;

3. Asset Backed Securities rated A or higher by at least one major credit agency;

4. commercial paper rated A1/P1;

5. domestic certificates of deposit and time deposits rated A1/P1;

6. repurchase agreements collateralized at a minimum of 102% with securities allowed under this investment policy statement.

*Id.* at Ex. C, p. 1.  In addition, the Agreement reserved to the Board the power to prohibit the Bank from investing "with particular financial institutions or issuers" by delivering a written notice to the Bank with appropriate instructions.  *Id.* at Ex. A, Art. IV.2(b).  The Board also retained the right to terminate the Agreement "without penalty" to the Plan on five days written notice.  *Id.* at Ex. A, Art. VI.

The Amended Complaint does not – and cannot – allege that the Bank ever invested in anything other than an "Approved Investment," or in a manner that deviated from the "mutually agreed upon" written Guidelines that the Amended Complaint alleges "governed Defendant's

exercise of its fiduciary duties." *Id.* at Ex. C, § 1; *id.* ¶ 26. Moreover, the Amended Complaint does not – and cannot – allege that the Board ever prohibited the Bank from investing in notes issued by Lehman Brothers, although it was within the Board's right to do so.

### 2. The Board Willingly Agreed to the Fee Arrangement, and Retained the Right to Terminate the Agreement at Any Time.

Under the terms of the Agreement, the Bank receives compensation for an investment of the Plan's collateral only to the extent that the investment results in revenue. Where an investment results in revenue, the Agreement provides for a 60/40 split of that revenue between the Plan and the Bank, respectively (the "Fee Arrangement"). AC ¶ 29 & Ex. A, Art. V.8. If an investment results in a loss of principal, which could render the collateral amount insufficient to repay the amount owed to the borrower, then the Plan must pay cash to cover any deficiency. *Id.* ¶ 28. The Agreement exculpates the Bank "for any costs, expenses, damages, liabilities or claims (including attorneys' and accountants' fees) incurred by Lender [*i.e.*, the Plan], except those costs, expenses, damages, liabilities or claims arising out of the negligence, bad faith or willful misconduct of Bank, or any failure by Bank to act in accordance with Prohibited Transaction Class Exemption 81-6." *Id.* ¶ 30 & Ex. A, Art. V.1(a).

### B. The Investment of Collateral

The Amended Complaint alleges generically that the Bank "invested a large percentage of the Collateral in risky investments that were not designed to preserve principal such as asset-backed securities, floating rate notes, and derivatives – investment vehicles that invested in asset-backed securities themselves despite wide spread public knowledge that such investments were inherently risky." AC ¶ 34. The Amended Complaint provides only one example of an allegedly "improper" investment of collateral resulting in an unrealized loss of principal, that being a "Lehman floating rate note purchased on or about March 23, 2007." *Id.* ¶ 41. The Lehman

floating rate note is a corporate note, and thus falls within one of the categories of fixed income securities in which the Guidelines require the Bank to invest the Plan's collateral. *Id.* at Ex. C, p. 1. According to the Amended Complaint, it "was widely known or should have been known among sophisticated investment managers like Defendant that Lehman was heavily invested in asset-backed securities, and that these types of investments were inherently risky." *Id.* ¶ 41.

The Amended Complaint – while admitting that the Board is a fiduciary that had unfettered authority to prohibit investments in any issuer – alleges that "Defendant's investment in such risky investments, but in particular Lehman, exhibits Defendant's imprudence and recklessness in the management and monitoring of the Plan's assets." *Id.* ¶ 51.[2] The Amended Complaint further alleges that "when it became obvious that the Collateral was at risk of loss and in danger of losing principal or becoming illiquid, a reasonably prudent fiduciary would have taken affirmative steps to monitor and change investments to meet the stated and expected goal of preserving the Collateral." *Id.* ¶ 54. The Bank's alleged motivation in making "high risk investments" was purportedly "to maximize its own profits," *id.* ¶ 58, an allegation that is contradicted by the fact that the Agreement makes clear that the Bank would earn revenue only on investments of Plan assets that earned revenue. *Id.* ¶ 29 & Ex. A, Art. V.8.

Count I alleges that the Bank violated ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)) by failing to invest the Collateral in a prudent manner, and by focusing on its own interests in potential profit sharing "without any reasonable regard to losses that could be suffered by the Plans." AC ¶¶ 79-83. Count II alleges that the Bank violated ERISA § 406 by dealing with the

---

[2] The Amended Complaint alleges that the Bank "also invested the Collateral in floating rate notes of other dangerously impaired banks such as Bank of America, SunTrust Bank and Wachovia who, like Lehman, made perilous investments in asset-backed securities." AC ¶ 49. Tellingly, however, it does not allege that the Plan suffered any losses in connection with these alleged investments.

Collateral "in its own interest or for its own account in that it invested the Collateral for the express purpose of making investments for its own financial benefit and earning profits for itself and at the expense of the Plans." AC ¶ 89.

## LEGAL STANDARD

A court should dismiss a complaint under Rule 12(b)(6) if it contains no more than "'naked assertions' devoid of 'further factual enhancement,'" or if it is only "an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949, 1950. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2006)). Likewise, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* at 1950 (citing Fed. R. Civ. P. 8(a)(2); internal quotations and alterations omitted). A plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Comms., Inc. v. Shaar Fund. Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## ARGUMENT

### I.    THE AMENDED COMPLAINT LACKS FACTUAL CONTENT THAT WOULD PERMIT A REASONABLE INFERENCE THAT THE BANK IS LIABLE FOR THE ALLEGED MISCONDUCT.

The Amended Complaint divides the Bank's allegedly imprudent investment choices into two subheadings:  (1) "Investments in Lehman," at paragraphs 40 through 52, and (2) "Risky Investments," at paragraphs 34 through 39.  We address the pleading deficiencies of these two categories in turn, and then address the Amended Complaint's additional failure to offer anything beyond "an unadorned, the-defendant-unlawfully-harmed-me accusation" with regard to its challenge to the Fee Arrangement. *Iqbal*, 129 S. Ct. at 1949.

**A.**    **The Amended Complaint Does Not**
**Give Rise to a Reasonable Inference that the Bank's**
**Investment of Collateral in a Lehman Bond Was Unlawful.**

In *Iqbal*, the Supreme Court directed courts to take a "two-pronged approach" to

determine whether a complaint states a claim. *Iqbal*, 129 S. Ct. at 1950. First, a court should

identify and disregard any "allegations in the complaint that are not entitled to the assumption of

truth." *Iqbal*, 129 S. Ct. at 1951. Allegations in this category include any "legal conclusion

couched as a factual allegation," and formulaic "recitals of the elements of a cause of action,

supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949-50. Second, a court must

evaluate any allegations not disregarded under the first prong of the test and "determine if they

plausibly suggest an entitlement to relief." *Iqbal*, 129 S. Ct. at 1951. The Supreme Court

explained the plausibility standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the defendant is liable for the
> misconduct alleged. The plausibility standard is not akin to a "probability
> requirement," but it asks for more than a sheer possibility that a defendant has
> acted unlawfully. Where a complaint pleads facts that are "merely consistent
> with" a defendant's liability, it "stops short of the line between possibility and
> plausibility of 'entitlement to relief.'"

*Iqbal*, 129 S. Ct. at 1949 (internal citations omitted).

The majority of the Board's allegations about the Lehman investment fail under the first

prong of *Iqbal*, because they are simply legal conclusions with no factual support. For example,

paragraph 51 of the Amended Complaint alleges that "Defendant's investment in such risky

investments, but in particular Lehman, exhibits Defendant's imprudence and recklessness in the

management and monitoring of the Plan's assets." *See also* AC ¶ 60 (alleging that "in violation

of its express duty to use expertise in investing," Bank "invested the Collateral in imprudent

investments . . . in particular Lehman," despite it being "inherently risky beyond that sanctioned

under the Agreements and Guidelines"). The Amended Complaint, however, offers no factual

justification for why such an inference should be drawn. *See Iqbal*, 129 S. Ct. at 1950

("plaintiffs' assertion of an unlawful agreement was a 'legal conclusion'" and, as such, was not

entitled to the "assumption of truth") (citing *Twombly*, 550 U.S. at 555). To be sure, the

Amended Complaint offers numerous hindsight assertions about what a reasonably prudent

fiduciary would have done at various times (*e.g.*, AC ¶¶ 51, 61), but again such allegations are

legal conclusions entitled to no deference.[3]

The Board will likely respond by arguing that its allegation that the Lehman bond lost

more than $2.5 million of value (AC ¶ 41) provides the requisite factual content to survive

dismissal. But the Amended Complaint does not allege that the Bank knew or should have

known about Lehman's ultimate collapse before it happened. Plainly, an allegation that an

investment decreased in value is insufficient, without more, to state a cause of action under

ERISA. *E.g.*, *Chao v. Merino* 452 F.3d 174, 182 (2d Cir. 2006) ("Because the fiduciary's

obligation is to exercise care prudently and with diligence under the circumstances then

prevailing, his actions are not to be judged from the vantage point of hindsight.") (internal

citations and quotations omitted). Indeed, the Amended Complaint expressly recognizes the

many "potential risks involved in securities lending, including borrower bankruptcy, collateral

deficiencies, and challenges with settlements, corporate actions, or dividends and interest." AC

¶ 13. When it entered into the Agreement, the Board acknowledged in writing that "All

Approved Investments shall be for the account and **risk** of Lender." *Id.* ¶ 28 & Ex. A, Art.

IV.2(c) (emphasis added). The Agreement also expressly contemplated the possibility of a "loss

---

[3] *E.g.*, *United States v. Ho*, 94 F.3d 932, 936-37 (5th Cir. 1996) (characterizing question of
whether "a reasonable person with Officer Simone's knowledge and experience would have had
some suspicion" as "a legal conclusion"); *First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, No. C-
03-02013RMW, 2006 WL 2228941, at *12 (N.D. Cal. Aug. 3, 2006) (characterizing question of
whether "a reasonable person in the real estate industry would conclude that the Final Proposal
was not binding" as a legal conclusion).

arising out of Approved Investments" that could result in a "deficiency in the amount of Collateral available for return to a Borrower." *Id.* at Ex. A, Art. IV.2(c). The Court should reject the Board's effort to drag the Bank through the burdens of litigation simply because these "potential risks" came to fruition in the context of a single investment in a multi-million dollar portfolio.

The only other allegations regarding the Lehman investment are quotes from news clips and Internet blogs from the months preceding the Lehman Brothers bankruptcy. *Id.* ¶¶ 42-47. In a classic example of 20/20 hindsight, the Amended Complaint strings together these selected, out-of-context articles to try to create the impression that the Bank (and the rest of the world) should have known that Lehman was doomed from the start. The Amended Complaint (at ¶ 45) points to an Internet posting on the "Huffington Post" website regarding a UBS equity analyst's downgrade of Lehman stock to "neutral" – not "sell," but merely "neutral" – as somehow supporting the notion that the Bank should have known that the market value of the Lehman bond would drop below par. *Id.* ¶ 45. What the Amended Complaint omits, however, is that the next sentence of the posting stated: "On the bright side, Moody's reaffirmed its ratings on Lehman Monday – so maybe the firm can weather the storm." *See* Duffy Decl. Ex. A at 1.[4] Moreover, another media report relied upon in the Amended Complaint (from "Business Week Online") reported that the UBS analyst downgraded "all the financial names he had buy ratings on to neutral" that day, not just Lehman. *See* Duffy Decl. Ex. B at 4.[5] The same article reported

---

[4] Because the Amended Complaint relies heavily on the news articles to support its claims, the Court may consider the entire article in deciding this motion, including portions not quoted in the Amended Complaint. *E.g.*, *Alter v. Bogoricin*, No. 97 CIV. 0662 (MBM), 1997 WL 691332, at *4 (S.D.N.Y. Nov. 6, 1997). The articles discussed herein are as Exhibits A and B to the accompanying Declaration of Christopher E. Duffy.

[5] In any event, debt instruments such as the Lehman floating rate note have a superior payout priority than the equity instruments on which the UBS analyst issued his opinion.

that "Deutsche Bank Securities upheld its *buy rating* on the stock on Mar. 17, declaring in a

research note that Lehman is not Bear." *Id.* at 2 (emphasis added).

>    **B.**    **The Amended Complaint Does Not Give Rise to a**
>            **Reasonable Inference that the Bank Unlawfully Invested**
>            **Plan Assets in Generically Defined "Risky Investments."**

Other than allegations about the investment in Lehman, discussed above, the Amended

Complaint fails to identify ***any*** investment that resulted in any losses to the Plan.  Instead, it

offers sweeping and conclusory assertions regarding the risk profiles of broad categories of

investments.  For example, paragraph 34 alleges that "BNY Mellon invested a large percentage

of the Collateral in risky investments that were not designed to preserve principal such as asset-

backed securities, floating rate notes, and derivatives – investment vehicles that invested in asset-

backed securities themselves despite wide spread public knowledge that such investments were

inherently risky."  The Board repeatedly refers to the "high risk securities," "high risk

investments," "investments that were risky," "risky investment vehicles," "hazardous investment

decisions" and "risky investment strategy" for which it seeks to hold the Bank liable (*e.g.*, AC

¶¶ 2, 34, 55, 56, 58, 61, 76), but fails to identify any investments that suffered losses.  Generic

allegations that investments in unspecified asset-backed securities involved "risk" or "high risk"

do not move the Board's claims "across the line from conceivable to plausible," *Twombly*, 550

U.S. at 570, particularly where the Amended Complaint fails to allege any resultant harm.

Nor does the use of arcane financial terms supply the requisite inference of imprudence.

Terms such as "asset-backed securities" and "floating rate notes" represent broad investment

categories.  Allegations that the Bank invested collateral in these categories is no more probative

of imprudence or disloyalty than an allegation that it invested in other general categories such as

commodity futures, foreign currencies, municipal bonds, or growth-oriented mutual funds.  In

fact, the allegations here prove the opposite, because both asset-backed securities and floating

rate notes ***are expressly approved investments*** under the Guidelines.  AC Ex. C, § 3 (requiring investment of collateral in, among other things, "Corporate Notes/Bonds" and "Asset Backed Securities" rated "A" or higher by a major credit agency).[6]  The Board cannot charge the Bank with liability for investing the collateral in "asset-backed securities" when the Board's own Guidelines approved such investments.

The Amended Complaint's two pages of block quotes from *Wall Street Journal* articles do nothing to support the Board's claims.  *Id.* ¶¶ 35-38.  Contrary to the Board's mischaracterization, these quotes do not constitute a "warning about the risks associated with asset-backed securities," or their allegedly "risky nature."  *Id.* ¶¶ 38, 39.  Rather, they focus on two subjects that are irrelevant to the Amended Complaint:  the sub-prime mortgage market (*id.* ¶¶ 35-36, 38) and the use of financial derivatives by mutual funds (*id.* ¶ 37).  The Amended Complaint never mentions "sub-prime," "mortgage" or "mutual fund" beyond these quotes, and does not link any of its several passing references to "derivatives" to any loss suffered by the Plan.[7]  *Id.* ¶¶ 26, 34, 51, 61.

The Amended Complaint makes some additional allegations in paragraph 27, alleging that the Guidelines require that "No more than 5% of the fixed income portfolio based on market value shall be invested in securities in any one issuing entity at the time of purchase."  AC ¶ 27

---

[6] The Complaint does not allege that the Bank invested the Collateral in instruments with credit ratings lower than an "A" rating.

[7] The Amended Complaint alleges that the Bank's investment of Plan assets in Lehman "caused the Class 'derivative' exposure to [asset backed-securities]."  AC ¶ 51.  This assertion appears to be designed to suggest that the Lehman bond was a financial derivative that violated the Guidelines' prohibition against "the use of derivatives to increase the portfolio risk about the level that could be achieved . . . using only traditional investment securities."  *Id.*  The Amended Complaint's attempt to classify the Lehman bond as a "derivative" is inconsistent with the Agreement, the Guidelines, basic financial terminology, and common sense.  Adoption of the Board's proposed definition of the term "derivative" would mean that every person who has invested in a corporation's stock or bonds is by definition investing in derivatives, by virtue of the fact that the corporation is itself an investor in some other asset class.

(quoting *id.* at Ex. C, Art. III).  The Amended Complaint, however, does not allege that the Bank ever violated this diversification requirement.  Accordingly, the allegation in paragraph 27 cannot support a cause of action.

### C.    The Amended Complaint Alleges in Only the Most Conclusory Fashion that the Fee Arrangement Constituted Misconduct.

Finally, the Amended Complaint contains nothing more than conclusory statements that the Bank breached its fiduciary duties by agreeing with the Board on the terms of the Fee Arrangement.  *E.g.*, AC ¶¶ 82-83.  Indeed, while claiming that the Bank earned "substantial fees and profits" from administration of the Program (*id.* ¶ 82), the Board fails to articulate ***any*** concrete reasons why these fees (which were earned as the result of a revenues generated by the Bank for the Plan) were unreasonable or unfair; nor does it give rise to any such inference.

The Amended Complaint alleges that the Board itself was a participant in the selection of the Fee Arrangement (including the 60/40 revenue split, and the Plan's assumption of all risk of loss), and further alleges that the Fee Arrangement was never modified after 1998 (when the Agreement was executed).  The Amended Complaint does not allege that the Board ever complained to the Bank about the Fee Arrangement, or ever sought to amend it.  Thus, the Board has provided no factual basis to allege that the Fee Arrangement was unreasonable or in any way caused the Bank to breach its fiduciary duty.  *See also* Point II.B, below.

## II.    THE *IN PARI DELICTO* DOCTRINE BARS THE BOARD'S CLAIMS.

The doctrine of *in pari delicto* "derives from the Latin, *in pari delicto potior est conditio defendentis*:  'In a case of equal or mutual fault … the position of the [defending] party … is the better one.'"  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985).  The doctrine arises from the policy that "courts should not lend their good offices to mediating disputes among wrongdoers," because "denying judicial relief to an admitted wrongdoer is an

effective means of deterring illegality." *Id*. Here, the face of the Amended Complaint leaves no

doubt that the Board – itself a fiduciary of Plan participants – bears primary responsibility for

any alleged wrongdoing. Accordingly, the Board has no entitlement to seek relief.

> **A.    Courts Regularly Apply the *In Pari Delicto* Doctrine to Dismiss Federal Claims.**

In the Second Circuit, a defendant may invoke *in pari delicto* as a basis for a Rule

12(b)(6) motion "if the defense appears on the face of the complaint." *Official Comm. of*

*Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir.

2003) (affirming dismissal of claims against accounting firm based on *in pari delicto*); *see also*,

*e.g.*, *UCAR Int'l Inc. v. Union Carbide Corp.*, 119 Fed. Appx. 300, 302 (2d Cir. 2004) (same).

Both the Supreme Court and the Second Circuit have routinely applied the *in pari delicto*

defense to bar federal statutory claims. *See Bateman Eichler*, 472 U.S. at 310-11 (holding

federal securities action barred by plaintiff's own culpability when "(1) as a direct result of his

own actions, the plaintiff bears at least substantially equal responsibility for the violations he

seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective

enforcement of the securities laws and protection of the investing public."); *see also*, *e.g.*, *Ross v.*

*Bolton*, 904 F.2d 819, 825-26 (2d Cir. 1990) (dismissing securities claims based on *Bateman*

*Eichler*); *UCAR Int'l Inc.*, 119 Fed. Appx. at 302.

In determining whether to apply the doctrine to bar a federal claim, courts consider two

factors: (1) "the plaintiffs' active participation in the violation," and (2) "the policy goals of the

federal statute." *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d

1145, 1154 (11th Cir. 2006). (citing *Pinter*, 486 U.S. at 632-33); *see also Nisselson v. Lernout*,

469 F.3d 143, 152 (1st Cir. 2006) (citing *Edwards*, 437 F.3d at 1154); *Rogers v. McDorman*, 521

F.3d 381, 389 (5th Cir. 2008) (quoting *Edwards*, 437 F.3d 1154).  Application of this framework here mandates dismissal of the Amended Complaint.

      **B.**     **The Amended Complaint Makes Clear that the Board's Culpability for Any Losses to the Plan Is at <u>Least Substantially Equal to the Alleged Culpability of the Bank.</u>**

The Amended Complaint alleges that the Bank breached its fiduciary duties by placing the Plan's Collateral in imprudent investments (over which the Board has ultimate authority) (*e.g.*, AC ¶¶ 76-77), and by permitting the implementation of the Fee Arrangement that the Board agreed to in 1998 (*e.g.*, *id.* ¶¶ 82-83).  Accordingly, even if the Amended Complaint stated a claim under *Iqbal*, the claims should nonetheless be dismissed because if misconduct occurred, the Board's misconduct was necessarily "at least substantially equal" to that of the Bank. *BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218 (2d Cir. 2006).

      **1.**     **If the Allegations in the Amended Complaint Are Credited, then the Board Bears Primary Culpability for Permitting <u>Plan Assets to Be Placed in Allegedly Imprudent Investments.</u>**

The Amended Complaint admits that the Board is a fiduciary of the Plan.  AC, p. 1 (alleging in preamble that Board is member of purported class of "fiduciaries ('Class Members') of other similarly situated retirement plans"); *see also*, *e.g.*, *Ladouceur*, 2009 WL 3104039, at *2 (stating that "ERISA imposes a fiduciary duty on plan administrators").  As an "authorizing fiduciary," (AC at Ex. A, Art. III(e)), the Board had the power to authorize the Bank to engage in securities lending operations as the Plan's agent, or to forbid such activities.  Moreover, having authorized the Bank to engage in securities lending, the Board itself had the power to terminate that authority (*id.* at Ex. A, Art. VI).  An ERISA fiduciary's appointment and termination power "carries with it the concomitant duty to monitor" the performance of the appointed fiduciary and "to take action upon discovery that the appointed fiduciaries are not performing properly."  *Liss v. Smith*, 991 F. Supp. 278, 311 (S.D.N.Y. 1998).

Here, if the allegations in the Amended Complaint could be credited with stating a claim against the Bank, it is clear that the Board also failed to fulfill its fiduciary duties. Under the Agreement, any investment the Bank makes must be an "approved investment" under the Guidelines. AC at Ex. A, Art. IV.2(a). Moreover, the Guidelines that instructed the Bank on how to invest the cash collateral were "mutually agreed upon" by the Board and the Bank. *Id.* at Ex. C, § I. The Guidelines require the Bank to "conduct the investment management services in accordance with the terms of this addendum as well as the Investment Policy Statement *as set by the Board of Trustees*." *Id.* at Ex. C, § VI (emphasis added). Despite all of this (which is readily apparent from the Amended Complaint and attachments thereto), the Board asserts that the Bank purportedly had "complete authority or control over the management or disposition of the Collateral" and "was the sole investment fiduciary for investment of the Collateral and the Plan's assets." *Id.* ¶ 25. This unadorned legal conclusion cannot be squared with the facts alleged in the Amended Complaint, and, in any event, is a conclusory assertion entitled to no deference on a motion to dismiss. *Iqbal*, 129 S. Ct. at 1950.

The Amended Complaint does not allege that the Bank invested in anything other than an approved investment, or ever deviated from the Investment Policy Statement set by the Board. Thus, the Board's allegations that investments in Lehman were violations of fiduciary duties (despite the fact they were approved investments under the Guidelines), necessarily mean that the Board itself failed to monitor the Plan collateral and "participate[d] knowingly in … an act or omission of such other fiduciary, knowing such act or omission is a breach," rendering the Board culpable as the Plan's primary fiduciary. 29 U.S.C. § 1105(a)(1); *see also*, *e.g.*, *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 309 (S.D.N.Y. 1998) (applying *in pari delicto* to dismiss action brought by hedge funds because they "were active and voluntary

16

participants in the securities purchases about which they now complain" and "were the central decisionmakers in the allegedly improper purchases they made.").

Moreover, the Amended Complaint alleges that the Bank was investing Plan assets in areas that, if the allegations are to be credited, the entire financial community (including presumably the Board) knew as early as 2006 would lose value. *E.g.*, AC ¶¶ 39, 41. The Amended Complaint makes clear that Plan collateral was invested in Lehman for at least eighteen months – from March 23, 2007 until September 15, 2008 – without any objection or action from the Board. *Id.* ¶ 41. If the investment in Lehman in March 2007, and in unspecified asset-backed securities at unspecified times, were breaches of fiduciary duty, then the Board violated its fiduciary duty to prohibit such investments pursuant to its power under the Agreement, or terminate its participation in the Program. *Liss*, 991 F. Supp. at 311 ("by failing to take appropriate steps to remove Union-appointed trustees who it knew were breaching their fiduciary obligations to the Fund, defendant . . . failed to act solely in the interest of the Fund's participants and beneficiaries . . . in violation of ERISA §§ 404(a)(1)(A) and (B)") (internal citation omitted). This is particularly true where, as here, the Board expressly reserved the right to prohibit any particular investments and/or exit the Program on only five days' notice.

Indeed, the Amended Complaint makes clear that the Board made no "reasonable efforts under the circumstances to remedy the breach," 29 U.S.C. § 1105(a)(3), thus exposing the Board to liability to the extent that the Bank violated ERISA. *See Liss*, 991 F. Supp. at 311 n.37 ("failure to monitor and remove the breaching trustees satisfies both categories (2) and (3)" of ERISA § 405(a)). Additionally, by failing to direct the Bank to take action to preclude or terminate the investments, the Board itself "participated knowingly in an omission" that gave rise to the alleged fiduciary breach by the Bank (*i.e.*, the Board participated knowingly in a failure to

stop the alleged breach).  *See* 29 U.S.C. § 1105(a)(1).  Therefore, to the extent the Bank violated

ERISA, the Board itself is primarily liable under ERISA § 405(a)(1).

> **2.    If the Allegations in the Amended Complaint
> Are Credited, then the Board Bears Primary
> <u>Culpability for Agreeing to the Fee Arrangement.</u>**

The Amended Complaint acknowledges that the Board itself was a participant in the

selection of the Fee Arrangement (*e.g.*, AC ¶ 15), including the 60/40 revenue split, and the

Plan's assumption of all risk of loss (*e.g.*, AC ¶¶ 28-29 & Ex. A, Art. IV.2(c), V.8).  It contains

no allegation that the Fee Arrangement (included at Article V.8 of the Agreement) was ever

modified subsequent to the execution of the Agreement in 1998.  The Amended Complaint does

not allege or give rise to any inference that the Bank wrongly induced the Board into signing the

Agreement, or misrepresented or concealed the Fee Arrangement before the parties executed it.

Thus, if the Fee Arrangement is improper in any way, then the Board is the most culpable party,

because the Board agreed to the structure ***while acting as a fiduciary for the Plan***.[8]

If the Fee Arrangement violated ERISA, then the Board, which entered the arrangement

while acting in a fiduciary capacity, violated ERISA § 404(a)(1), which requires the Board to

discharge its duties "solely in the interest of the participants and beneficiaries."  At the very least,

if, as stated at paragraph 89 of the Amended Complaint, the Fee Arrangement violated ERISA

§ 406(b)(1), then the Board is liable under ERISA § 405(a)(1), because by negotiating, devising

and implementing the purportedly unlawful Fee Arrangement, the Board would have

---

[8]  If the Fee Arrangement was improper, the Board is the only party that could be liable.  The
Bank had no control of the management or disposition of the assets of the Plan before the
Agreement was signed and thus was not a fiduciary of the Plan when the Agreement was
negotiated and executed.  *See* 29 U.S.C. § 1002(21).  ERISA § 409(b) clearly states that a party
such as the Bank cannot "be liable with respect to a breach of fiduciary duty under this
subchapter if such breach was committed before [it] became a fiduciary."  29 U.S.C. § 1109(b).
The Board, by contrast, was already a fiduciary when the Agreement was executed.

"participated knowingly in an act" that it knew was a breach of its fiduciary obligations under ERISA.  The *in pari delicto* doctrine thus bars any claim based on the Fee Arrangement.

### C.    Public Policy Considerations Militate in Favor of Applying the *In Pari Delicto* Doctrine to Bar the Board's Claims.

The policy goals ERISA also weigh in favor of dismissal.  The policy of ERISA is "to protect the interests of plan participants and beneficiaries by deterring fiduciary misconduct." *Schoenholtz v. Doniger*, 657 F. Supp. 899, 916 (S.D.N.Y. 1987) (quoting *Jiminez v. Pioneer Diecasters*, 549 F. Supp. 677, 679 (C.D. Cal. 1982)).  To allow the primary ERISA violator of to escape liability by filing a lawsuit (while still participating in the allegedly improper conduct, no less) inhibits that goal.

Applying *in pari delicto* is particularly appropriate here because of the force of ERISA § 405(a), which imposes liability on a fiduciary for another fiduciary's breach of duty:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a); *see also Liss*, 991 F. Supp. at 311 n.37.

Moreover, dismissal here would not harm the interests of Plan participants because the Plan participants remain free to bring any claims in their own right, without the taint of the Board's own violations.  This is in accord with the holdings of the First and Eleventh Circuits' application of the *in pari delicto* defense in the context of bankruptcy proceedings.  For example,

in *Nisselson*, the First Circuit rejected a bankruptcy trustee's argument that permitting the

assertion of *in pari delicto* defense would harm the otherwise innocent creditors, who ultimately

would receive the fruits of any recovery in the absence of an *in pari delicto* dismissal.  469 F.3d

at 157.  The First Circuit rejected that argument, reasoning that "despite the interposition of the

*in pari delicto* defense, the creditors remain free to proceed in their own right, untainted by [the

bankrupt corporation's] role in the alleged wrongdoing."  *Id.*  The Eleventh Circuit applied the

same reasoning to this argument and reached the same conclusion.  *See Edwards*, 437 F.3d at

1151; *see also In re Dublin Secs., Inc.*, 133 F.3d 377, 380 (6th Cir. 1997) (same).  Just as in

*Nisselson*, *Edwards*, and *Dublin*, dismissal here would not leave Plan participants without the

means to remedy any misconduct, because ERISA § 502(a)(2) grants standing to "a participant"

to bring a civil action "for appropriate relief under section 1109 of this title."  29 U.S.C.

§ 1132(a)(2); *see also Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985).

## III.    THE COURT SHOULD DISMISS COUNT II BECAUSE THE LIMITATIONS PERIOD EXPIRED BEFORE THE BOARD FILED ITS COMPLAINT.

The limitations period for fiduciary duty claims under ERISA is governed by 29 U.S.C.

§ 1113, which states:

> No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
>
> (1)    six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2)    three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

Count II alleges that the Fee Arrangement created "incentives [that] were diametrically opposed to BNY Mellon's fiduciary obligations to Plaintiff, the Plan, the Class Plans, and Class Members." AC ¶ 57. The Amended Complaint alleges that the structure of the Fee Arrangement meant that the Bank "invested the Collateral for the express purpose of making investments for its own financial benefit and earning profits for itself and at the expense of the Plans" and therefore purportedly "violated ERISA § 406." AC ¶ 89.

The Amended Complaint admits, however, that the Board signed the Fee Arrangement in 1998, more than eleven years ago. The Fee Arrangement has remained unchanged since that time. Thus, the Amended Complaint alleges that the Board had actual knowledge no later than May 29, 1998 of what it now characterizes as an unlawful incentive structure. On that basis, the face of the Amended Complaint shows that Count II is untimely and should be dismissed for this independent reason. *See, e.g.*, *Oechsner v. Connell Ltd. P'ship*, 283 F. Supp. 2d 926, 931-34 (S.D.N.Y. 2003) (granting motion to dismiss ERISA claims because "Complaint demonstrates that there can be no question that plaintiffs had all of the relevant information" regarding their asserted claims more than 15 years prior to filing action), *aff'd by summary order*, 101 Fed. Appx. 849 (2d Cir. 2004); *see also*, *e.g.*, *Carey v. IBEW Local 363 Pension Plan*, 201 F.3d 44, 47 (2d Cir. 1999) (holding that ERISA statute of limitations requires "strict adherence").

## IV. COUNT II FAILS TO STATE A CLAIM BECAUSE ERISA § 406 IS INAPPLICABLE TO THE FEE ARRANGEMENT.

Count II alleges that the Bank violated ERISA § 406(b)(1) by dealing with Plan assets, *i.e.*, the collateral, in its own interest. AC ¶ 89.[9] Specifically, the Amended Complaint alleges that the Bank "invested the Collateral for the express purpose of making investments for its own

---

[9] ERISA § 406(b)(1) provides that a "fiduciary with respect to a plan shall not … deal with the assets of the plan in his own interest or for his own account." Count II tracks this language exactly.

financial benefit and earning profits for itself and at the expense of the Plan." AC ¶ 89. In addition to all the reasons addressed above, this claim should be dismissed because the United States Department of Labor (the "DOL") has specifically exempted securities lending transactions from ERISA § 406 claims.

Section 408(a) of ERISA authorizes the DOL to grant exemptions for classes of fiduciaries or particular transactions. 29 U.S.C. § 1108(a). In 2006, the DOL promulgated Prohibited Transaction Exemption ("PTE") 2006-16, 71 F.R. 63786 (Oct. 31, 2006), which became effective on January 2, 2007 and superseded PTE 81-6 and PTE 82-63.[10] Section I(c) of PTE 2006-16 exempts securities lending transactions from ERISA § 406(b)(1). Specifically, it provides that "the restrictions of section 406(b)(1) of ERISA … shall not apply to the payment to a fiduciary (the Lending Fiduciary) of compensation for services rendered in connection with loans of plan assets that are securities, provided that the conditions set forth in section IV below are met." PTE 2006-16, § I(c).[11] The Amended Complaint alleges that the Bank is a fiduciary of the Plan, and that it received compensation for services rendered in connection with lending securities that were Plan assets. *E.g.*, AC ¶¶ 1, 29. Thus, the only remaining requirement for entitlement to the exemption is compliance with Section IV of PTE 2006-16.

Section IV contains five relevant prerequisites for the exemption.

- First, the securities loan at issue must not be prohibited by ERISA § 406(a), or must otherwise satisfy the conditions of the exemption, PTE 2006-16, § IV(a);

---

[10] Courts recognize that "matters of public record, statements in the Federal Register can be examined on 12(b)(6) review." *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993). In evaluating the instant motion, the Court therefore may consider and apply PTE 2006-16, which appears in the Federal Register. Indeed, the Amended Complaint itself cites and relies on another Prohibited Transaction Exemption issued by the DOL. AC ¶ 30.

[11] The text of the exemption, including the sections referenced herein, appears at pages 63795-99, which are available at Exhibit C to the accompanying Declaration of Christopher E. Duffy.

- Second, the "Lending Fiduciary" – here, the Bank – must be "authorized to engage in securities lending transactions on behalf of the plan," PTE 2006-16, § IV(b);

- Third, the compensation must be "reasonable and paid in accordance with the terms of a written instrument," PTE 2006-16, § IV(c);

- Fourth, the arrangement under which the compensation is paid must be "subject to the prior written authorization of a plan fiduciary . . . who is independent of the" Bank and terminable by the plan fiduciary within 5 days (or a shorter negotiated period) without penalty to the plan, PTE 2006-16, §§ IV(d); and

- Fifth, the written authorization may not be made or renewed unless the Lending Fiduciary furnished the authorizing fiduciary with any reasonably available information which the Lending Fiduciary reasonably believes to be necessary to determine whether such authorization should be made or renewed, and any other reasonably available information regarding the matter that the authorizing fiduciary may reasonably request. PTE 2006-16, §§ IV (e).[12]

The Amended Complaint demonstrates that the Board's securities lending arrangement with the Bank (the "Arrangement") satisfies each of the five relevant conditions under Section IV, thus falling squarely within the terms of PTE 2006-16 and entitling the Bank to the exemption provided therein.

- First, the Arrangement is not "prohibited by section 406(a) of ERISA." PTE 2006-16 § IV(a). Section 406(a) prohibits transactions between a plan and a "party in interest." 29 U.S.C. § 1106(a). The Board does not – and cannot – allege that the Arrangement violates § 406(a).[13]

---

[12] A sixth prerequisite is a special provision that only applies to "pooled separate account maintained by an insurance company … or a common or collective trust fund maintained by a bank or trust company supervised by a State or Federal agency" and is, therefore, inapplicable here. PTE 2006-16, §§ IV(f).

[13] The prohibited transactions include selling, exchanging, or leasing property, *see* § 406(a)(1)(A); lending money or extending credit, *see* § 406(a)(1)(B); furnishing goods, services, or facilities, *see* § 406(a)(1)(C); transferring assets of the plan or using such assets for the benefit of the party in interest, *see* § 406(a)(1)(D); acquiring, on behalf of the plan, an employer security or employer real property in violation of § 407(a), *see* § 406(a)(1)(E); and permitting a plan to hold any employer security or real property in violation of certain percentage limitations established by § 407(a).

- Second, the Bank is "authorized to engage in securities lending transactions on behalf of the plan." PTE 2006-16, § IV(b). By entering into the Agreement, the Plaintiff authorized the Bank to engage in securities lending on behalf of the Plan. AC Ex. A, Art. II.1.

- Third, compensation paid to the Bank in connection with the Arrangement "is reasonable and is paid in accordance with the terms of a written instrument." PTE 2006-16, § IV(c). The Amended Complaint makes clear that fees paid to the Bank were paid pursuant to the Agreement, a written instrument that was willingly signed by the Board. AC Ex. A, Art. V.8. The Amended Complaint does not include any well-pleaded allegations that the Bank's compensation was unreasonable, and does not allege any facts that could lead to a plausible inference in that regard.[14] Indeed, under the Agreement, the Bank would receive compensation only if the investments of Plan Collateral generated revenue for the Plan. For any Collateral investment that resulted in a loss, the Bank would receive no compensation for its efforts. AC Ex. A, Art V.8.

- Fourth, the Agreement's Fee Arrangement is "subject to the prior written authorization of a plan fiduciary … who is independent of" the Bank, and the Arrangement is terminable within the "time negotiated for such notice of termination by the plan." PTE 2006-16, § IV(d). Article V.8 of the Agreement establishes the Fee Arrangement, and thus qualifies as a prior written authorization. AC Ex. A, Art. V.8. The Board authorized the Fee Arrangement by executing the Agreement. *Id.* at Ex. A, p. 1. The Board is independent from the Bank and its affiliates, and nothing in the Amended Complaint alleges otherwise. Finally, the Agreement gives the Board the right to terminate the entire Agreement (including the Fee Arrangement) on 5 days notice and "without penalty" to the Board. *Id.* at Ex. A, Art. VI.

- Fifth, the Bank has furnished the Board with "any reasonably available information which [the Bank] reasonably believes to be necessary to determine whether such authorization should be made or renewed, and any other reasonably available information regarding the matter that the [Board] may reasonably request." PTE 2006-16, § IV(e). The Amended Complaint contains no allegation that the Bank withheld any information that the Board reasonably requested.

---

[14] While the Complaint offers a conclusory and unsupported legal conclusion that the Fee Arrangement was "in violation of ERISA § 406," the Supreme Court has instructed courts to disregard "allegations in the complaint that are not entitled to the assumption of truth," including any "legal conclusion couched as a factual allegation," and threadbare, formulaic "recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949-50, 1951. To the extent that the Complaint suggests that the Fee Arrangement was unreasonable, its suggestion is not well-pleaded and not entitled to the presumption of truth under the first prong of the *Iqbal* analysis.

Thus, the Arrangement meets each of the five relevant conditions of Section IV of PTE 2006-16, and ERISA § 406(b)(1) does not apply to the Arrangement. *See* PTE 2006-16, § I(c). Accordingly, the Court should dismiss Count II of the Amended Complaint for this independent reason.

## **CONCLUSION**

For the reasons stated above, the Bank respectfully requests that the Court dismiss the Board's Amended Complaint with prejudice.

Dated: November 9, 2009          Respectfully submitted,
       New York, New York

                           /s/
                      Damien J. Marshall
                      dmarshall@bsfllp.com
                      BOIES, SCHILLER & FLEXNER LLP
                      401 East Las Olas Boulevard, Suite 1200
                      Fort Lauderdale, Florida 33301
                      Tel.: 954-356-0011
                      Fax: 954-356-0022

                      Christopher E. Duffy
                      cduffy@bsfllp.com
                      BOIES, SCHILLER & FLEXNER LLP
                      575 Lexington Avenue, 7th Floor
                      New York, New York 10022
                      Tel.: 212-446-2300
                      Fax: 212-446-2350

                      *Attorneys for Defendants Bank of New*
                      *York Mellon Corp. and BNY Mellon, N.A.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a true and correct copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT to be served via ECF, electronic mail and U.S. Mail on November 9, 2009 to Plaintiff through its counsel:

> Stephen R. Astley
> COUGHLIN STOIA GELLER RUDMAN &
>   ROBBINS LLP
> 120 East Palmetto Park Road, Suite 500
> Boca Raton, Florida  33432

_____/s/_____

Christopher E. Duffy
