UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

THE BOARD OF TRUSTEES OF THE     :
SOUTHERN CALIFORNIA IBEW-NECA   :
DEFINED CONTRIBUTION PLAN, On    :
Behalf of Itself and All Others Similarly   :
Situated,                                    :

                Plaintiff,       :

    vs.                                   :

THE BANK OF NEW YORK MELLON     :
CORPORATION, et al.,                  :

               Defendants.     :

                                        :

——————————————————————— x

Civil Action No. 09-cv-06273 (RMB)(AJP)

CLASS ACTION

**DEMAND FOR JURY TRIAL**

## <u>THIRD AMENDED CLASS ACTION COMPLAINT</u>

Plaintiff the Board of Trustees, on behalf of the Southern California IBEW-NECA Defined

Contribution Plan (the "Plan"),[1] and a class of all other similarly situated trustees, administrators,

and other fiduciaries ("Class Members") of other similarly situated retirement plans ("Class Plans")

(the Plan and the Class Plans may collectively be referred to as the "Plans"), brings this class action

against BNY Mellon, National Association, formerly known as Mellon Bank, N.A. ("BNY Mellon,

N.A."), The Bank of New York, and The Bank of New York Mellon (hereinafter collectively "BNY

---

[1]     The Plan is the real party in interest to this action, and operates through the Board of
Trustees, its advisors, investment managers, and investment consultants. The Board of Trustees is
the nominal plaintiff in this action. Hereinafter, for ease of reference, the Plan and the Board of
Trustees will be referred to collectively as the "Plaintiff."

**REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009**

Mellon" or "Defendant") and states as follows:[2]

## I.      SUMMARY OF THE ACTION

1.      Defendant is a sophisticated financial institution that represents itself as the "global leader in the securities lending industry." In 1998, Defendant, who served as the Plan's custodian, encouraged Plaintiff to participate in BNY Mellon's Securities Lending Program ("SLP") as a means to offset custodial fees associated with maintaining its trust funds. As part of this program, Defendant promised to act as Plaintiff's agent to invest securities loaned by Plaintiff to approved borrowers in return for collateral that it would prudently manage and invest while ensuring the safety of principal above all other considerations. Defendant agreed that it would invest the collateral received to earn a modest return for Plaintiff.

2.      Enticed by the ability to offset its custodial fees, Plaintiff entered into a Securities Lending Agreement and Guaranty (the "Agreement") with Defendant, a sophisticated financial institution. Under the Agreement, Defendant provided investment management services to Plaintiff as its fiduciary under the Employee Retirement Income Security Act ("ERISA"). Defendant had *full discretion* to loan Plaintiff's securities to borrowers in return for cash and non-cash collateral (the "Collateral"). Defendant also had *full discretion* to invest the Collateral. While Plaintiff kept abreast of the performance of the SLP through presentations made by Defendant, Plaintiff relied on Defendant to make prudent investment decisions as required by ERISA, the Agreement, the Securities Lending Guidelines (the "Guidelines") executed by the parties, correspondence, and Plaintiff's Investment Policy Statement ("IPS"). The clear investment objective under each was to

---

[2]      The allegations contained herein are based on discovery produced to date. However, there are many notable deficiencies in Defendant's document production. Accordingly, Plaintiff reserves its right to add to or amend any of the allegations contained herein upon the completion of the discovery process.

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

earn a sufficient return to ensure safety of principal over all other considerations.  Under the Agreement, Defendant was paid 40% of any profit earned from Collateral investments but had no liability if the investments lost money, except due to its negligence, bad faith, willful misconduct, or failure to act in accordance with the Prohibited Transaction Class Exemption 81-6.

3.     As Plaintiff's Investment Manager, Defendant made various investments with Plaintiff's Collateral.  In particular, it invested the Collateral in a Lehman Brothers Holdings, Inc. ("Lehman") floating rate note ████████████████ purchased on March 23, 2007 (the "Lehman Note").[3]  Beginning in 2007, and continuing into 2008, it became increasingly apparent to the market and Defendant, that there was tremendous uncertainty surrounding Lehman's financial stability.  By August of 2008, Defendant's concern about Lehman's financial uncertainty was so great that Defendant, who was also one of a handful of clearing banks for Lehman, required additional collateral from Lehman as a required condition to allow Lehman to continue its operations with Defendant.  ████████████████████████████████

████████████████████████████████████

████████████████████████

4.     Despite Defendant's concerns regarding Lehman's stability and its own actions to minimize its exposure to a Lehman default, Defendant surprisingly took no action with respect to the Collateral investments it made on behalf of Plaintiff and the Class.  Although Defendant could have divested the Lehman Note and other similar Lehman investments at any point during 2007 through 2008, and significantly minimized or eliminated any losses, Defendant held on to the Lehman investments.  In such a way, Defendant took a gamble with Plaintiff's and the Class Plans' money

---

[3]     The Lehman Note had a maturity date of March 23, 2009.

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

for which it bore no risk of loss. Defendant took this gamble because under the Agreement, Defendant had no risk of loss but was paid 40% of any profit. As a result of this "heads I win, tails you lose" paradigm, Defendant had no incentive to modify its unauthorized and risky investment strategy, and made no attempt to do so, because it was the beneficiary of all profits, and would not be responsible for any losses.

5.      Defendant lost its gamble when Lehman declared bankruptcy on September 15, 2008, and Plaintiff and the Class Plans suffered more than a billion dollars in losses. Defendant's gamble of holding on to the Lehman investments violated the Agreement, the Guidelines, the IPS, and its fiduciary duties under ERISA. In particular, Defendant violated the Guidelines, the IPS, and ERISA by: (1) failing to adhere to the key objective of safety of principal and corpus being paramount over all other considerations; (2) failing to diversify the Collateral investments; (3) imprudently maintaining the investments in Lehman despite growing uncertainty over Lehman's financial stability; and (4) acting in its own self-interest by failing to modify its risky investment strategy because it was the beneficiary of all the profits but none of the losses.

6.      This action seeks to recover losses caused by Defendant's breaches of its fiduciary duty to the Plaintiff and the Class Plans. Defendant's misconduct caused the Plan and the Class Plans to lose both principal and profits that would have been earned but for Defendant's misconduct, and resulted in substantial losses. Defendant's acts and omissions, as herein described, are breaches of fiduciary duty under ERISA §404(a) and are prohibited transactions that violate ERISA §406, which entitle the Plans, pursuant to ERISA §502(a)(2), to recover appropriate relief under ERISA §409 and, pursuant to ERISA §502(a)(3), to enjoin acts which violate ERISA. *See* 29 U.S.C. §§1104(2), 1106, 1132(a)(2)-(3) and 1109(2).

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

## II.    PARTIES

### 1.    Plaintiff

7.    The Plan was established on June 1, 1985, and is located at 6023 Garfield Avenue, City of Commerce, California.  The Plan currently has approximately 15,221 participants.

8.    The Board of Trustees is the trustee of the Plan.

### 2.    Defendant

9.    Until their merger in 2007, Mellon Financial Corporation ("Mellon Corp.") and The Bank of New York Company, Inc. ("BNY") were the respective holding companies for Mellon Bank, N.A., a nationally-chartered bank, and **The Bank of New York**, a state-chartered bank under the laws of New York.   Through their respective banks, Mellon Corp. and BNY operated independent securities lending programs servicing hundreds of clients.  Then, on July 7, 2007, the holding companies merged to form The Bank of New York Mellon Corporation ("BNY Mellon Corp."), with their respective operations consolidated thereunder.  Mellon Bank, N.A. later changed its name to **BNY Mellon, N.A.,** and The Bank of New York became **The Bank of New York Mellon**.[4]  At all relevant times, collectively and/or individually, the foregoing banks had authority and control over the investment of the Plans' Collateral and the liquidation thereof.

10.    Headquartered in New York, BNY Mellon is a leading asset management and securities services company, providing investment management, asset and fund administration, and fiduciary and banking solutions for corporations, institutions and affluent individuals worldwide. BNY Mellon, through its Asset Servicing division, managed the Plans' cash investments that are at issue in this case.  BNY Mellon has offices in 27 U.S. states, as well as international offices in

---

[4]    This process of consolidation was completed on or about July 1, 2008.

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

Europe, South America, the Middle East and Africa, and the Asia-Pacific region, among other international locations, serving more than 100 markets worldwide. As of March 31, 2009, BNY Mellon has $19.5 trillion in assets under custody or administration and $881 billion under management.[5]

## III.   JURISDICTION AND VENUE

11.     Plaintiff seeks relief for the Plans under the civil enforcement remedies provided by ERISA against fiduciaries pursuant to ERISA §§404, 406, 409 and 502(a) (29 U.S.C. §§1104, 1106, 1109, 1132). This Court has exclusive jurisdiction over this action and the Defendant pursuant to 28 U.S.C. §§1331, 1332, and ERISA §§502(e)(1) and (2) (29 U.S.C. §§1132(e)(1) and (2)).

12.     Venue of this action in the Southern District of New York is proper pursuant to ERISA §502(e)(2) (29 U.S.C. §1132(e)(2)) and 28 U.S.C. §1391 because Defendant maintains its headquarters in the district, Defendant's breaches took place in the district, and because Plaintiff consented to venue in New York City, New York pursuant to the Agreement dated May 29, 1998.

## IV.   FACTUAL ALLEGATIONS

### A.   The Securities Lending Relationship

#### 1.   BNY Mellon Served as Custodian for Plan Assets



---

[5]     The Bank of New York Mellon, About Us, At a Glance, http://www.bnymellon.com/about/ ataglance.html (last visited June 1, 2009).

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

███████████████████████████████████████████████████

███████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

**2.  Defendant Encourages Plaintiff to Participate in its Securities Lending Program to Offset Custodial Fees**

15.  ████████████████████████████████████████████

████████████████████████  BNY Mellon began its SLP in 1977,[7] and as of June 2006,

BNY Mellon's SLP had more than $1 trillion in lendable securities.  Securities lending refers to the

lending of securities by one party to another.  The terms of the loan are governed by a securities

lending agreement, which requires that the borrower provide the lender with collateral in the form of

---

[6]     BNY Western Trust Company was a subsidiary of The Bank of New York that served as Plaintiff's Co-Trustee prior to the merger with Mellon Bank.

[7]     The Bank of New York Mellon, Securities Lending, http://www.mellon.com/securities lending/index. html (last visited May 13, 2009).

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

cash, government securities or a letter of credit of value equal to or greater than the loaned securities. The primary reason for borrowing securities is market making, hedging, and arbitrage trading purposes.

16.     As an intermediary between the lender and the borrower and as an agent on behalf of the lender, BNY Mellon invests the collateral provided by the borrower in accordance with specific investment guidelines agreed upon between BNY Mellon and the lender which require BNY Mellon to invest the collateral in investments that provide a "steady return while focusing upon the preservation of principal, interest rate sensitivity and credit risk."[8]

17.     BNY Mellon represents that it delivers value to its clients through "a disciplined process of generating returns and managing risk, while focusing on maximizing client flexibility."[9] According to BNY Mellon, its SLP adds value to a portfolio while operating within strict risk parameters and fiduciary responsibilities by:[10]

- Lending to only the most credit worthy borrowers at equal or better than prevailing market rates;

- Maintaining minimum collateral levels through a daily mark-to-market process;

- *Conservative investment* of cash collateral with goals of optimizing returns while *preserving principal*;

---

[8]     The Bank of New York Mellon, Securities Lending, http://www.mellon.com/ securitieslending/index.html (last visited May 13, 2009).

[9]     The Bank of New York Mellon, Securities Lending, http://www.mellon.com/ securitieslending/ index.html (last visited May 13, 2009).

[10]    Unless otherwise noted, all emphasis is added.

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

- Equitable, systemic allocation of lending opportunities, regardless of portfolio size.[11]

18.     Despite the potential risks involved in securities lending, including borrower bankruptcy, collateral deficiencies (*i.e.*, the value of collateral investments depreciates), and challenges with settlements, corporate actions, or dividends and interest, BNY Mellon nevertheless extolled that a main objective of its program is "the ***preservation of principal*** by maintaining a prudent level of liquidity, implementing policies and procedures to monitor and control our investment guidelines, monitoring the quality of our issuers, and performing regularly scheduled tests to identify the interest rate sensitivity of our investment portfolio."[12]

19.     The SLP investments were also to be made in accordance with Rule 2a-7 of the Investment Company Act of 1940, which provides requirements regarding the credit quality, diversification and maturity guidelines for investments in money market funds.  Money market funds are designed to limit investors' exposure to credit, market, and liquidity risks.  To that end, the securities comprising money market funds must be highly liquid and of the highest quality. Rule 2a-7 carefully prescribes the overall composition of money market funds' portfolios.  Maturity guidelines are outlined for individual securities as well as the portfolio as a whole.  Eligible securities are defined and classified by tiers according to credit quality, maturity, and ratings.  A variety of diversification requirements are based on security type, security classification and issuer. Moreover, funds must perform an independent credit analysis for every security purchased -- reliance on credit ratings agencies alone, is insufficient.

---

[11]     The Bank of New York Mellon, Securities Lending, http://www.mellon.com/ securitieslending/about.html (last visited May 13, 2009).

[12]     The Bank of New York Mellon, Securities Lending, http://www.mellon.com/ securitieslending/index.html (last visited May 13, 2009).

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

[REDACTED]

### 3. Plaintiff's and the Class Plans' Securities Lending Agreements and Guaranties

23.     On or about May 29, 1998, Plaintiff entered into the Agreement.[13]  The Agreement governs BNY Mellon's standardized SLP.  Upon information and belief, the Agreement executed by and between Plaintiff and Defendant is materially similar to Securities Lending Agreements

---

[13]     A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

executed by and between Defendant and the members of the Class on behalf of the Class Plans ("Agreements").[14]

24.     Under the terms of the Agreement, Defendant was appointed as Plaintiff's "agent to lend securities in the Account to Borrowers from time to time." As agent for the Plans, Defendant had *full discretion* to lend securities owned by the Plans to approved "credit-worthy" borrowers pursuant to a securities borrowing agreement. These borrowers typically needed the securities for their own short-term market-making or arbitrage purposes.

25.     In order to protect the Plans' securities from a borrower's default, the Agreement required borrowers to post Collateral as security for the return of the loaned securities. Under the Agreement, borrowers were required to post Collateral that, at all times, had a market value of not less than *102% of the then current market value* of the loaned securities as of the close of the preceding business day (the "Collateral Requirement"). If the market value of the Collateral received from the borrower fell below the 102% Collateral Requirement, the Agreement required BNY Mellon to demand additional Collateral from the borrower in order to assure the market value of the Collateral was never less than the Collateral Requirement. Under the Agreement, BNY Mellon would be responsible for replacing any loaned securities that were not returned by a borrower (*e.g.*, in the event of a borrower's default). Exhibit A, Article V.

26.     Pursuant to the Collateral Requirement, borrowers provided the Collateral to BNY Mellon, as agent for the Plans, as security for the return of the loaned securities. Defendant, as *agent*

---

[14]     On or about June 20, 2008, Plaintiff, on behalf of the Plan, the Bank of New York, and Mellon Bank, N.A. executed an Assignment, Assumption, and Consent Agreement (the "Assignment"). The names of these parties later changed as is indicated in n.4 above. A true and correct copy of the Assignment is attached hereto as **Exhibit B**. The Assignment concerns BNY Mellon's standardized SLP. Upon information and belief, the Assignment executed by and between Plaintiff and Defendant is materially similar to Assignments executed by and between Defendant and the members of the Class on behalf of the Class Plans.

**REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009**

for the Plans, held the Collateral in approved collateral accounts (the "Collateral Account"). The Plans each held an interest in the Collateral Account based on their outstanding loan balances. Exhibit A, Article IV 2(a).

27.     As part of the SLP, Defendant then invested the Collateral in its *full discretion* as a means of earning a modest return that would offset the cost of the custodial fees otherwise being charged to Plaintiff and the Class Plans.

28.     Under the Agreement, BNY Mellon would not share in any losses resulting from Collateral investments. Rather, the Agreement states that "[a]ll Approved Investments shall be for the account and risk of Lender [the Plans]." *See* Exhibit A. To the extent any loss arising out of Collateral investments results in a deficiency in the amount of Collateral available for return to a Borrower, the lender agrees to pay cash in an amount equal to such deficiency. *See* Exhibit A, Article IV.2.(c).

29.     Although BNY Mellon does not share in any Collateral investment losses, under the terms of the Agreement, BNY Mellon collects a fee, "accrued daily, equal to 40% of the sum of all interest, dividends and other distributions earned from Approved Investments and Securities Loan Fees paid or payable by the relevant Borrowers, net of Rebates paid by Bank to relevant Borrowers and brokerage commissions incurred in making Approved Investments." *See* Exhibit A, Article V ¶8. In other words, BNY Mellon receives 40% of the profits from Collateral investments even though it bears none of the risk of loss.

30.     Significantly, however, the Standard of Care section of the Agreement provides that, "Bank shall not be liable for any costs, expenses, damages, liabilities or claims (including attorneys' and accountants' fees) incurred by Lender, *except those costs, expenses, damages, liabilities or claims arising out of the negligence, bad faith or willful misconduct of Bank, or any failure by*

- 12 -

***Bank to act in accordance with Prohibited Transaction Class Exemption 81-6.***" *See* Exhibit A, Article V.1.(a).

### 4.      The Securities Lending Guidelines

31.      Pursuant to the Agreement, BNY Mellon had ***full discretion*** to invest the Collateral pursuant to the Guidelines, which specifically prescribed how Defendant was to invest the Collateral pursuant to the Agreement.[15] Upon information and belief, the Guidelines executed by and between Plaintiff and Defendant are materially similar to the Guidelines executed by and between Defendant and members of the Class on behalf of the Class Plans.

32.      The Guidelines provided that Defendant had "***full investment discretion*** within the scope of these mutually agreed upon investment guidelines." Exhibit C, Article III.   Accordingly, Defendant was the sole investment fiduciary responsible for investment of the Collateral and the Plans' assets in the Collateral Account and had complete authority and control over the management and disposition of the Collateral.

33.      In addition to vesting Defendant with "full investment discretion," the Guidelines stated that "Bank of New York shall discharge its management ***in a prudent manner***, always keeping the ***best interest of the participants*** clearly in mind." *See* Exhibit C.  The Guidelines also made clear that in investing the Collateral, "***[a]bsolute safety of principal is paramount over all other considerations***." *Id.* at Article II.

34.      The Guidelines also provided several specific investment rules.  Among others, they provided that Defendant, by and through "[t]he portfolio manager ***shall not use derivatives*** to increase portfolio risk above the level that could be achieved in the portfolio using only traditional

---

[15]      A true and correct copy of the Guidelines is attached hereto as **Exhibit C**.

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

investment securities." Exhibit C, Article III.  Moreover, with respect to diversification, the

Guidelines provided that "[t]he fixed income securities *should be well diversified to avoid undue*

*exposure* to any single economic sector, industry, or individual security." *Id.*  The guidelines further

stated that "[n]o more than 5% of the fixed income portfolio based on market value shall be invested

in securities in any one issuing entity at the time of purchase." *Id.* at Article III.

      35.    In executing the Guidelines, Defendant signed the following acknowledgement:

> As an authorized representative of Bank of New York, *provider of investment
> management services* to the Southern California I.B.E.W. – N.E.C.A. Defined
> Contribution Plan, I hereby acknowledge receipt on behalf of Bank of New York and
> agree on behalf of Bank of New York to *conduct investment management services*
> in accordance with the terms of this addendum *as well as the Investment Policy
> Statement* as set by the Board of Trustees.

*See* Exhibit C.

      36.    In such a way, Defendant acknowledged that it was an Investment Manager with

respect to Plaintiff's securities lending portfolio.  Moreover, it acknowledged its required adherence

to the Plaintiff's IPS.

      **5.    The Investment Policy Statement**



---

[16]    A true and correct copy of the IPS  is attached hereto as **Exhibit D.**

**REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009**



### 6.     Defendant's Fiduciary Duties Under ERISA

41.     BNY Mellon is a fiduciary in that it exercised authority or control over the management or disposition of the assets of the Plans.

42.     Defendant is also a fiduciary in its capacity as an Investment Manager of Plaintiff and the Class Plans' assets under the SLP, as defined by ERISA.  29 U.S.C. §1002(38).   Defendant managed, acquired, and disposed of Plan assets in its administration of Plaintiff's securities lending portfolio, and acknowledged such in the Guidelines, stating that it agreed "to conduct the investment

- 15 -

management services" contemplated by and outlined in the Agreement, the Guidelines, and IPS.

Additionally, BNY Mellon qualifies as a banking institution organized under the laws of the United

States in accordance with the Investment Advisers Act of 1940.

43.     Pursuant to ERISA §404(a)(1) (29 U.S.C. §1104(a)(1)), Defendant had the following

duties:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan;
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> >
> > (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
> >
> > (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

44.     Defendant also had the duty to refrain from engaging in prohibited transactions.

Section 406(b)(1) of ERISA (29 U.S.C. §1106(b) (1)) provides, in pertinent part, that

- 16 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

(b)   Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not-

(1)   deal with the assets of the plan in his own interest or for his own account, . . .

45.   Under this statute, Defendant has a duty to act prudently by employing proper methods to investigate, evaluate and structure investments made with Plaintiff's and the Class Plans' Collateral.  Defendant is also required to act in a manner as would others who have the capacity and familiarity with such matters.  In addition, Defendant was required to exercise independent judgment when making investment decisions.  Blanket reliance upon the ratings issued by ratings agencies does not suffice as such independent judgment.  Furthermore, Defendant's responsibilities with respect to the investments made with Plaintiff's and the Class Plans' Collateral do not terminate upon the decision to invest.  Defendant's fiduciary duties under ERISA are continuous, and, accordingly, Defendant has an ongoing duty to monitor the investments made with Plaintiff's and the Class Plans' Collateral with reasonable diligence and to dispose of any inappropriate investments.

**B.   The Investments**

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████
█████████████████████████████████████████

48.     This limitation on liability is also reflected by ERISA.  As Defendant was hired by the Board of Trustees as an Investment Manager to its SLP, under ERISA, the Board of Trustees is not liable for any acts or omissions of BNY Mellon in its administration of the securities lending portfolio.  29 U.S.C. §1105(d)(1).  Likewise, the Board of Trustees is not required to invest or otherwise manage the Plan's securities lending assets that were subject to BNY Mellon's management.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

- 18 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

51.   ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████

52.     In its capacity as a sophisticated fiduciary and Investment Manager of Plaintiff and the Class Plans' Collateral, Defendant purchased many types of securities purportedly for the benefit of the Class.  Among these securities, Defendant purchased and held various floating rate notes ("FRNs") in the Collateral Account.  A FRN is a bond with a variable coupon interest rate that varies with the market rate.  The coupon rate is typically equal to a money market reference rate (such as LIBOR[17] or the federal funds rate) plus a fixed spread.

53.     In particular, Defendant invested Plaintiff's Collateral in the Lehman Note and purchased many other Lehman FRNs with Class Plans' Collateral (the "Lehman Securities")

---

[17]     "LIBOR" refers to the London Interbank Offered Rate, which is derived from a filtered average of the world's most creditworthy banks' interbank deposit rates for larger loans with maturities between overnight and one full year  As the rate at which the world's most preferred borrowers are able to borrow money, it represents the most widely used benchmark for short-term interest rates around the globe.

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

(together, the "Investments"). ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

54.      The Investments had a significant credit risk associated with their high probability of

default.  Credit risk is defined as the risk of loss of principal or loss of a financial reward stemming

from a borrower's failure to repay a loan or otherwise meet a contractual obligation.[18]  "Credit risk is

closely tied to the potential return of an investment, the most notable being that the yields on bonds

correlate strongly to their perceived credit risk."  *Id.*  "The higher the perceived credit risk, the

higher the rate of interest that investors will demand for lending their capital.  Credit risks are

calculated based on the borrowers' overall ability to repay.  This calculation includes the borrowers'

collateral assets, revenue-generating ability and taxing authority (such as for government and

municipal bonds)."

55.      Credit risks are a vital component of fixed-income investing, which is why ratings

agencies such as Standard & Poor's ("S&P"), Moody's and Fitch evaluate the credit risks of

thousands of corporate issuers and municipalities on an ongoing basis.

---

[18]      *See* Credit Risk, Investopedia, http://www.investopedia.com/terms/c/creditrisk.asp (last
visited May 11, 2010).

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

C. **Defendant Knew of the Tremendous Uncertainty Surrounding Lehman's Financial Stability**

[19] Standish Mellon Asset Management is commonly referred to as "SMAM," "Standish Mellon" or "Standish." Standish Mellon Asset Management Company, LLC is an investment subsidiary of BNY Mellon Asset Management. Prior to January 1, 2009, Standish Mellon Asset Management Company LLC offered securities lending services through its Short Duration, Beta and Stable Value Strategies group.



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



59.     On August 23, 2007, nabCapital issued an analyst report entitled "At a glance –

Lehman Brothers – The Fixed Income Specialist getting out of Subprime."  This report stated as

follows:

> We reiterate what we said back on the 10th of August,  that S&P's reasons for going
> Negative on Bear Stearns "could also apply to Lehman Brothers and S&P could have
> them in their sights". While today's announcement is not material from an absolute
> capital or earnings perspective, it does potentially load another bullet into the gun,
> which if S&P is going to fire it will probably be after the company releases what we
> expect to be a particularly weak 3Q result (applies sector wide).
>
> From a trading perspective we think that as a result of having smaller and less
> diversified revenues, *Bear Stearns and Lehman's will continue to be more
> susceptible than the larger brokers are to the subprime related events which are
> expected to remain an issue for at least the remainder of 2007. We also think that*

**REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009**

*from a credit ratings perspective (though we acknowledge it hardly matters at the moment) it's fair to state that Bear's and Lehman's ratings will come under greater pressure as their overall revenues are also are more reliant on the fixed income markets.* Therefore, while liquidity remains as tight as it is, the 40bps-50ps CDS differential between the larger brokers and the smaller ones (Bears and Lehmans) should be respected and in the short term if it is going to change, its likely to widen rather than narrow, particularly relative to the broader market.

60.     Likewise, on December 14, 2007, Punk Ziegel & Co. issued an analyst report, rating

Lehman a "sell" and stating that:

I have raised the Lehman estimates slightly but they are still well below street consensus. Moreover, I do not expect 2009 earnings to be as high as 2007 earnings for this company. The target price on the stock has been lowered despite this adjustment in the estimate to reflect the fact that the multiple on this stock is declining in response to a murkier outlook.

Balance sheet re-engineering is not the core of this company. Operating businesses are. *The outlook for these businesses is not positive. Therefore, even though this is one of the most impressive companies in the financial sector, its stock should be avoided.*



- 24 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



64.     On March 17, 2008, Bear Stearns, the fifth-largest U.S. investment bank, was sold to JPMorgan Chase "for the investment-banking equivalent of pocket change," *BusinessWeek* reported the day after the collapse.  The same article stated that the takeover was causing Wall Street to worry "that the high-stakes game of dice the big firms were playing with asset-backed securities of dubious quality may force more players to exit the table."

65.     The Bear Sterns collapse raised numerous red flags as to the soundness of maintaining SLP Collateral in Lehman.  To this end, on March 17, 2008, the *Dow Jones Newswires* published a column entitled "IN THE MONEY: Why Lehman May or May Not Be The Next Bear." This article stated in pertinent part:

> NEW YORK (Dow Jones)--There are a number of reasons to think Lehman Brothers Holdings Inc. (LEH) won't be the next Bear Stearns Cos. (BSC) - but at least one big reason to think it might.
>
> ***Lehman's stock tumbled 19% Monday to its lowest level in years, on investor concern that the liquidity crisis that nearly wiped out Bear might strike Lehman or another big investment bank next***. The firm roundly denied it had anything resembling a liquidity problem, but then so did Bear, just days before it almost collapsed and was forced to accept a takeover by JPMorgan Chase & Co. (JPM) at a tiny fraction of its book value.

\*       \*       \*

- 25 -

**REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009**

> *But there's at least one reason for concern: Lehman has sizable exposure to dicey mortgage securities and other hard-to-value instruments that could be a drag on its liquidity. That same issue contributed to the problems at Bear.*

<div align="center">

\*        \*        \*

</div>

> But then there's the mortgage issue. As of the end of its fiscal year in November, Lehman held *$42 billion worth of "Level 3" securities - illiquid, write-down-prone* securities valued using Lehman's estimates and models instead of actual market data. Of that amount, $25.2 billion are mortgage and asset-backed securities, making them even dicier.

> The $42 billion amounts to 14.4% of Lehman's total financial instruments, and about 1.9 times the company's entire shareholder equity. Bear had even higher exposure by some measures, but Lehman's is significant.

66.    Also, on March 17, 2008, the *Dow Jones Business News* published an article entitled "Moody's Cautions On Outlook For Lehman; Shares Poised to Fall." This article stated in pertinent part:

> Earlier Monday, Moody's said that it affirmed its A1 rating on the senior long-term debt of Lehman Brothers (LEH) but lowered its outlook on Lehman ratings to stable from positive.

<div align="center">

\*        \*        \*

</div>

> "However, these conditions have decreased the upward pressure on Lehman's rating, and therefore a positive outlook is no longer warranted," the ratings agency said.

67.    Also, on this date, *The Huffington Post* published an article entitled "Is Lehman Next?" that questioned the "possibility that Lehman will face a run like the one that brought down Bear Stearns." The article reported that the market's "concerns were intensified when UBS downgraded Lehman stock to neutral from buy . . . , and analysts at ING speculated that Lehman may not play a big enough role in the markets to justify a Fed-backed bailout like the one at Bear Stearns."

<div align="center">

- 26 -

</div>

**REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009**



70.   On March 18, 2008, in an article entitled "Is Lehman Liquid Enough?,"

*BusinessWeek* reported:

> As more hedge funds are forced to liquidate in the course of this year, . . . broker-dealers such as Lehman will get hit again because hedge funds won't be able to make good on the credit-default swaps they have with broker-dealers.  And that could make an already difficult year for Lehman even more unpleasant.

- 27 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

  ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

  ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

  ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

  ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

76.     On March 29, 2008, the *Wall Street Journal* published an article entitled "Undertow
of Worry Again Tugs on Stocks ---  After an Initial Climb, Shares End Lower, DJIA Falls 1.2% in
Week." This article stated in pertinent part:

> Citigroup upgraded investment bank Lehman Brothers Holdings, whose shares have
> fallen sharply amid talk of liquidity troubles. But options traders were still betting

- 28 -

heavily against Lehman and another broker that has suffered during the credit crunch, Merrill Lynch. Lehman ended the day down 2.2% at $37.87, while Merrill lost 4.7% to 39.93, pulling other financials lower. Citi and American Express were the worst performers in the Dow industrials, falling 4.4% to 20.83 and 3.8% to 43.15, respectively.



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



- 30 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



- 33 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



85.     Lehman's problems continued to mount.  On June 2, 2008, *Dow Jones Newswires* published an article entitled "S&P Cuts Rating On Lehman, Merrill, Morgan Stanley."  This article stated in pertinent part:

> NEW YORK (Dow Jones)--Standard & Poor's Corp. rattled investors' confidence in three big investment banks on Monday, cutting the ratings of Lehman Brothers

- 34 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

Holdings Inc. (LEH), Merrill Lynch & Co. Inc. (MER) and Morgan Stanley (MS) by a notch.

*The credit-rating agency was most critical of Lehman, whose business profile is closest to that of the recently collapsed Bear Stearns Cos., saying its operating performance is under pressure.*

*"We expect a relatively meaningful deterioration in Lehman's second-quarter performance, owing to a generally slower business environment, additional writedowns on certain troubled exposures and the negative effects of hedges,"* the rating agency said as it sliced the firm's long-term ratings to A from A+ and kept a "negative outlook" on Lehman. A negative outlook implies a one-in-three likelihood of another downgrade within about two years.



**REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009**



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



92.

93.     On June 9, 2008, the *Dow Jones Newswires* published a story entitled "Moody's Cuts Lehman Outlook to Negative," which stated that "***Moody's says its outlook for credit ratings at Lehman is now negative, as an unexpectedly deep 2Q loss has raised questions about the investment bank's risk management. Outlook change means Moody's thinks Lehman's credit ratings could deteriorate over the long term.***"

94.     Also, on this day, the *Dow Jones Newswires* published an article "Lehman to Raise $6B After Deep $2.8B Loss," which further elaborated on the Moody's credit rating.  This article stated in pertinent part:

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

Moody's Investors Service lowered its outlook for the bank's credit ratings to negative, expressing concerns about Lehman's ability to manage the risks in its still-large exposures to commercial and residential mortgages and signaling the market may not have much tolerance for further losses.

"The rating action also reflects Moody's concerns over risk management decisions that resulted in elevated real estate exposures and the subsequent ineffectiveness of hedges to mitigate these exposures in the recent quarter," Moody's wrote in a release. ***"Any additional net valuation marks that result in firm-wide losses in coming quarters would raise serious concerns about the effectiveness of Lehman's risk management and may create additional market unease about the firm, potentially weakening its franchise."***

Fitch Ratings cut its grade one notch to A+, noting Lehman's "increased earnings volatility," the lack of securitizations and "the level of risky assets exposing earnings to challenges in hedge effectiveness."



**REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009**



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



- 42 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



- 46 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

████████████████████████████████████████████

████████████████████████████████████████████

106.    On June 13, 2008, the *Wall Street Journal* posted several articles chronicling

Lehman's financial problems:

   (a)    For example, an article entitled "Lehman's Holders in Pain --- Shares May

Not Get A Lift as Firm Seeks To Exit Rough Patch," stated in pertinent part:

> So Lehman may have some breathing room, perhaps even enough to allow Chief
> Executive Richard Fuld to continue fighting against a sale of the firm. ***But, with the
> credit crunch continuing to bite, it is tough to see how Lehman can earn its way
> out of its current predicament.***
>
> \*       \*       \*
>
> ***There also is the continued threat that Lehman's capital won't prove sufficient in
> the face of losses that could still hit its books.*** When it releases second-quarter
> results Monday, Lehman is expected to report, for example, that it still has about $30
> billion in residential-mortgage assets and about $35 billion in commercial-real-estate
> assets.
>
> \*       \*       \*
>
> A strong board of directors could have helped steer Lehman Brothers away from the
> worst of the credit storm that has crushed the firm's stock and led some to question
> its survival.
>
> But Lehman's board lacks members with recent, hands-on experience in markets,
> risk management and accounting. And shareholders now have to ask whether the
> board will hold Lehman Chief Executive Richard Fuld accountable for
> management's mistakes. . . .

   (b)    Another article entitled "Lehman Shuffles 2 Key Jobs In Bid to Restore

Confidence -- Finance Chief Is Demoted; 'Wall Street Wants a Head,'" stated that:

> Lehman Chief Executive Officer Richard S. Fuld Jr., the longest-serving head of a
> major Wall Street firm, removed Joseph M. Gregory, a lifelong friend, as his No. 2
> and demoted Erin Callan, Lehman's finance chief and the highest-ranking woman on
> Wall Street.
>
> \*       \*       \*

- 47 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009

But instead of mollifying short sellers -- investors betting that Lehman's stock would fall -- her responses seemed to deepen Lehman's woes. Her actions appeared to be fanning the flames by giving some on Wall Street the impression that the fight was distracting her from the challenge of helping to pull Lehman through the continuing credit crisis.

<div align="center">*     *     *</div>

Mr. Fuld has vowed never to sell the firm as long as he's alive. But it is widely believed on Wall Street that if things don't stabilize in coming weeks, Mr. Fuld may have no choice.

107.    Also, on this day, the *Wall Street Journal Online* posted "The Morning Brief: A

'Delicate Balance of Governance,'" which stated:

The question is what Lehman Brothers Holdings will do next. Judging by the stock market's reaction, the removal of Erin Callan as finance chief and Joseph Gregory as chief operating officer sure didn't restore Wall Street's confidence in the firm. Lehman Chief Executive Richard S. Fuld Jr. replaced them, only six months after Ms. Callan was appointed to the role, as The Wall Street Journal notes. Ms. Callan took on the high-profile role of trying to reassure investors that Lehman was weathering the credit crunch and wider banking and economic woes. "But instead of mollifying short sellers -- investors betting that Lehman's stock would fall," the paper says, "her actions appeared to be fanning the flames by giving some on Wall Street the impression that the fight was distracting her from the challenge of helping to pull Lehman through the continuing credit crisis." ***The surprise news of a $2.8 billion loss, made public by Lehman on Monday, may have been the last straw.***

The executive changes seemed aimed at restoring Lehman's credibility and saving Mr. Fuld's own job, the New York Times says. But the removal of Ms. Callan and Mr. Gregory -- who will take on other jobs at Lehman, "may not erase doubts about the future of the bank and of Mr. Fuld, one of the longest-serving chief executives on Wall Street," the Times says. ***"While Lehman is unlikely to founder [sic], partly because it has access to a government lending program put in place after Bear's collapse, some analysts doubt that Lehman can thrive as an independent firm."*** Lehman's shares ended the day down 4.4%, and are off 26% since the close of regular trading Monday and 64% this year.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

<div align="center">- 48 -</div>



- 49 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



112.    On July 7, 2008, *Barron's* posted an article entitled "A Sampling of Advisory Opinion," which detailed "Twenty-Five Reasons We Remain Cautious." Number 17 on the list was the following: "Companies from GM to Ford to ***Lehman are technically insolvent***."



- 50 -

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

115.    On July 15, 2008, in an article entitled "Large Stock Focus: Bank Fears Continue To Weigh on Market – WaMu, Zions Post Sharp Declines; GM Falls 5.4%" the *Wall Street Journal* stated that "Lehman has broad exposure to mortgage securities, and credit markets in general."

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████

117.    On July 22, 2008 *Bloomberg* reported:

Last year, as the market collapsed, Lehman underwrote more mortgage-backed securities than any other firm, accumulating an $85 billion portfolio, 44 percent more than Morgan Stanley's and almost four times the $22.5 billion of shareholder equity Lehman had as a buffer against losses. Lehman saw trouble in the mortgage market as late as 2006 and still didn't move fast enough to reverse course, according to people familiar with the firm's internal workings.

118.    On July 24, 2008, Morgan Stanley issued an analyst report for Lehman, which contained the following statement:

Primary downside risks. A meaningful deterioration in credit markets would limit exit opportunities in troubled assets (and heighten write-down worries). Accordingly, persistent decline in share price could create its own reality, becoming the tail that wags the dog by making it more difficult for the firm to optimize its business.

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009



121.   On August 11, 2008, the *WSJ Blog* posted the following in an article entitled "Just How Far Behind The Pack is Lehman Brothers?":

Fretting about the future of investment banks has become something of a cottage industry on Wall Street, ***most of the hand-wringing of late has been about Lehman Brothers Holdings Inc. (LEH)***, with seemingly daily reports speculating about its options for raising capital: a sale of all or part of Neuberger Berman, a sale of its entire investment management division, a capital-markets offering of some kind.

\*     \*     \*

So just what kind of shape is Lehman in? There is a nice set of clues from Banc of America Securities analyst Michael Hecht, whose research report Monday compared four big investment banks - Morgan Stanley (MS), Goldman Sachs Group Inc. (GS), Merrill Lynch & Co. (MER) and Lehman Brothers - by the size of their balance sheets, trading books, progress in reducing their debt and exposure to the riskiest securities.

***Lehman Brothers, the smallest of the four, is the laggard on nearly all fronts.***

\*     \*     \*

***Lehman's trading book is heavily weighted to mortgages and mortgage-related securities. Such securities account for 35% of Lehman's trading book, dwarfing its corporate debt holdings at 19% and derivatives at 17%.***

\*     \*     \*

. . . The less exposed to such risky assets any securities firm is, the better off it is, according to the risk-averse conventional wisdom right now. At the end of the second

- 52 -

REDACTED PURSUANT TO THE CONFIDENTIALITY STIPULATION AND ORDER FILED ON 12/17/2009