UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

THE BOARD OF TRUSTEES OF THE
SOUTHERN CALIFORNIA IBEW-NECA
DEFINED CONTRIBUTION PLAN, On
Behalf of Itself and All Others Similarly
Situated,

                              Plaintiff,

    vs.

THE BANK OF NEW YORK MELLON
CORPORATION, et al.,

                           Defendants.

———————————————————— x

    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :

Civil Action No. 09-cv-06273 (RMB)

<u>CLASS ACTION</u>

**PLAINTIFF'S MOTION AND
INCORPORATED MEMORANDUM OF
LAW IN SUPPORT OF CLASS
CERTIFICATION, APPOINTMENT OF
CLASS REPRESENTATIVE, AND
APPOINTMENT OF CLASS COUNSEL**

ECF Case

*Contains Confidential Information*

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................2

II.    STATEMENT OF FACTS ......................................................................................3

    A.    Plaintiff Hires BNYM as Custodian ...........................................................3

    B.    BNYM's Securities Lending Program ........................................................4

    C.    BNYM's Investment in Lehman Notes .......................................................6

III.   PROCEDURAL HISTORY.....................................................................................9

IV.   ARGUMENT ........................................................................................................10

    A.    Courts Favor Class Action Treatment in ERISA Breach of Fiduciary Duty Actions ...............................................................................................10

    B.    This Action Satisfies the Standards for Class Certification Under Rule 23(a) .........................................................................................................12

        1.    The Class Is So Numerous that Joinder of All Members Is Impracticable......................................................................................12

        2.    There Are Questions of Law and Fact Common to Each Member of the Proposed Class ...................................................................14

        3.    Plaintiff's Claims Are Typical of Those of the Class ...............16

        4.    Plaintiff Will Fairly and Adequately Represent the Class .........18

    C.    The Conditions of Rule 23(b)(3) Are Satisfied by the Proposed Class .................20

        1.    Common Questions of Law or Fact Predominate......................20

        2.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action..................................23

V.    CONCLUSION.....................................................................................................25

# **TABLE OF AUTHORITIES**

## CASES

*Banyai v. Mazur,*
205 F.R.D. 160 (S.D.N.Y. 2002) ..................................................................... *passim*

*Bd. of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,*
269 F.R.D. 340 (S.D.N.Y. 2010) .................................................................... *passim*

*Brown v. City of Barre, Vermont,*
2010 WL 5141783 (D. Vt. Dec. 13, 2010) ............................................................ 13

*Brown v. Kelly,*
609 F.3d 467 (2d Cir. 2010)........................................................................... 20, 25

*Bruce v. Christian,*
113 F.R.D. 554 (S.D.N.Y. 1986) ......................................................................... 14

*Consol. Rail Corp. v. Town of Hyde Park,*
47 F.3d 473 (2d Cir. 1995)........................................................................... 12, 13

*Eisen v. Carlisle & Jacquelin,*
417 U.S. 156 (1974)............................................................................................ 11

*Fidelis Corp. v. Litton Indus., Inc.,*
293 F. Supp. 311 (S.D.N.Y. 1968)...................................................................... 14

*Fogarazzo v. Lehman Bros., Inc.,*
232 F.R.D. 176 (S.D.N.Y. 2005) ........................................................................ 11

*In re Citigroup Pension Plan ERISA Litig.,*
241 F.R.D. 172 (S.D.N.Y. 2006) ........................................................................ 10

*In re Metlife Demutualization Litig.,*
229 F.R.D. 369 (E.D.N.Y. 2005) ........................................................................ 11

*In re Nassau County Strip Search Cases,*
461 F.3d 219 (2d Cir. 2006)................................................................................ 21

*In re Parmalat Secs. Litig.,*
2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)................................................. 17, 24

*In re Polaroid ERISA Litig.,*
240 F.R.D. 65 (S.D.N.Y. 2006) .............................................................. 10, 13, 16

*In re Sadia, S.A. Secs. Litig.,*
269 F.R.D. 298 (S.D.N.Y. 2010) ..................................................................... 19, 24

*In re Worldcom, Inc. ERISA Litig.*,
    2004 WL 2211664 (S.D.N.Y. Oct. 4, 2004) .........................................................10

*In re YRC Worldwide, Inc. ERISA Litig.*,
    2011 WL 1303367 (D. Kan. Apr. 6, 2011)...........................................................10

*LaFlamme v. Carpenters Local #370 Pension Plan*,
    212 F.R.D. 448 (N.D.N.Y. 2003)................................................................. *passim*

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)...............................................................................11

*Odmark v. Mesa Ltd. P'ship*,
    1992 WL 203541 (N.D. Tex. Jun. 5, 1992) ........................................................16

*Padilla v. Maersk Line, Ltd.*,
    271 F.R.D. 444 (S.D.N.Y. 2010) (Berman, J.) ........................................11, 12, 14

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)...........................................................................................24

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
    2011 WL 3652477 (S.D.N.Y. Aug. 22, 2011) ..............................................23, 24

*Robinson v. Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001)...............................................................................14

*Shanehchian v. Macy's, Inc.*,
    2011 WL 883659 (S.D. Ohio Mar. 10, 2011) ....................................................10

*Thompson v. Linvatec Corp.*,
    2007 WL 1526418 (N.D.N.Y. May 22, 2007) ...............................................*passim*

*Town of New Castle v. Yonkers Contracting Co., Inc.*,
    131 F.R.D. 38 (S.D.N.Y. 1990) .........................................................................13

*Yost v. First Horizon Nat. Corp.*,
    2011 WL 2182262 (W.D. Tenn. June 3, 2011) ..................................................10

The Board of Trustees (the "Board"), on behalf of the plaintiff, The Southern California IBEW-NECA Defined Contribution Plan ("Plaintiff," "IBEW," or the "Plan"),[1] respectfully moves this Court for an Order, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure: (i) certifying the proposed Class defined below; (ii) appointing IBEW as Class Representative; and (iii) appointing Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel. Plaintiff seeks certification of a class consisting of:

> all ERISA-governed plans that participated in BNY Mellon, National Association, formerly known as Mellon Bank, N.A., The Bank of New York, and/or The Bank of New York Mellon's (hereinafter collectively "BNYM" or "Defendant") securities lending program and had collateral invested in a Lehman Brothers Holdings Inc. ("Lehman") floating rate note(s) bearing CUSIP number 52517PL33, 52517PQ53, 524908X21, 52517P2K6, 52517PC58, 52517PG39, 52517PQ46, 52517PW31, 52517PW56, and/or 52520WDF5 (collectively, the "Lehman Notes") as of September 15, 2008 (the "Class").[2]

The Class's claims arise out of BNYM's breaches of its fiduciary duties under sections 404(a) and 406 of the Employment Retirement Income Security Act ("ERISA"), which entitle Class members, pursuant to ERISA §502(a)(2), to recover appropriate relief under ERISA §409 and, pursuant to ERISA §502(a)(3), to enjoin acts which violate ERISA. *See* 29 U.S.C. §§1104(2), 1106, 1132(a)(2)-(3) and 1109(2).

---

[1]   The Plan is the real party in interest to this action, and operates through the Board of Trustees, its advisors, investment managers, and investment consultants. The Board is the nominal plaintiff in this action. Hereinafter, for ease of reference, the Plan and the Board will be referred to collectively as the "Plaintiff."

[2]   Excluded from the Class is Defendant, any entity in which Defendant or any excluded person has or had a controlling interest, the officers and directors of Defendant, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

## I.    INTRODUCTION

Lehman filed for bankruptcy on September 15, 2008, leaving enormous financial damage in its wake.  Despite months of internal reports and discussions surrounding Lehman's growing uncertainty, BNYM took advantage of the "heads I win; tails you lose" strategy defining its Securities Lending Program (the "Program" or "SLP").  Standing to profit from any gains but bearing no risk of loss, Defendant imprudently maintained Class members' risky investments in Lehman while taking separate actions to protect *itself* against a potential Lehman default.  In so doing, BNYM breached its ERISA-mandated fiduciary duties of prudence and loyalty.

The proposed Class seeks to represent those ERISA-governed SLP participants who, like Plaintiff, suffered millions of dollars in losses due to risky Lehman investments unfit for BNYM's "ultra-conservative" SLP.  For the reasons described below, Plaintiff's and the Class' claims are eminently suitable for class treatment.  *See also* Miller Decl. ¶¶16-32.[3]

Each of the approximately 240 geographically-dispersed, ERISA-governed Class members alleges common questions of law and fact stemming from BNYM's imprudent maintenance of the Lehman investments.  The evidence necessary to prove Defendant's status as an ERISA fiduciary and its imprudence in holding the Lehman Notes will be identical from one Class member to the next.  In fact, the standardized forms, policies, and operation of the Program – including BNYM's aggregate purchases of collateral investments such as the Lehman Notes here at issue – necessarily elevate common questions of law and fact over any individual issues that may arise.  And IBEW, the proposed Class Representative who was injured as a result of Defendant's breaches of its fiduciary

---

[3]    "Miller Decl. ¶__" refers to paragraphs in the Declaration of Geoffrey P. Miller, dated February 1, 2011 and attached hereto as **Exhibit A.**

duties, has precisely the same interests as the Class as a whole – achieving the maximum possible recovery in connection with BNYM's risky and imprudent Lehman investments.

Notably, on August 4, 2010, Judge Shira Scheindlin of this District entered an order certifying a substantially similar class of investors who participated in JPMorgan's securities lending program and suffered losses a result of alleged imprudent collateral investments. *See Bd. of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340 (S.D.N.Y. 2010) ("*AFTRA*"). In form and operation, JPMorgan's securities lending program is virtually identical to BNYM's Program at issue here. Likewise, as in *AFTRA*, this case does not involve Defendant's individual investment policies or individual practices as to each putative Class member. Rather, the relevant facts at issue surround BNYM's (mis)management of the Program as a whole. *See id*. at 351.

For all these reasons, and as more fully set forth below, the Court should certify the proposed Class because this action satisfies all the requisites for class certification under Rule 23.

## II.    STATEMENT OF FACTS

### A.    Plaintiff Hires BNYM as Custodian

IBEW is an ERISA-governed defined contribution retirement plan under which employers contribute certain monies for the benefit of their employees in the electrical profession. The Plan's Board is responsible for oversight of the Plan and, pursuant to a governing Trust Agreement, is permitted to delegate investment powers and authority to investment managers to serve as fiduciaries for the Plan. SOF ¶12.[4] Once an investment manager is appointed, the Trust Agreement also dispels the Board from any liability "for the Acts or omissions of the Investment Manager" and any obligation to "invest or otherwise manage any asset of the plan." SOF ¶12. Investment decisions

---

[4]    "SOF ¶__" refers to paragraphs in Plaintiff's Rule 56.1 Statement of Material Undisputed Facts, filed July 25, 2011 [Dkt. No. 176] and herein incorporated by reference.

were thus delegated to sophisticated fiduciaries who actually managed the Plan's assets or otherwise assisted in developing the Plan's broad investment policies and hiring and reviewing the performance of the Plan's various investment managers.  SOF ¶¶13-14, 23-24.  Among these fiduciaries is BNYM, who, for a fee, began serving as the Plan's custodian in November 1995 and continues to serve the Plan in this capacity.  SOF ¶¶48, 49.

### B.    BNYM's Securities Lending Program

As one of its many products, BNYM offers a securities lending program to its custodial accounts.  SOF ¶50.  BNYM describes securities lending as "the process of lending securities to a borrower, typically a broker-dealer who wishes to borrow securities to avoid operational fails or to complete certain short sales and other transactions.  In return, the borrower provides collateral for the securities loan in excess of the market value of the lent securities."  SOF ¶53.  The collateral received was either placed in a "commingled fund," wherein each lending client owns a pro rata share of that fund's investments, or deposited into a separately managed account ("SMA"), wherein the collateral was invested and managed solely for that lender's benefit.  SOF ¶55.

Regardless of the investment vehicle, BNYM's securities lending program was marketed to all Class members as a program that "provides incremental return with minimal risk" while adhering to certain "key objectives" and guidelines, including the safeguarding of principal in collateral accounts, the maintenance of a diversified portfolio of investments with adequate liquidity, and the optimization of the spread between the collateral earnings and the rebate rate paid to the borrower. SOF ¶¶56, 73.  As understood throughout the securities lending industry, BNYM's Program was simply a "way to reduce expenses for other services that [participants] were . . . subscribing to[, including custodial services], and it was an offset to those fees."  SOF ¶77.

BNYM likewise touted the Program's "prudent short-term investment posture" and "senior management review."  SOF ¶74.  In fact, the Program's "buy and hold" strategy, wherein portfolio

managers generally purchased securities with the intent of holding them to maturity, was advertised as one of many investment controls that allowed BNYM to offer "unsurpassed experience, expertise, and resources" to its many clients.  SOF ¶¶57-59.

Once clients agreed to participate in the Program, they were given a standard lending agreement ("Agreement" or "SLA") that allowed BNYM to lend the participants' securities to Approved Borrowers in exchange for collateral that BNYM invested.  SOF ¶78.  All Class members' SLAs were thus materially similar.  *See* Miller Decl. ¶13(b).  BNYM  maintains lists of Approved Borrowers and Approved Issuers – those entities that may borrow securities or in whose securities participants' collateral could then be invested – that are the same for all participants.  SOF ¶80. While securities lending participants were free to restrict or exclude certain Approved Borrowers and/or Approved Issuers, additional names could not be added to the lists.  SOF ¶80.  In fact, once a schedule of approved investments was selected, that schedule was "hard coded into the system, so that it ensures that only approved investments are permitted into those accounts."  SOF ¶¶80, 81, 99.

Moreover, once an Approved Investment was made, participants lost any control over decisions related to that investment.  SOF ¶¶84-87.  According to the Agreement, Approved Investments "shall be controlled by, and subject only to the instruction of, [BNYM], and [BNYM] shall not be required to comply with any instruction of [Plaintiff] with respect to the same."  SOF ¶86.  Along with the SLA, all participants also executed Investment Guidelines (the "Guidelines"), which granted BNYM full investment authority and discretion to manage each participant's securities lending collateral account and which also dictated that "[a]bsolute safety of principal is paramount over all other considerations" in BNYM's management of the collateral account.  SOF ¶¶90-102.  All participants' Guidelines were derived from a template of standard collateral

investment guidelines that were provided to all securities lending program participants at the outset of the relationship.  SOF ¶94.

The standard guidelines incorporated certain universal investment policies that dictated the most aggressive maturity, issuer diversification, and credit quality allowable for any collateral investment (the "Umbrella Guidelines").  SOF ¶¶94-95.  While it is true that a client could be more conservative than the Umbrella Guidelines, participants could not be any more aggressive. SOF ¶94. All Class members' Guidelines were thus also materially similar.  *See* Miller Decl. ¶13(c).  In fact, even if a client were to negotiate a more aggressive investment strategy, BNYM's systems would automatically modify the divergence to meet the Program's required investment standards.  Mannix 30(b)(6) Dep. 54:19-58:11, Jan. 20, 2011, attached hereto as **Exhibit B**.

Once the Agreement and the Guidelines were executed, the Guidelines were given to an identified group within BNYM that is "responsible for hard coding those into the system."  SOF ¶99. The clients' particular investment parameters, including, among others, ratings criteria, issuer concentration levels, and security maturities would be entered into a computer system, and the account is then assigned to a particular portfolio manager.  SOF ¶99.

### C.  BNYM's Investment in Lehman Notes

The selection of specific securities for collateral reinvestment is the primary responsibility of the Program's portfolio managers ("PMs").  SOF ¶60.  Among their responsibilities is to select investments that comply with applicable investment guidelines while generating returns to both cover the rebate owed to borrowers as well as provide incremental income to the lender.  SOF ¶60. Because of the Program's conservative investment strategy, PMs regularly invested participants' collateral in floating rate notes, like the Lehman Notes here at issue, because they are insulated from market interest rate movements and generally carry far less interest rate risk than do fixed rate notes. SOF ¶¶112-11█



Yet, despite over 60,000 news articles regarding Lehman's financial instability in major news and business publications between January 1, 2007 and September 15, 2008, and despite the demise of Bear Stearns which should have served as a warning, the last record evidence of any credit memorandum prepared on Lehman was July 20, 2006. SOF ¶¶180, 182-372. Moreover,

fundamental analysis would have shown that from July 2007 through Lehman's bankruptcy in September 2008, the default probabilities of the Lehman Notes rose to levels characteristic of risky, speculative, junk-rated bonds, wholly unsuitable for BNYM's Program.  SOF ¶¶436-465.



Although BNYM was reducing its own exposure to Lehman throughout 2008, no action was taken on behalf of Program participants to mitigate *their* exposure.  SOF ¶¶466-489.  BNYM could have lessened or even eliminated participants' exposure to a Lehman default by supplementing or abandoning its "buy and hold" strategy.  SOF ¶510.  Defendant could have (a) purchased insurance on the Lehman Notes via credit default swap contracts (for which there was an active market during the relevant time period) (SOF ¶¶510-511), (b) sold the Lehman Notes in the active market at any time prior to Lehman's bankruptcy (SOF ¶¶512-13), or (c) transferred the Lehman Notes into one of the bank's own accounts, thus assuming any risk associated with the Notes.  SOF ¶514.

Instead, until and including the date of the bankruptcy, BNYM's investments in the Lehman Notes remained in participants' collateral accounts, causing Plaintiff and other Class members to suffer millions of dollars in damages.  SOF ¶¶466-500.

## III.  PROCEDURAL HISTORY

Plaintiff initiated this action on July 13, 2009 [Dkt. No. 1], and Robbins Geller was appointed interim class counsel on October 13, 2009.  Dkt. No. 25.  Thereafter, on October 29, 2009, Plaintiff filed an amended class action complaint, which Defendant moved to dismiss on November 9, 2009.  Dkt. No. 29.  That motion was granted on April 14, 2010.  Dkt. No. 59.  However, with the benefit of millions of pages of discovery from BNYM at that time, on May 12, 2010, Plaintiff sought relief from the Court's dismissal and permission to file a second amended complaint.  Dkt. No. 65.  On September 7, 2010, the Court issued an order granting Plaintiff relief from the earlier dismissal and reopening this case.  Dkt. No. 83.

Plaintiff's second amended complaint was then filed on September 21, 2010, adding considerable "factual enhancement" to its allegations by way of reference to newly released public records and dozens of BNYM's internal documents.  Dkt. No. 89.  Defendant eventually produced more than 18 million pages of responsive documents, while more than 30 depositions of party witnesses have been taken.  On March 11, 2011, Plaintiff filed its Third Amended Class Action Complaint to add new defendants identified through the discovery process.  Dkt. No. 138.

Defendant promptly answered this complaint, offered numerous defenses, and also asserted four counterclaims against the Board in its role as fiduciary to the Plan.  Dkt. No. 144.  The parties having fully briefed the validity and relative merits of Plaintiff's ERISA claims and Defendant's counterclaims, the Court entered an Order on December 9, 2011 granting Plaintiff's motion to dismiss BNYM's counterclaims, denying Plaintiff's motion to strike Defendants' affirmative defenses, denying Defendants' motion for summary judgment on Plaintiff's ERISA claims, and

scheduling this matter for trial on April 2, 2012.  Dkt. No. 204.

## IV.   ARGUMENT

### A.   Courts Favor Class Action Treatment in ERISA Breach of Fiduciary Duty Actions

Courts in this Circuit and around the country have repeatedly stressed that "[c]lass actions are generally well-suited to litigation brought pursuant to ERISA." *Banyai v. Mazur*, 205 F.R.D. 160, 165 (S.D.N.Y. 2002);[5] *see also AFTRA*, 269 F.R.D. at 355; *Thompson v. Linvatec Corp.*, No. 06-0404, 2007 WL 1526418, at *5 (N.D.N.Y. May 22, 2007) ("ERISA cases are well-suited for class action certification pursuant to Rule 23."); *In re Citigroup Pension Plan ERISA Litig.*, 241 F.R.D. 172, 182 (S.D.N.Y. 2006) (certifying ERISA class); *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 74 (S.D.N.Y. 2006) (same); *In re Worldcom, Inc. ERISA Litig.*, No. 02-4816, 2004 WL 2211664, at *4 (S.D.N.Y. Oct. 4, 2004) (same); *LaFlamme v. Carpenters Local #370 Pension Plan*, 212 F.R.D. 448, 460 (N.D.N.Y. 2003) (same).  *See also Yost v. First Horizon Nat. Corp.*, No. 08-2293, 2011 WL 2182262, at *4 (W.D. Tenn. June 3, 2011) ("ERISA breach of fiduciary duty claims like Plaintiffs['] are particularly well-suited for class certification under Rule 23(b)(1)(B)."); *In re YRC Worldwide, Inc. ERISA Litig.*, No. 09-2593, 2011 WL 1303367, at *14 (D. Kan. Apr. 6, 2011) (granting certification to class of plaintiffs alleging ERISA breaches of fiduciary duty); *Shanehchian v. Macy's, Inc.*, No. 07-00828, 2011 WL 883659, at *10 (S.D. Ohio Mar. 10, 2011) (same).

By providing a single forum in which to litigate similar claims, a class action affords an indispensable mechanism for the conservation of judicial resources. *See AFTRA*, 269 F.R.D. at 354 (finding class action superior because "the class consists of seventy-six entities, with thousands of beneficiaries, whose claims can be resolved efficiently in a single proceeding").  Rule 23, which

---

[5]   Internal citations and quotations are omitted, and emphasis is added, unless otherwise noted.

governs class actions, is therefore broadly construed so as to facilitate the certification of class

actions. "Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a

standard of flexibility." *Id.* at 345 (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997));

*see also Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 178-79 (S.D.N.Y. 2005) ("The Second

Circuit requires a liberal construction of Rule 23 of the Federal Rules of Civil Procedure. Thus, to

deny a class action simply because all of the allegations of the class do not fit together like pieces in

a jigsaw puzzle would destroy much of the utility of Rule 23.").

As the U.S. Supreme Court has held, class certification does not require a determination on

the merits of the allegations asserted:

> [The court has no] authority to conduct a preliminary inquiry into the merits of a suit
> in order to determine whether it may be maintained as a class action.

*     *     *

> In determining the propriety of a class action, the question is not whether plaintiff or
> plaintiffs have stated a cause of action or will prevail on the merits, but rather
> whether the requirements of Rule 23 are met.

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-178 (1974). In determining class certification in

this Circuit, "district courts are required to analyze rigorously whether the proposed class satisfies

the Rule 23(a) criteria, but such analysis does not require or permit an evaluation of the relative

strength of the merits of the case." *In re Metlife Demutualization Litig.*, 229 F.R.D. 369, 372

(E.D.N.Y. 2005).

Accordingly, this Court explained in *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444 (S.D.N.Y.

2010) (Berman, J.):

> A plaintiff seeking to certify a class . . . bears the burden of establishing these [Rule
> 23] requirements. A court must conduct a rigorous analysis to determine if the
> requirements are met, resolving any factual disputes relevant to the Rule 23 analysis.
> In considering whether to certify a class, a court may not address the merits of the
> action except to the extent that the merits issue overlaps with a Rule 23 requirement.

*Id.* at 447-48.  Consequently, the sole issue presented in this motion for class certification is whether Plaintiff has fulfilled the requirements of Rule 23.  For a class to be certified pursuant to Rule 23, the four requirements of Rule 23(a) must be satisfied, as well as at least one of the conditions under Rule 23(b).  As demonstrated below, Plaintiff has satisfied the prerequisites of Rule 23(a) and the requirements of Rule 23(b)(3) for the proposed Class.  Therefore, class certification is proper.

**B.      This Action Satisfies the Standards for Class Certification Under Rule 23(a)**

Rule 23(a) establishes four prerequisites to class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are common issues of fact or law affecting all members of the class; (3) the claims of the class representatives are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  *AFTRA*, 269 F.R.D. at 345.[6]  Plaintiff satisfies each of these prerequisites.

**1.      The Class Is So Numerous that Joinder of All Members Is Impracticable**

"To establish that a 'class is so numerous that joinder of all members is impracticable,' a plaintiff need not show that joinder is impossible." *Banyai*, 205 F.R.D. at 163 (citing Fed. R. Civ. P. 23(a)).  "Nor need the plaintiff know the exact number of class members." *Id.*  Rather, "[c]ertification is appropriate where the number of class members is sufficiently large so that joinder of all members would make litigation needlessly complicated and inefficient." *Id.*  In this regard, "[t]he Second Circuit has held that a prospective class of forty or more raises a presumption of numerosity." *LaFlamme*, 212 F.R.D. at 452 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47

---

[6]      Significantly, in the *AFTRA* case, JPMorgan ***did not even dispute*** that the plaintiffs had satisfied Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements in their certification application.  *AFTRA*, 269 F.R.D. at 348.

F.3d 473, 483 (2d Cir. 1995)); *see also Linvatec Corp.*, 2007 WL 1526418, at \*4 ("Generally, courts will find that the numerosity requirement has been satisfied when the class comprises 40 or more members"); *In re Polaroid*, 240 F.R.D. at 74 ("When a class consists of forty or more members, numerosity is presumed.").

The proposed Class here easily satisfies the numerosity requirement. *See* Miller Decl. ¶19.



Regardless of the parties' disagreements, it is beyond dispute that the Class more than satisfies the 40-member threshold set by the Second Circuit. *See Consol. Rail Corp.*, 47 F.3d at 483. Numerosity is therefore presumed. *AFTRA*, 269 F.R.D. at 348 n.77 (certifying a class that "includes seventy-six geographically-dispersed class members, each of which has thousands of plan beneficiaries").

Moreover, district courts within the Second Circuit routinely certify classes in actions where the size of the proposed class is far smaller than the Class proposed here. *See Brown v. City of Barre, Vermont*, No. 10-81, 2010 WL 5141783, at \*4-\*6 (D. Vt. Dec. 13, 2010) (certifying class of at least 20 members); *Town of New Castle v. Yonkers Contracting Co., Inc.*, 131 F.R.D. 38, 40-41

---

[7]  *See* Response to Interrogatory No. 3 in Defendants' Supplemental Responses to Plaintiffs' First Set of Interrogatories, dated December 6, 2010 and attached hereto as **Exhibit C**.

[8]  *See* BNYM-I-18071402-1404, attached hereto as **Exhibit D**.

[9]  *See* **Exhibit E** attached hereto.  Excluded from the proposed Class are those Program participants with Lehman losses who are ***not*** governed by ERISA, including, *inter alia*, mutual funds, plans maintained outside the U.S. primarily for non-resident aliens, and plans for employees of federal, state, or local governments.

(S.D.N.Y. 1990) (certifying class with 36 members); *Fidelis Corp. v. Litton Indus., Inc.*, 293 F. Supp. 311, 316-16 (S.D.N.Y. 1968) (numerosity satisfied for class of 35-70 potential plaintiffs); *Bruce v. Christian*, 113 F.R.D. 554, 557 (S.D.N.Y. 1986) (numerosity satisfied where plaintiffs could identify only 16 class members at the time motion was filed).   Because it would be impracticable to join such a large and geographically diverse group as those ERISA-governed Program participants who suffered losses as a result of Defendant's imprudent Lehman investments, the numerosity requirement is satisfied here.  *See AFTRA*, 269 F.R.D. at 348.

## 2.    There Are Questions of Law and Fact Common to Each Member of the Proposed Class

The second requirement of Rule 23(a) is that class members share common questions of law or fact.  This Court has noted that commonality presents plaintiffs a "minimal burden" which is met "by showing that the class members' 'grievances share a common question of law or fact.'" *Padilla*, 271 F.R.D. at 448 (citing *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).  "[T]here is no requirement that the claims of all the potential class members . . . have every issue of law and fact in common.  An alleged common course of conduct is sufficient to satisfy the common question requirements of [Rule] 23(a)(2)." *Linvatec Corp.*, 2007 WL 1526418, at *5.

Here, the Class's claims arise out of the same alleged course of conduct – Defendant's imprudent maintenance of risky Lehman investments unsuitable for Class members' securities lending collateral accounts.  Based on the common cause of breach of fiduciary duty alleged, the Third Amended Class Action Complaint alleges numerous common questions of law and fact shared by the Class members, including: (1) whether Defendant is a fiduciary under ERISA; (2) whether Defendant owed Class members a duty to invest their securities lending collateral prudently; (3) whether Defendant owed Class members a duty of loyalty; (4) whether Defendant violated its obligations set forth in the Agreements and Guidelines; (5) whether Defendant violated its fiduciary

duty to invest securities lending collateral prudently; (6) whether Defendant violated its fiduciary duty of loyalty; (7) whether Class members suffered any losses as a result of Defendant's actions; and (8) whether Class members would suffer irreparable injury by the continuation of Defendant's conduct. *See also* Miller Decl. ¶¶20, 27-28.

      Proving the existence and nature of Defendant's breach of its fiduciary duties of prudence and loyalty – the most important issue in an ERISA case such as this – will be common to all members of the Class in this action. *See LaFlamme*, 212 F.R.D. at 453 (commonality satisfied because "the fact remains that whether any recovery can be had at all for any putative class member is completely dependent on one ultimate legal issue—whether the freezing rule places defendants in violation of the minimum accrual standards set forth in ERISA"). That is, Defendant's alleged misconduct in imprudently and disloyally maintaining the risky Lehman investments was carried out uniformly with respect to all members of the Class. *See Banyai*, 205 F.R.D. at 163 ("In general, the question of defendants' liability for ERISA violations is common to all class members because a breach of fiduciary duty affects all participants and beneficiaries."). Similar to the *AFTRA* plaintiffs' case, here,

> Plaintiff['s] position is not that the [Lehman Notes] could have been appropriate investments for some securities lending participants, but not others. Rather, [P]laintiff[] argue[s] that the [Lehman Notes] were too risky an investment for ***any*** securities lending participant by virtue of the basic, low-risk, high-quality structure that a securities lending program entailed. That there were slight variations in guidelines and portfolios is irrelevant to the common thread that links the prudence claims of the [SMA] holders to those that invested in the [Commingled Accounts]— that, according to [P]laintiff[], the [Lehman Notes] were not a conservative, high-quality, low-risk investment.

*AFTRA*, 269 F.R.D. at 351 (emphasis in original).

      Further to this point, regardless of any "slight variations" among Class members' individual collateral investment guidelines, ***all*** securities lending collateral investments that BNYM made and maintained on Class members' behalf were subject to the Umbrella Guidelines that dictated the most

aggressive maturity, issuer diversification, and credit quality allowable for any single investment. *See* SOF ¶94. As Mannix testified on behalf of BNYM, "I refer to it typically as an umbrella policy over the whole program. A client can be more conservative than our program guidelines; they can't be more aggressive." SOF ¶94. Thus, the question of whether BNYM violated the baseline conservatism associated with its SLP is common to all Class members.

Finally, the same facts that give rise to Plaintiff's claims also give rise to the claims of the members of the proposed Class. Absent Class members necessarily would have to prove the identical facts and answer identical legal questions if they pursued their claims individually. *See Odmark v. Mesa Ltd. P'ship*, No. 91-2376, 1992 WL 203541, at *3 (N.D. Tex. Jun. 5, 1992), *aff'd*, 59 F.3d 1241 (5th Cir. 1995) ("If the class plaintiffs prove their case with respect to the alleged wrongful conduct, they will also have provided all the proof needed on the issue of [BNYM's breach of fiduciary duty] for every other member of the class."). Accordingly, Plaintiff has demonstrated the existence and predominance of common questions of fact and law.

### 3.    Plaintiff's Claims Are Typical of Those of the Class

Courts in this District have described Rule 23(a)'s typicality requirement as follows:

> Typicality exists where the claims of the representative plaintiffs arise from the same course of conduct that gives rise to claims of the other class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives. When the same alleged unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.

*In re Polaroid*, 240 F.R.D. at 75. "In short, the test for typicality is not demanding." *LaFlamme*, 212 F.R.D. at 453. Nevertheless, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *In re Polaroid*, 240 F.R.D. at 75. The unique defense rule, however, "is not rigidly applied in this

Circuit.  Indeed, it is intended to protect [a] plaintiff class—not to shield defendants from a potentially meritorious suit and has generally been applied only where a full defense is available against an individual plaintiff[']s action." *In re Parmalat Secs. Litig.*, No. 04-1653, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008).  Regardless, "it is beyond reasonable dispute that a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members." *Id.*

Here, Plaintiff's claims are identical to those of the Class.  *See* Miller Decl. ¶21.  Plaintiff's claims arise out of the same course of conduct as the Class's claims and are premised on the exact same legal theories.  For example, Plaintiff and other members of the proposed Class allege that Defendant's maintenance of their risky Lehman investments while recognizing Lehman's instability and simultaneously reducing its own exposure to a potential Lehman default constituted a breach of Defendant's fiduciary duty to prudently manage Plaintiff's and the Class's assets.  Also, BNYM's maintenance of the Lehman investments, for which Defendant would share in all investment gains but bore no risk of loss, breached Defendant's fiduciary duty of loyalty to Plaintiff and the Class.  Rather than protect the Class from a potential Lehman default, BNYM was more concerned with protecting its own profitable business relationships with Lehman, which garnered the bank millions of dollars in fees each year.  Moreover, Plaintiff's claims, like the Class claims, are premised on the same legal theories – Defendant's violations of ERISA sections 404 and 406.

Thus, because the claims arise from the same event or course of misconduct as other Class members and are based on the same legal theories, Plaintiff's claims are therefore typical of those of the proposed Class, and Rule 23(a)(3) is satisfied.  *See Linvatec Corp.*, 2007 WL 1526418, at *5 ("As long as plaintiffs assert, as they do here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish the necessary typicality.");

*LaFlamme*, 212 F.R.D. at 453-54 (typicality satisfied where "all prospective class members would be alleging a violation of ERISA's minimum accrual standards, including plaintiff").

### 4.    Plaintiff Will Fairly and Adequately Represent the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts have noted that this "determination requires a two pronged inquiry: (1) class counsel must be qualified, experienced, and generally able to conduct the litigation; and (2) class members must not have antagonistic interests to one another." *Banyai*, 205 F.R.D. at 164; *see also Linvatec Corp.*, 2007 WL 1526418, at *7 ("This requirement is motivated by concerns similar to those driving commonality and typicality requirements, namely, the efficiency and fairness of class certification.").

Here, Plaintiff satisfies both prongs of the adequacy test of Rule 23(a)(4) for the proposed Class. *See* Miller Decl. ¶23. First, as established above, Plaintiff's interests coincide with, and therefore are not antagonistic to, those of other Class members. Plaintiff, like all members of the Class, was injured as a result of Defendant's breaches of its fiduciary duties under ERISA when BNYM imprudently and disloyally maintained Plaintiff's risky Lehman investments. Proof of Plaintiff's claims will establish the same issues of law and fact as the claims of the Class as a whole. As a result, Plaintiff and the Class have precisely the same interest in achieving the maximum possible recovery.

Additionally, Plaintiff and proposed Class Counsel, Robbins Geller, will vigorously prosecute this action, as they have done to date. In determining the adequacy of proposed class representatives, such status may only be denied

> where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys. However, the Supreme Court has expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance.

*In re Sadia, S.A. Secs. Litig.*, 269 F.R.D. 298, 305 (S.D.N.Y. 2010).  Here, IBEW stands ready, willing, and able to represent the Class in this action and fully understands the commitments and the fiduciary responsibilities attendant to serving as class representative.  To be sure, IBEW and certain of its trustees have already appeared for multiple hearings in New York, sat for four separate depositions in New York, answered or otherwise responded to dozens of interrogatories and requests for admission, and also produced thousands of pages of documents in response to Defendant's requests for production.  IBEW has, in short, remained integrally involved in every stop of this litigation and will continue to do so as the appointed Class Representative.

In addition to satisfying the adequacy prong of Rule 23(a)(4), Robbins Geller also satisfies the considerations of Rule 23(g) and should be appointed as Class Counsel.  *See* Miller Decl. ¶24.  Rule 23(g)(4) requires the court to appoint counsel who will fairly and adequately represent the Class.  Additionally, in appointing class counsel, Rule 23(g)(1)(A) requires the court to consider the following factors: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit in representing the class." Fed. R. Civ. P. 23(g)(1)(A).

First, Robbins Geller has worked vigorously to prosecute this action since its appointment as interim class counsel in October 2009.  *See* Dkt. No. 25.  If appointed as Class Counsel, it will continue to work to prove the claims being prosecuted by Plaintiff on behalf of itself and the Class.  Second, Robbins Geller is highly experienced in complex class action litigation.  The firm has extensive experience in the prosecution and successful resolution of complex securities fraud, consumer fraud, antitrust, and ERISA class actions in this District and in courts throughout the

United States.[10]  As a result, Robbins Geller has vast knowledge of the applicable laws at issue here. Moreover, the firm has demonstrated its willingness to commit substantial resources to representing the Class in this action through its efforts in prosecuting this action to date.  *See* Section III, *supra*.

Because there is no question about the competence of counsel to fairly and adequately represent the interests of the Class, the requirements of Rule 23(a)(4) and Rule 23(g) are satisfied, and Plaintiff's choice of counsel should be appointed as Class Counsel.

### C.      The Conditions of Rule 23(b)(3) Are Satisfied by the Proposed Class

In addition to meeting the requirements of Rule 23(a), this action also satisfies the requirements of Rule 23(b)(3), namely, that common questions of law or fact predominate over individual questions, and that class action treatment is superior to other available methods of adjudication.  As set forth below, this case meets the criteria set forth in Rule 23(b)(3).  *See* Miller Decl. ¶¶25-31.

### 1.      Common Questions of Law or Fact Predominate

"Generally, 'the predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, [] predominate over those issues that are subject only to individualized proof.'"  *AFTRA*, 269 F.R.D. at 346 (quoting *Brown v. Kelly*, 609 F.3d 467, 482-83 (2d Cir. 2010)); *LaFlamme*, 212 F.R.D. at 457. According to the Second Circuit, "Rule 23(b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Kelly*, 609 F.3d at 483.  "That some class members may be subject to a unique defense that

---

[10]      Robbins Geller is a vigorous advocate and has demonstrated familiarity with complex class action litigation, both in this Circuit and nationwide.  Its firm résumé is attached hereto as **Exhibit F**.

is inapplicable to other class members does not undermine a conclusion that common issues predominate." *AFTRA*, 269 F.R.D. at 346. "So 'long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification.'" *Id.* (citing *In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006)).

By virtue of the standardized operation of BNYM's SLP, its bulk purchases of the risky Lehman Notes as well as all other Program investments, and the application of the foregoing to Plaintiff's and the Class's ERISA claims, common questions of law and fact predominate over any individual questions here. Judge Scheindlin's *AFTRA* decision is particularly enlightening to this analysis because of the similarities (a) between JPMorgan's and BNYM's securities lending programs and (b) between the Class's claims and those of the *AFTRA* plaintiffs. For many of the same reasons class treatment was preferred in *AFTRA*, the Court should likewise certify the proposed Class in this action. *AFTRA*, 269 F.R.D. at 355.

Defendant will likely argue as JPMorgan did in *AFTRA* that "variations in [SMA] holders' control over their accounts as well as their communications with [BNYM] present highly individualized questions." *Id.* at 351. However,

> [f]or purposes of determining liability, it is [BNYM's] conduct—rather than that of individual class members—that is the key issue. [BNYM] made the decision that the [Lehman Notes] were an appropriate investment for its securities lending participants. It was based on that recommendation that [BNYM's] portfolio managers purchased the [Lehman Notes]. That [any] of the [approximately 240] class members had the authority to dictate which issuers [BNYM] could purchase from for their accounts has little bearing on the question of whether the purchase of the [Lehman Notes] was prudent.
>
> Similarly, [BNYM] made the recommendation to hold the [Lehman Notes]—a recommendation that both the portfolio managers of the [commingled funds] and the [SMA] holders followed. The [SMA] holders' ability to direct [BNYM] to sell the [Lehman Notes] does not detract from the overarching question of whether [BNYM's] recommendation to hold the notes was prudent [and loyal]. Accordingly,

these differences do not create individual issues that threaten to predominate over those that are common to the entire class.

*Id.* at 352-53.  Likewise, there was little-to-no individualization in BNYM's investment decisions for



Given the mechanical, standardized operation of Defendant's SLP as outlined above, it is clear that common questions of law and fact predominate in proving Plaintiff's and the Class's breach of fiduciary duty claims against BNYM. *LaFlamme*, 212 F.R.D. at 457 ("The underlying yet forefront issue in this case is whether the pension plan's freezing rule violates the mandates of ERISA.  Everything else springs from the answer to that question.  Common questions predominate.").

Moreover, questions of Class members' specific injuries, while individualized, will not predominate over the common questions of law and fact surrounding Defendant's liability, and should therefore pose no hurdle to certification here. *See Linvatec Corp.*, 2007 WL 1526418, at *6 ("Because typicality does not require that the class representative claims be identical to those of the class, differences in damages will not destroy typicality.  Thus the fact that the named plaintiffs may have suffered different injuries from those sustained by other class members does not, as defendants

suggest, undermine a finding of typicality here, where the injuries were all caused by defendants' alleged failure to [prudently and loyally manage the Class's securities lending assets].")

### 2. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

To determine whether the "superiority" requirement of Rule 23(b)(3) is satisfied, the Court must consider the following factors: (1) the interest of the Class members in maintaining separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by members of the Class; (3) the desirability or undesirability of concentrating the litigation of the claims in this particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *AFTRA*, 269 F.R.D. at 346-47. Each of these factors weighs strongly in favor of class certification here.

First, to Plaintiff's knowledge, no other putative Class members have instituted separate actions related to the investments at issue here. *See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, --- F.R.D. ----, 2011 WL 3652477, at *21 (S.D.N.Y. Aug. 22, 2011) (superiority requirement met where "there is no overwhelming interest by class members to proceed individually"). As the *AFTRA* court recognized, many Class members here may "have a strong disincentive to initiate individual lawsuits because they may not be willing to sue their securities custodian with whom they have active ongoing relationships." *Id.* at 355. Moreover, it is highly unlikely that individual participants will pursue their own claims as Defendant has aggressively defended itself in this action and produced over 18 million pages of documents, which are needed to demonstrate BNYM's breaches of its duties of prudence and loyalty. The burden on the courts from adjudicating separate actions that arise out of the same facts would be significant. *See Pub. Emps.' Ret. Sys. of Miss.*, 2011 WL 3652477, at *21 ("Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be 'fair' nor

an adjudication of their claims."); *AFTRA*, 269 F.R.D. at 354 ("Here, the class consists of seventy-six entities, with thousands of beneficiaries, whose claims can be resolved efficiently in a single proceeding."); *Sadia*, 269 F.R.D. at 321 ("Adjudicating individual claims would also be a significant waste of judicial resources."). Thus, the first two factors favor certification of the proposed Class. *See* Fed. R. Civ. P. 23(b)(3)(A)-(B).

Next, as shown above, courts uniformly have recognized that the class action device is superior to other available methods – particularly duplicative individual lawsuits – for the fair and efficient resolution of large-scale ERISA actions such as this. The Supreme Court has recognized that "[c]lass actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually . . . . [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). District courts within the Second Circuit similarly have commended class actions as superior to other methods of adjudication of claims under ERISA, and have found such claims particularly suitable to class treatment. *See AFTRA*, 269 F.R.D. at 355; *Linvatec Corp.*, 2007 WL 1526418, at *5 ("ERISA cases are well-suited for class action certification pursuant to Rule 23."); *Banyai*, 205 F.R.D. at 165 (same).

Moreover, given the Court's and the parties' intimate familiarity with the complex issues here presented,

> it is clearly desirable to concentrate this litigation in this forum. Concentrating litigation in a single forum plainly has a number of benefits, including eliminating the risk of inconsistent adjudications and promoting the fair and efficient use of the judicial system . . . . Efficiency interests are particularly weighty here given that this action has been ongoing since December 2008 and the Court has already issued three Opinions in this matter.

*Pub. Emps.' Ret. Sys. of Miss.*, 2011 WL 3652477, at *22; *see also Parmalat*, 2008 WL 3895539, at *11 ("judicial economy would best be served by concentrating all claims in this forum, as this Court

as gained extensive knowledge of the subject matter of this action over the last four years"). Therefore, the second two superiority factors also favor certification here. *See LaFlamme*, 212 F.R.D. at 458 ("As stated, *ad nauseum*, one legal issue—whether the pension plan's freezing rule violates ERISA—largely controls the outcome of this litigation. All other issues, in terms of claims and relief sought, are dependent upon the resolution of the issue. There may be . . . differences in amounts received or to be received in the event of a favorable verdict for the class, but not so much so that the case will be difficult for the parties or court to handle. The attorneys are competent, the issues federal, and the system ready.").

Consistent with the requirements of Rule 23(b)(3), the certification of this litigation as a class action would not only be "superior to other available methods for the fair and efficient adjudication of the controversy," but is the sole method for fairly and efficiently litigating the claims of all members of the proposed Class. Accordingly, the prosecution of this action as a class action will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Kelly*, 609 F.3d at 483; *see also* Miller Decl. ¶32.

## V.    CONCLUSION

In light of the foregoing, Plaintiff respectfully submits that this case is eminently suitable for class treatment and therefore respectfully requests that the Court enter an order (i) certifying the proposed Class, (ii) appointing IBEW as Class Representative, and (iii) appointing Robbins Geller as Class Counsel.

DATED:  January 31, 2012

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER (*pro hac vice*)
STEPHEN R. ASTLEY (*pro hac vice*)
ELIZABETH A. SHONSON (*pro hac vice*)
SABRINA E. TIRABASSI (*pro hac vice*)
JESSE S. JOHNSON (*pro hac vice*)


            */s/ Stephen R. Astley*
_____
         STEPHEN R. ASTLEY

120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Attorneys for Plaintiff and Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 31, 2012, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all

counsel of record.

<i>/s/ Stephen R. Astley</i>
STEPHEN R. ASTLEY