**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
THE BOARD OF TRUSTEES OF THE          :
SOUTHERN CALIFORNIA IBEW-NECA        :
DEFINED CONTRIBUTION PLAN, on behalf  :
of itself and all others similarly situated,    :
                                                              :
                              Plaintiff,          :
                                                              :
            -against-                              :
                                                              :
THE BANK OF NEW YORK MELLON          :
CORPORATION, et al.,                          :
                                                              :
                              Defendants.      :
------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____          │
│ DATE FILED: 8/16/2012            │
└─────────────────────────────────┘
```

09 Civ. 6273 (RMB) (AJP)

**DECISION & ORDER**

## I.    Background

Before the Court is a motion for class certification, filed on January 31, 2012 by the

Board of Trustees ("Plaintiff" or "IBEW-NECA Board of Trustees") of the Southern California

IBEW-NECA ERISA Defined Contribution Plan ("Plan") pursuant to Rules 23(a) and (b)(3) of

the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). (See Pl.'s Mot. and Inc. Mem. of Law

in Supp. of Class Cert., dated Jan. 31, 2012 ("Pl. Class Cert. Mem.").) Plaintiff seeks to certify a

class of:

> all ERISA-governed plans that participated in BNY Mellon,
> National Association, formerly known as Mellon Bank, N.A., The
> Bank of New York, and/or The Bank of New York Mellon's
> securities lending program and had collateral invested in Lehman
> Brothers Holding Inc. floating rate note(s) bearing CUSIP number
> 52517PL33, 52517PQ53, 524908X21, 52517P2K6, 52517PC58,
> 52517PG39, 52517PQ46, **52517PW31**, 52517PW56, and/or
> 52520WDF5 as of September 15, 2008 (the "Class").

(Pl. Class Cert. Mem. at 1 (emphasis added).)

The underlying action was filed by the IBEW-NECA Board of Trustees on July 13, 2009

pursuant to Sections 404 and 406 of the Employee Retirement Income Security Act of 1974, 29

U.S.C. §§ 1104, 1106, et seq. ("ERISA"), against The Bank of New York Mellon Corp., The Bank of New York, and BNY Mellon, N.A. (collectively, "Defendants" or "BNY Mellon"). (Compl., dated July 13, 2009, as amended on Oct. 29, 2009, Sept. 21, 2010 & Mar. 11, 2011 ("Compl."), ¶¶ 1, 6.)  Plaintiff alleges that Defendants violated Section 404 of ERISA by imprudently maintaining Plaintiff's assets in a floating rate note issued by Lehman Brothers Holding, Inc. ("Plaintiff's Lehman Note" or "Plaintiff's Note") and by "failing to diversify the [Plaintiff's] [c]ollateral investments" ("Imprudent Maintenance Claim").  (Compl. ¶¶ 5, 223–39.) Plaintiff also alleges that Defendants violated Section 406 of ERISA by acting in their "own interest" in "investing" Plaintiff's assets in Plaintiff's Lehman Note ("Self-Dealing Claim"). (Compl. ¶¶ 5, 240–45.)  Plaintiff's Note had a maturity date of March 23, 2009 and bore CUSIP number 52517PW31.  (Compl. ¶ 3.)  Plaintiff alleges that it suffered $3 million in losses with respect to Plaintiff's Lehman Note when Lehman declared bankruptcy on September 15, 2008. (Hr'g Tr., dated July 19, 2012 ("Oral Arg. Tr."), at 2:22–24; Compl. ¶ 5.)

Defendants invested Plaintiff's assets because Plaintiff was—and continues to this day to be—a participant in Defendants' securities lending program ("Securities Lending Program"). (Compl. ¶¶ 1, 3.)[1]  Under the Securities Lending Program, Plaintiff contributed a "basket" of its securities to BNY Mellon who, in turn, lent Plaintiff's securities to approved third-party borrowers; the borrowers provided collateral to BNY Mellon (in exchange for the securities) which it invested on Plaintiff's behalf and "in accordance with a set of investment guidelines previously provided by [Plaintiff]."  (See Compl. ¶¶ 23–27; Hr'g Tr., dated Apr. 8, 2010, at 3:22–24; Rebuttal Expert Report of Keith R. Ugone, Ph.D., dated Mar. 4, 2011 ("Ugone

---

[1]      Apart from Plaintiff's Lehman Note, Plaintiff does not allege that it has suffered any other losses under the Securities Lending Program.  (See Defs. Mot. for Summ. J., dated May 25, 2011, at 4 (citing Pl. 30(b)(6) Dep. at 49:5–13).)

Report"), ¶¶ 21–24.)  Plaintiff's investment guidelines included, among other requirements, "certain universal investment policies that dictated the most aggressive maturity, issuer diversification, and credit quality allowable for any collateral investment ('Umbrella Guidelines')."  (Pl. Mem. at 6.)

Plaintiff argues in its motion for class certification, among other things, that (1) the proposed Class of some "239 geographically-dispersed ERISA governed" plans satisfies the "numerosity" requirement of Fed. R. Civ. P. 23(a)(1) because, even though they (i.e., the 239 plans) did not all invest in Plaintiff's Lehman Note, they did invest in one or more of ten Lehman notes which differed in "announcement date" (i.e., the date the issuance was announced), principal amount, maturity date, and tenor (i.e., the time until maturity); and (2) the proposed Class satisfies the "predominance" and "superiority" requirements of Fed. R. Civ. P. 23(b)(3) because the question as to "each and every" proposed class member is whether the ten Lehman notes were "impermissible for any securities lending collateral account."  (Pl. Class Cert. Mem. at 13, 20–25; Reply Mem. in Supp. of its Mot. for Class Cert., dated Mar. 15, 2012 ("Pl. Class Cert. Reply"), at 3, 8–9 (emphasis omitted).)  In support of its motion, Plaintiff seeks to rely upon the declaration of New York University School of Law Professor Geoffrey P. Miller, dated February 1, 2011 ("Miller Decl.").[2]  (Miller Decl. ¶ 1.)  Professor Miller is of the opinion that class certification "would achieve economies of scale, facilitate the uniform resolution of this controversy, and enhance enforcement of the law," and "is an effective, convenient, and manageable means to address the legal issues presented in this case."  (Miller Decl. ¶ 3.)

---

[2]      Professor Miller has been "involved in the area of class action litigation as a teacher, scholar, attorney, consultant, and expert witness," and received his A.B. from Princeton University in 1973 and his J.D. from Columbia Law School in 1978.  (See Miller Decl. ¶ 2, p. 18.)

On March 1, 2012, Defendants opposed class certification contending, among other things, that (1) the numerosity requirement is not satisfied for two reasons: first, "at least" 187 of the 239 proposed class members "are not 'ERISA-governed plans,'" and second, with respect to the remaining 52 plans (i.e., 239 minus 187) that are governed by ERISA, Plaintiff has standing to represent (at most) the eight other plans that also invested in Plaintiff's Lehman Note;[3] and (2) the predominance and superiority requirements are not satisfied because, as Plaintiff conceded at the summary judgment stage of these proceedings (see Decision & Order, dated Dec. 9, 2011), "the decision to maintain Lehman investments could be prudent for one manager and imprudent for another *depending upon the individual investment expectations and tolerances [of] the client [i.e., the plan]* . . . ." (Defs. Class Cert. Opp'n at 1–4, 16–23 (citing Pl. Mem. of Law in Opp'n to Defs.' Mot. for Reconsideration, dated Feb. 9, 2012 ("Pl. Reconsideration Mem."), at 5 (emphasis in original); Pl. Mem. of Law in Opp'n to Defs. Mot. for Summ. J., dated July 25, 2011 ("Pl. SJ Opp'n"), at 14–15).) According to Defendants, each plan had "individualized investment guidelines, risk tolerances, investment portfolios, and communications with BNY Mellon." (Defs. Class Cert. Opp'n at 1.) These differences from plan to plan "predominate over common issues such that a 'one stroke' resolution of class claims is not possible." (Defs. Class Cert. Opp'n at 1–2.)

Defendants also move to exclude the Miller Declaration because Miller "offers legal conclusions." (Defs. Class Cert. Opp'n at 24.) Without objection from Plaintiff, Defendants submit their own expert report of Keith R. Ugone, Ph.D., dated March 4, 2011. Dr. Ugone is the managing principal at Analysis Group, Inc., and provides "economic, financial, and business

---

[3]     Defendants also point out that the eight other plans could readily be joined as parties under Fed. R. Civ. P. 23(a)(1). (See infra pp. 12–13; Mem. of Law in Opp'n to Pl.'s Mot. for Class Cert., dated Mar. 1, 2012 ("Defs. Class Cert. Opp'n"), at 21.)

strategy consulting to its clients." (Ugone Report ¶ 8.) Dr. Ugone opines that "a [c]lass-wide approach would obfuscate (or mask) . . . important differences" among proposed class members' (individual) investment expectations, tolerances, and guidelines, such as "differences in maturity guidelines, differences in credit quality guidelines, differences in prohibited investments, and differences in diversification requirements."[4] (Ugone Report ¶ 5.)

On March 15, 2012, Plaintiff filed a reply arguing, among other things, that, "[w]hile the parties disagree over which [of the 239 proposed class members] are ERISA-governed, this . . . does not preclude certification . . . [and] Defendant[s] concede[] that the Class totals . . . between 52 and 77 members."[5] (Pl. Class Cert. Reply at 6.) Plaintiff also argues that the Miller Declaration "is offered to describe and explain that central factual issues are common to the class as a whole—not, as Defendant[s] suggest[], to opine on legal presumptions that should apply." (Pl. Class Cert. Reply at 10.)

The Court heard oral argument on July 19, 2012. (See Oral Arg. Tr.)

During the three years that this matter has been pending, there have been extensive and sometimes contentious submissions, including three amended complaints, two motions to dismiss, a motion for summary judgment, and a motion for reconsideration of the summary judgment ruling. Discovery is said to have included production of over 18 million documents and 30 depositions. (Pl. Class Cert. Mem. at 9.) By Decision and Order, dated April 14, 2010, the Court granted Defendants' first motion to dismiss, dated November 9, 2009 ("April 14, 2010

---

[4]     Dr. Ugone received his B.A. in Economics from the University of Notre Dame in 1977, his M.A. in Economics from the University of Southern California in 1979, and his Ph.D. in Economics from Arizona State University in 1983. (Ugone Report ¶ 11.)

[5]     Defendants vigorously deny making any such concession. (See infra p. 10; Defs. Class Cert. Opp'n at 16 n.4 ("BNY Mellon expressly stated that by providing you [Plaintiff's counsel] with this list [of clients] we do **not** concede that these clients belong in a class or that a class should be certified at all.") (emphasis added).)

Order"), and initially did so "with prejudice." (See Decision & Order, dated Apr. 14, 2010 [#59], at 9 ("Plaintiff's allegation that there was, in hindsight, a loss of principal from the investment of the Plan's collateral in the Lehman floating rate note is not, without further 'factual enhancement,' sufficient to sustain a claim under ERISA §§ 404 or 406.").) By motion, dated May 12, 2010, Plaintiff contended that it "was not informed that by choosing to amend the complaint [prior to motion practice], any order of dismissal would thereby be made with prejudice," to which Defendants responded that they understood that, because Plaintiff was given the opportunity to amend its complaint and, in fact, took that opportunity, the Court intended that "any dismissal of the amended pleading would be with prejudice." (See Pl.'s Mot. to Alter, Amend or Grant Relief from Order of Dismissal, dated May 12, 2010 [#65], at 2; Defs.' Mem. of Law in Opp'n to Pl.'s Mot. to Vacate J., dated May 26, 2010 [#71], at 1.) By Decision and Order, dated September 7, 2010, the Court allowed a further amendment, giving Plaintiff the benefit of the doubt. (Decision & Order, dated Sept. 7, 2010 [#83], at 3.)[6]

    **For the reasons set forth below, Plaintiff's motion for class certification is denied.**

## II.    Legal Standard

    "[T]he party invoking federal jurisdiction . . . bears the burden of establishing that he has suffered concrete injury." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005). "Without a plaintiff's satisfaction and demonstration of the requirements of Article III standing, a federal court has no

---

[6]    By Decision and Order, dated December 9, 2011, the Court granted Plaintiff's motion to dismiss Defendants' counterclaims; denied Plaintiff's motion to strike Defendants' affirmative defenses; and denied Defendants' motion for summary judgment. (See Decision & Order, dated Dec. 9, 2011 [#204], at 5 ("[G]enuine issues of fact exist . . . as to Plaintiff's claims for breach of fiduciary duty under ERISA § 404(a) . . . and for prohibited transactions under ERISA § 406.").) And, by Decision and Order, dated March 9, 2012, the Court denied Defendants' motion for reconsideration. (See Decision & Order, dated Mar. 9, 2012 [#227].)

subject matter jurisdiction to hear the merits of a plaintiff's—or, in this case, the class

plaintiffs'—claim."  Id.  A plaintiff has no standing to assert claims in relation to securities in

which that plaintiff did not personally invest.  See Public Emps.' Ret. Sys. of Miss. v. Merrill

Lynch & Co. Inc., 714 F. Supp. 2d 475, 481 (S.D.N.Y. 2010) (citing Hoffman v. UBS-AG, 591

F. Supp. 2d 522, 532 (S.D.N.Y. 2008)).

      A class action is "an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541,

2550 (2011) (internal quotation marks omitted).  "In determining whether class certification is

appropriate, a district court must first ascertain whether the claims meet the preconditions of

Rule 23(a) of numerosity, commonality, typicality, and adequacy."  Teamsters Local 445 Freight

Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 201–02 (2d Cir. 2008).  A "failure to meet

any one of Rule 23's requirements destroys the alleged class action."  Jeffries v. Pension Trust

Fund of the Pension Hospitalization and Benefit Plan of the Elec. Indus., 172 F. Supp. 2d 389,

394 (S.D.N.Y. 2001).  "If th[e] lawsuit meets the prerequisites of a class action under Rule 23(a),

it must then also qualif[y] under at least one of categories provided in Rule 23(b) before it may

be certified as a class action."  Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502

F.3d 91, 104 (2d Cir. 2007) (internal citation and quotation marks omitted).

      "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation."  Amchem Prods. Inc. v. Windsor, 521 U.S.

591, 623 (1997).  "Clearly, if proof of the essential elements of the cause of action requires

individual treatment, then there cannot be a predominance of questions of law and fact common

to the members of the class."  In re Currency Conversion Fee Antitrust Litig., 230 F.R.D. 303,

309 (S.D.N.Y. 2004) (quoting In re Linerboard Antitrust Litig., 305 F.3d 145, 156 (3d Cir.

2002)).

## III.   Analysis

### Miller Declaration

The Miller Declaration is, in the Court's view and as pointed out by Defendants, in part at

least "substantively indistinguishable from a legal brief."  (Defs. Class Cert. Opp'n at 24); see

United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[A]n expert's testimony on

issues of law is inadmissible.").  It sets forth Professor Miller's opinions that "certification of this

case as a class action would achieve economies of scale, facilitate the uniform resolution of this

controversy, and enhance enforcement of the law," that "[t]he simplicity that class action

treatment offers in this case is a decided advantage when compared with joinder of individual

suits," that the purpose of the commonality requirement "would be served by certifying the

proposed class, given the essential overlap of many of the claims," and that "[c]lass action

treatment is clearly the superior means for resolving this controversy."  (Miller Decl. ¶¶ 19–21,

26, 32); see Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 470 (S.D.N.Y.

2005) ("[I]t is axiomatic that an expert is not admitted to provide legal opinions, legal

conclusions, or interpret legal terms; those roles fall solely within the province of the court.").[7]

Even assuming, arguendo, that the Miller Declaration were admissible, it would not persuade the

Court to grant Plaintiff's motion for class certification for the reasons set forth below.

---

[7]     Professor Miller's Declaration is quite similar to the declaration he submitted to the court
in Bd. of Trs. of the AFTRA Ret. Fund v. JP Morgan Chase Bank, 269 F.R.D. 340 (S.D.N.Y.
2010).  (See Decl. of Geoffrey Miller, dated Apr. 19, 2010, filed in Docket No. 09 Civ. 686
[#47], ¶ 31 ("[I]t is my opinion that this case is suitable for class certification under Rule 23(a)
and (b)(3) as the prerequisites of the Rule are easily satisfied.  Therefore, in my opinion, the
action should be certified as a class for litigation purposes.").)  It does not appear from the
AFTRA court's opinion whether or to what extent it may have relied upon Professor Miller's
submission.  See AFTRA, 269 F.R.D. at 340–55.

**The Numerosity Requirement Is Not Satisfied**

Rule 23(a) of the Federal Rules of Procedure provides in relevant part:

> (a) One or more members of a class may sue or be sued as
>     representative parties on behalf of all members only if:
>
>> (1) the class is so numerous that joinder of all members is
>>     impracticable;
>> (2) there are questions of law or fact common to the class;
>> (3) the claims or defenses of the representative parties are
>>     typical of the claims or defenses of the class; and
>> (4) the representative parties will fairly and adequately
>>     protect the interests of the class.

Fed. R. Civ. P. 23(a).  "[A] plaintiff must satisfy all of the requirements of Rule 23, by a

preponderance of the evidence, to obtain class certification."  Novella v. Westchester Cnty., 661

F.3d 128, 148–49 (2d Cir. 2011).  "In addition to meeting the four requirements of Rule 23(a), a

class must also satisfy one out of the three sub-paragraphs to Rule 23(b)."  In re IMAX Secs.

Litig., -- F. Supp. --, 2012 WL 2359653, at *7 (S.D.N.Y. 2012).  A "failure to prove any of these

elements precludes class certification."  Deen v. New School Univ., No. 05 Civ. 7174, 2008 WL

331366, at *2 (S.D.N.Y. Feb. 4, 2008) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591,

613–14 (1997)).

Plaintiff argues that the numerosity requirement of Rule 23(a)(1) is satisfied because the

Class "is comprised of 239 geographically-dispersed, ERISA-governed" plans who "suffered

millions of dollars in losses due to risky Lehman investments."  (Pl. Class Cert. Mem. at 2, 13.)

Plaintiff also argues that, "at a minimum, Plaintiff and Defendants agree that the proposed Class

will consist of at least 77 members."  (Pl. Class Cert. Mem. at 13; see Pl. Class Cert. Reply at 6.)

Plaintiff contends that it has standing to represent all ERISA plans holding any of the ten

Lehman notes because "any differences among the [ten Lehman n]otes are trivial" and

"Plaintiff's ERISA claims . . . require proof of a common course of misconduct by . . .

[D]efendant[s]," namely that "all ten Lehman [n]otes were impermissible for any collateral account in light of the risk associated with Lehman and the Lehman [n]otes."  (Pl. Class Cert. Reply at 2, 7.)

Defendants contend that the numerosity requirement is not met, first because at least 187 of the 239 proposed class members are not governed by ERISA and cannot be part of Plaintiff's (ERISA only) Class.  (Defs. Class Cert. Opp'n at 16–17.)  Second, Defendants deny they ever conceded that 77 plans belong in a class or that any class should be certified (Defs. Class Cert. Opp'n at 16 n.4.), and they contend that Plaintiff has standing to represent no more than the eight other (ERISA) plans that invested in Plaintiff's Lehman Note.  (Defs. Class Cert. Opp'n 17–21.)  And, Defendants argue that "a class of nine is not sufficiently numerous that joinder is impracticable."  (Defs. Class Cert. Opp'n at 21.)

The Court concludes, as set forth below, that: (1) only 52 of the proposed class members are governed by ERISA and, thus, arguably fall within the class definition; (2) of the 52 ERISA-governed plans, Plaintiff has standing to represent the eight other plans that purchased Plaintiff's Lehman Note; and (3) a class of nine plan members is not so numerous that joinder is impracticable.  See Novella, 661 F.3d at 148–49.  Plaintiff has not met the numerosity requirement.  See Jeffries, 172 F. Supp. 2d at 394.

Plaintiff concedes that non-ERISA governed plans should be excluded from the Class.  (See Oral Arg. Tr. at 11:14–23, 12:5–6 (THE COURT: "So we agree that your class, if a class is certified, would not include non-ERISA plans?"  PL. COUNSEL: "Correct.").)[8]  And, while

---

[8]     The Court notes that Plaintiff's counsel also represents non-ERISA governed plans in a separate action pending before District Judge Richard J. Sullivan "against the same [D]efendants concerning the same [Lehman] investments."  (Pl. Class Cert. Reply at 9; see Oral Arg. Tr. at 12:21–24 (THE COURT: "[T]here is no disagreement we can remove the non-ERISA plans because they are protected by your legal services before Judge Sullivan, right?"  PL. COUNSEL:

Plaintiff bears the burden of establishing by a preponderance of the evidence that the proposed

class members are governed by ERISA, see Novella, 661 F.3d at 148–49, Plaintiff offers no

evidence in support of its contention that 239 plans are ERISA-governed.  See Weissman v.

ABC Fin. Servs., Inc., 203 F.R.D. 81, 84 (E.D.N.Y. 2001) ("Where the plaintiff's assertion of

numerosity is pure speculation or bare allegations, the motion for class certification fails.").  On

the other hand, Defendants offer the (unrebutted) Declaration of William P. Kelly, dated March

1, 2012, showing that 187 of the proposed class members are, in fact, not governed by ERISA

because they include, among them, foreign national banks, mutual funds, insurance companies,

and charities.  (See Decl. of William P. Kelly, dated Mar. 1, 2012 ("Kelly Decl."), ¶ 7.)  At oral

argument, Plaintiff's counsel relied upon the Kelly Declaration to show which of the 239 plans

are ERISA-governed.  (See Oral Arg. Tr. at 13:15–14:7 (THE COURT: "[I]t's your burden to

prove by a preponderance of the evidence how many of these plans are ERISA plans. . . .

[W]here do I look to see how many ERISA plans are in your class?"  PL. COUNSEL: "William

Kelly's declaration, paragraph 9, which was advanced in support of defendant's opposition

. . . .")); see also Oboler v. Ins. Co. of N. Am., No. 91 Civ. 2808, 1994 WL 414438, at *5

(S.D.N.Y. Aug. 5, 1994).

  Plaintiff's suggestion that the Court may determine whether a particular plan is ERISA-

governed "once the Class is certified" (Pl. Class Cert. Reply at 6) is wholly unpersuasive.  "The

district court must receive enough evidence, by affidavits, documents, or testimony, to be

satisfied that each Rule 23 requirement has been met" prior to class certification.  In re Initial

Pub. Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006); see Weissman, 203 F.R.D. at 84.

---

"That's right.")); see Bd. of Trs. of the Gen. Ret. Sys. of the City of Detroit v. BNY Mellon,
N.A., No. 11 Civ. 6345 (RJS) (S.D.N.Y.).

Because Plaintiff has failed to show that 187 of the proposed class members are ERISA-governed, and has failed to counter Defendants' proof that only 52 (<u>i.e.</u>, 239 minus 187) are in fact ERISA-governed, the Court finds that 187 of the proposed class members fall outside of the class definition.  (<u>See</u> Kelly Decl. ¶¶ 8, 9); <u>In re IPO</u>, 471 F.3d at 41; <u>Hamelin v. Faxton-St. Luke's Healthcare</u>, No. 08 Civ. 1219, 2010 WL 1257932, at *2 (N.D.N.Y. Mar. 26, 2010) (where proposed class member "does not fall within the definition of the class and must be dismissed").

**Article III Standing**

Of the 52 ERISA-governed plans, Plaintiff has standing to represent only those plans that invested in Plaintiff's Lehman Note.  <u>See In re Am. Int'l Grp., Inc. ERISA Litig. II</u>, 08 Civ. 5722, 2011 WL 1226459, at *3 (S.D.N.Y. Mar. 31, 2011); <u>Fuller v. SunTrust Banks, Inc.</u>, No. 11 Civ. 784, 2012 WL 1432306, at *8 (N.D. Ga. Mar. 20, 2012).  Plaintiff has not suffered an "injury-in-fact" with respect to Lehman notes in which it did not invest.  <u>In re Am. Int'l Grp.</u>, 2011 WL 1226459, at *3.  Plaintiff's alleged $3 million injury is premised upon its ownership of Plaintiff's Lehman Note.  <u>Kendall v. Emps. Ret. Plan of Avon Prods.</u>, 561 F.3d 112, 118 (2d Cir. 2009); <u>see Fuller</u>, 2012 WL 1432306, at *8 ("Plaintiff, beyond the bare assertion that a breach of fiduciary duty harms all plan participants [under ERISA], has not described how the offering of a fund in which she did not invest caused her a non-speculative injury."); <u>In re Bank of Am. Corp. Secs., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.</u>, No. 10 Civ. 275, 2011 WL 3211472, at *12–13 (S.D.N.Y. July 29, 2011); <u>In re Lehman Bros. Secs. & ERISA Litig.</u>, 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010); <u>Hoffman</u>, 591 F. Supp. 2d at 531–32.

Plaintiff's argument that it has standing to represent all Lehman note holders because of a "common course of misconduct by [D]efendants" pursuant to "certain universal investment

policies" (Pl. Class Cert. Reply at 7; Pl. Class Cert. Mem. at 6) and Plaintiff's citations to, among other cases, In re Dynex Cap., Inc. Secs. Litig., No. 05 Civ. 1897, 2006 WL 314524, at *12 (S.D.N.Y. Feb. 10, 2006), and Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., No. 05 Civ. 1898, 2005 WL 2148919, at *7–8 (S.D.N.Y. Sept. 6, 2005) are unpersuasive. (Pl. Class Cert. Reply at 7); see Kendall, 561 F.3d at 120; Fuller, 2012 WL 1432306, at *8.  The plaintiffs in Dynex and Bombardier alleged injury stemming from "the same repeated, material misstatements" allegedly contained in a series of prospectuses.  Dynex, 2006 WL 314524, at *5 ("A plaintiff has standing to represent a class of all purchasers who relied on the same repeated, material misstatements and thus suffered the same injury."); Bombardier, 2005 WL 2148919, at *8 ("[P]laintiff has standing to represent a class of all purchasers who relied on the same repeated, material misstatements and thus suffered the same injury.").  In this case, Plaintiff does not allege that it suffered any injury based upon any alleged misstatement in any registration statement in purchasing the Lehman notes.  (See Compl. ¶¶ 223–45; see also Oral Arg. Tr. at 4:18–21 (THE COURT: "So you're not complaining that they bought the Lehman note or notes. You're complaining that they held them for too long, is that right?"  PL. COUNSEL: "That's right."); id. at 48:11–24 (THE COURT: "It was prudent initially to buy it?"  PL. COUNSEL: "Exactly right.").)  Rather, Plaintiff alleges that it was harmed because Defendants "imprudently maintain[ed]" Plaintiff's Lehman Note, and that other plans were harmed because Defendants maintained collateral in other Lehman notes.  (See Compl. ¶ 5.)  As Defendants point out, Plaintiff's registration statement argument is a "great red herring" because this is not a case of fraud based upon (mis)statements contained in a registration statement.  (Oral Arg. Tr. at 40:14–18.)[9]

---

[9]     Plaintiff's contention that it has standing to represent holders of all ten Lehman notes

**Joinder Is Practicable**

Plaintiff argues that the Class is comprised of "239 geographically-dispersed, ERISA-governed Program participants," and "it would be impracticable to join such a large and geographically diverse group." (Pl. Class Cert Mem. at 13–14.) Defendants argue that joinder is practicable because, among other things, the Class consists of only nine plans, "a class of nine is not sufficiently numerous," and the plans "are large sophisticated institutional investors" with the ability to join this lawsuit (or to institute individual lawsuits). (Defs. Class Cert. Opp'n at 20–21; Oral Arg. Tr. at 41:1–22.)

"We are particularly hesitant to certify a . . . class, where joinder appears practicable, due to the additional manageability and due process concerns raised by certification of such classes." State of N.Y. v. Anheuser-Busch, Inc., 117 F.R.D. 349, 351 (E.D.N.Y. 1987); see also Moore's Fed. Prac. § 23.22(1)(b). In deciding whether joinder is practicable, courts consider the number of class members and "(1) judicial economy arising from the avoidance of a multiplicity of actions, (2) geographic dispersion of class members, (3) financial resources of class members, (4) the ability of claimants to institute individual suits, and (5) requests for prospective injunctive relief which would involve future class members." Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 269 F.R.D. 252, 255 (S.D.N.Y. 2010) (citing Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1999)).

The Court finds (for the reasons stated) that the potential class would consist of nine plans and it is not so numerous that joinder is impracticable. See Fed. R. Civ. P. 23(a)(1); Abu

---

because they were all "subject only to the credit risk of Lehman" (Pl. Class Cert. Reply at 7) is also unpersuasive. Under such a theory, Plaintiff conceivably could have standing to represent every investor in every Lehman asset. See King Cnty., Wash. v. IKB Deutsche Industriebank AG, No. 09 Civ. 8387, 2010 WL 2010943, at *2 (S.D.N.Y. May 18, 2010) (finding "unavailing" plaintiff's assertion that it has standing to represent purchasers of a "separate series of . . . notes"). Plaintiff points to no authority that would support such a claim.

<u>Dhabi</u>, 269 F.R.D. at 255 ("Generally, courts will find that the numerosity requirement . . . has not been satisfied when the class comprises 21 or fewer.").  And, class certification here would not promote judicial economy.  See <u>Deen v. New Sch. Univ.</u>, No. 05 Civ. 7174, 2008 WL 331366, at *3 (S.D.N.Y. Feb. 4, 2008).  Plaintiff can readily contact each of the eight other class members, apprise them of its lawsuit, and invite each of them to join this lawsuit.  See <u>Ansari v. New York Univ.</u>, 179 F.R.D. 112, 114–16 (S.D.N.Y. 1998); <u>Abu Dhabi</u>, 269 F.R.D. at 259; (Oral Arg. Tr. at 41:11–13 (Plaintiff knows who the other plans are and has their names and addresses).)[10]

Second, Plaintiff has not submitted evidence in support of its contention that the eight other ERISA-governed plans are geographically dispersed.  See <u>Primavera Familienstiftung v. Askin</u>, 178 F.R.D. 405, 410 (S.D.N.Y. 1998); (Pl. Mem. at 14.)  And, even assuming, <u>arguendo</u>, that they were, "dispersion is not dispositive."  <u>Abu Dhabi</u>, 269 F.R.D. at 259.

With respect to the third and fourth factors referred to above at p.14, Plaintiff has failed to demonstrate that the eight other ERISA plans either lack the financial resources to join Plaintiff's lawsuit or that they are incapable of bringing individual lawsuits.  See <u>Abu Dhabi</u>, 269 F.R.D. at 259; <u>Ansari</u>, 179 F.R.D. at 115.  To the contrary, Plaintiff and the eight other plans plainly each appear to be "sophisticated, high-worth ERISA-governed plans with hundreds of millions of dollars under their management." (Defs. Class Cert. Opp'n at 22; Kelly Decl. ¶ 9.) They seem clearly to have the ability and the financial resources either to join this litigation or to

---

[10]     The other eight ERISA plans that invested in Plaintiff's Lehman Note are the Atlanta Plumbers and St. Pension Fund, the Local 295/851 Pension Trust, the Carpenter Annuity Trust Fund North CA, the Alliant Technology Defined Benefit Master Trust, the Carpenter Pension Trust Fund North CA, the Nationwide Group Retirement Pension, the UFCW National Pension Fund, and the Nationwide Defined Benefit Master Trust.  (Kelly Decl. ¶ 9.)

institute individual lawsuits.  See Stoudt v. E.F. Hutton & Co. Inc., 121 F.R.D. 36, 38 (S.D.N.Y. 1998); Abu Dhabi, 269 F.R.D. at 259.

Finally, "there is no concern that there are [other potential class members] who may be injured in the future and who are, therefore, impossible to identify in the present."  Abu Dhabi, 269 F.R.D. at 259.  The nine ERISA plans who invested in Plaintiff's Lehman Note are a "finite number of [plans] all of whom are identifiable and all of whom have been injured, if at all, in the past."  Ansari, 179 F.R.D. at 116.

Because Plaintiff has failed to establish the numerosity prerequisite under Rule 23(a)(1) (and because joinder is practicable), Plaintiff's motion for class certification is denied, see Krouner v. Am. Heritage Fund, Inc., No. 94 Civ. 7213, 1997 WL 452021, at *5 (S.D.N.Y. Aug. 6, 1997), and the Court need not address the remaining requirements of Rule 23(a) or (b)(3).  See Romero v. Flaum Appetizing Corp., No. 07 Civ. 7222, 2011 WL 812157, at *6 (S.D.N.Y. Mar. 1, 2011); Jeffries, 172 F. Supp. 2d at 394 ("Failure to meet any one of Rule 23's requirements destroys the alleged class action.").

### Plaintiff Cannot Satisfy the Requirements of Rule 23(b)(3)

Even if it were, arguendo, necessary to apply the requirements of Rule 23(b)(3) here, the Court would likely find that individual questions predominate over class-wide issues and that a representative (class) action is not superior to other available methods for adjudicating this controversy, as follows:[11]

---

[11]     Rule 23(b) states:

> A class action may be maintained if Rule 23(a) is satisfied and if:
> (1) prosecuting separate actions by or against individual class members would create a risk of:

**Common Questions Do Not Predominate**

Plaintiff argues that the "overriding question . . . as to each and every [c]lass member is whether the Lehman [n]otes were impermissible for any securities lending collateral account," and "this question will be answered using class-wide common evidence."  (Pl. Class Cert. Reply at 3.)  Defendants counter that there is no predominance of common issues and they point, among other things, to Plaintiff's own arguments at summary judgment that individual issues and concerns are paramount.  (Defs. Class Cert. Opp'n at 2–3.)  According to Defendants, "by IBEW's own admission, facts specific to each putative class member—such as its risk tolerance, its earnings expectations, the makeup of its investment portfolio, and its communications with BNY Mellon—are outcome determinative" to Plaintiff's claims.  (Defs. Class Cert. Opp'n at 5.)

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to

---

        (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
        (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
    (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
    (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. . . .

Fed. R. Civ. P. 23(b).

individualized proof." UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 131 (2d Cir. 2010) (internal quotation marks omitted). Where, as here, individual issues of fact predominate and generalized proof would not suffice, a court must deny class certification. See In re Currency Conversion Fee, 230 F.R.D. at 309 ("[A] plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." (internal quotation marks omitted)).

Plaintiff has failed to establish that common questions of law or fact predominate over individual issues with respect to Plaintiff's claims. See Myers v. Hertz Corp., 624 F.3d 537, 548 (2d Cir. 2010). For one thing, each of the ten Lehman notes was a separate security which varied in announcement date, principal amount, maturity date, and tenor. (See Defs. Class Cert. Opp'n at 17; Kelly Decl. ¶ 4.) Whether Defendants maintained a particular Lehman note prudently or in their own self-interest will depend, among other things, upon the riskiness of the investment and the risk tolerance of the investor. The Lehman note bearing CUSIP number 52517P2k was announced on May 22, 2007, had a tenor of three years, and was scheduled to mature on May 25, 2010, i.e., twenty months after Lehman's bankruptcy. (Kelly Decl. ¶ 4.) The Lehman note bearing CUSIP number 52490X21, by contrast, was announced on September 26, 2007, had a tenor of one year, and was scheduled to mature on October 14, 2008, i.e., just one month after Lehman's bankruptcy. (Kelly Decl. ¶ 4.) As pointed out by Dr. Ugone, "[a]ll else being equal, the longer the maturity of a fixed income security, the greater the credit risk." (Ugone Report ¶ 41.) Because the Lehman notes had, among other things, different maturities and carried different risks, individual analysis of each note and its appropriateness for each plan would predominate over common issues. See Abu Dhabi, 269 F.R.D. at 253–54.

18

Second, each proposed class member had individual investment expectations, individual risk tolerances, and individual investment guidelines.  (Ugone Report ¶¶ 5(a)–(d), 49; see Oral Arg. Tr. at 6:3 (PL. COUNSEL: "[W]e don't dispute at all that there are such differences.").) Plaintiff conceded at summary judgment—when it was trying to demonstrate the existence of unresolved material issues—that these individual differences are "outcome determinative" to the prudence and self-dealing claim analyses.  (Defs. Class Cert. Opp'n at 5.)  Plaintiff argued "that the decision to maintain Lehman investments could be prudent for one manager and imprudent for another *depending upon the individual investment expectations and tolerances the client had for each [investment] manager*."  (Defs. Class Cert. Opp'n at 1–2 (emphasis in original); see Pl. SJ. Opp'n at 14–15).)  Plaintiff has also acknowledged that investment managers who were obligated to comply with each plan's individual investment guidelines "served in *different* capacities under *different* risk parameters and with *different* investment aims," reflecting the individual investment expectations and risk/return profiles of each plan.  (Pl. Reconsideration Mem. at 5; see Pl. Class Cert. Mem. at 6.)  Plaintiff's investment guidelines, for example, restricted its investments in long-term securities (over one year) to ratings of "A or better" with a maturity date of not more than two years.  (See IBEW Secs. Lending Investment Guidelines, dated Sept. 18, 2000, at 1–2 ("IBEW Investment Guidelines"), attached as Ex. 7 to Decl. of Vincent Y. Liu, dated Mar. 1, 2012 ("Liu Decl.").)  Plaintiff's guidelines would have precluded Plaintiff from investing in four of the ten Lehman notes.  (See id.; Kelly Decl. ¶ 4.)  Other proposed class members' investment guidelines, such as those of the ICR Fund, required that collateral investments be rated "A1" and have a maturity of no greater than 397 days.  (Liu Decl. Ex. 6.)  Such plans would have been precluded from investing in eight of the ten Lehman notes. (See Liu Decl. Ex. 6; Kelly Decl. ¶ 4.)  And, still other plan investment guidelines, such as those

of the EB Enhanced Fund, permitted substantially more aggressive investments in "BBB-" rated securities with maturities as long as five years.  (Ugone Report ¶ 55.)  The inescapable conclusion is that, because each plan had different investment objectives and parameters (that ranged, for example, from conservative to aggressive), individual analyses of each class member's investment profile will predominate over common questions of law or fact.  See Abu Dhabi, 269 F.R.D. at 261–62.

Third, the proposed class members had different types of accounts with BNY Mellon. (See Ugone Report ¶ 5(c).)  Some held separately managed accounts ("SMAs") and others held commingled fund accounts.  (See Ugone Report ¶ 5(c).)  Plaintiff and several other proposed class members had SMAs, in which collateral was invested and managed solely for their own account(s).  (See Ugone Report ¶ 5(c).)  SMA holders were able to "customize their guidelines and direct their investment activity to reflect customized risk tolerances and investment objectives," "modify their [investment] guidelines at any time to preclude any type of investments," and direct Defendants when to sell particular securities.  (Defs. Class Cert. Opp'n at 9–11; see Ugone Report ¶¶ 5(c), 53 n.88.)  Class members who held commingled fund accounts owned pro rata shares of particular investments.  (See Ugone Report ¶ 5(c).) Commingled fund account holders "did not have the ability to customize their collateral investments."  (Ugone Report ¶ 5(c).)  The point here is that, because of differing types of accounts, individual examination of each proposed class member's ability to manage its Lehman investment(s)—and individual determination of whether and how a fund did manage its Lehman investment(s)—would be crucial to determining whether maintaining a Lehman note investment was prudent and/or reflected self-dealing.  See Moore v. PaineWebber, Inc., 306 F.3d 1247, 1255 (2d Cir. 2002).

Fourth, there were variations—not commonality—among proposed class members' instructions to BNY Mellon regarding Lehman note investments.  See N.J. Carpenters Health Fund v. RALI Series 2006-Q01 Trust, Nos. 11 Civ. 1683 & 11 Civ. 1684, 2012 WL 1481519, at *3 (2d Cir. Apr. 30, 2012).  For example, some proposed class members communicated directly with BNY Mellon, including the National Association of Letter Carriers Plan ("NALC") which, just five days before Lehman filed for bankruptcy, appears to have directed Defendants by email, dated September 10, 2008, as follows: "[d]o not add any more funds to Lehman Brothers, **but do not unwind the current positions**."  (See Liu Decl. Ex. 11 (emphasis added).)  Other proposed class members do not appear to have communicated with BNY Mellon regarding their Lehman investments.  (Ugone Report ¶ 5(d)(iii)).  And, while Plaintiff seeks to downplay the significance of the September 10, 2008 NALC email by arguing that "NALC is not asking [Defendants] or evidencing any intent or concern over Lehman Brothers' cash investments.  It's focused on the lending activity" (Oral Arg. Tr. at 23:4–22), Defendants contend persuasively that unraveling any particular plan's instructions involves "exactly the kind of mini-trial that [the parties] would be facing here with class certification." (Oral Arg. Tr. at 42:6–15.)  There are "numerous examples of communications back and forth regarding Lehman Brothers" and "numerous examples of [proposed class members] who [also] held Lehman Brothers outside of the [S]ecurities [L]ending [Program]."  (Id.)  The point here is that the question of whether a class member issued instructions to Defendants regarding Lehman investments, and, if so, what the instructions were, entails individual rather than common analysis (in determining whether maintaining a plan's Lehman investment was prudent or reflected self-dealing).  See Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 190 (3d Cir. 2001); Abu Dhabi, 269 F.R.D. at 261 (where

"investors varied in the communications they had with those selling the . . . [n]otes and the information they received prior to purchasing").

Fifth, individual plan examination(s) would be necessary to ascertain the differences in the composition of each proposed class members' investment portfolio.  See Moskowitz v. La Suisse, Societe D'Assurances sur la Vie, -- F.R.D. --, 2012 WL 1080125, at *5 (S.D.N.Y. 2012). These examinations would be critical in assessing whether Defendants improperly failed to diversify any plan's portfolio.  (See Compl. ¶ 5.)  Plaintiff conceded at summary judgment that individual examination of each class member's portfolio and evaluation of each class member's Lehman note investment would be necessary.  (See Pl. SJ Opp'n at 21.)  At oral argument on July 19, 2012, Plaintiff's counsel agreed with this assessment.  (See Oral Arg. Tr. at 26:13–16 (PL. COUNSEL: "[Defendants'] basic argument is you can't look at an investment in isolation. You have to look at it in the context of the portfolio. I agree absolutely. We don't say otherwise.").)  To take one example, Plaintiff had approximately $29 million invested in its portfolio, with 56.77% in the financial sector, and 9.99% in Lehman.  (Ugone Report Ex. 5.)  By contrast, the Stationary Engineers (a proposed class member) had approximately $113.1 million invested, with 19.83% in the financial sector, and only 1.74% in Lehman.  (Ugone Report Ex. 5.) Whether Plaintiff's investment in Lehman reflected a lack of appropriate diversification requires an analysis quite separate and apart from the analysis of whether the Stationary Engineers' investment in Lehman reflected an appropriate amount of diversification.  Each plan's portfolio was different.  See Moskowitz, 2012 WL 1080125, at *5; Presbyterian Church of Sudan v. Talisman Energy, Inc., 226 F.R.D. 456, 468 (S.D.N.Y. 2005).

Plaintiff's argument that there is commonality because "all 10 Lehman [n]otes amounted to 'junk'" and "all [proposed] Class members' Lehman notes were purchased in bulk, monitored

in bulk, and maintained in bulk" is unpersuasive.  (Pl. Class Cert. Mem. at 6, 22; Pl. Class Cert.

Reply at 2–3; see Oral Arg. Tr. at 47:14–22.)  As discussed supra pp. 17–22, analysis of

Plaintiff's claims requires evaluation of, among other things, each plan's individual investment

guidelines, the individual decisions of each plan's investment manager(s), each plan's ability to

instruct Defendants with respect to their Lehman investments, and whether each plan did, in fact,

give any instructions.  These individual issues predominate over common questions of law or

fact.  See Spagnola v. Chubb Corp., 264 F.R.D 76, 99 (S.D.N.Y. 2010); Abu Dhabi, 269 F.R.D.

at 261 (where "the record evidence reveals material differences among investors with regard to

their decision making processes, investment guidelines, due diligence inquiries, and

communications" and "[t]hese dissimilarities require an assessment of reliance on an investor-

by-investor[] basis").

 Plaintiff's reliance on Bd. of Trs. of the AFTRA Ret. Fund v. JP Morgan Chase Bank,

269 F.R.D. 340 (S.D.N.Y. 2010) to show predominance is misplaced.  (See Pl. Class Cert. Mem.

at 3, 12, 15.)  AFTRA is clearly distinguishable from the case at bar.  All of the class members in

AFTRA invested in the **same** Sigma Medium-Term Notes that were all purchased in June 2007

and had a maturity date of June 2009.  See 269 F.R.D. at 341.  The proposed Class plans here

invested in ten different Lehman notes on different dates between October 19, 2005 and

September 26, 2007, and with different maturities.  (See supra p. 19; Defs. Class Cert Opp'n at

24.)  And, in AFTRA, the defendants acknowledged that the class members' investment

guidelines were "standard" and reflected "one of the most conservative, liquid, and safe

investments available."  269 F.R.D. at 349.  Here, (as shown at pp. 17–23), there were wide

variations among proposed class members' investment guidelines, e.g., some guidelines

permitted investments with five-year maturities while others restricted investments to thirteen-

month maturities.  Some guidelines permitted investments rated "BBB-," while others, such as Plaintiff's, required investments with ratings of "A or better."  (See supra p. 20.)

**Class Action Is Not Superior**

Plaintiff argues, among other things, that a class action is superior to other available methods for the fair and efficient adjudication of this action because "no other [proposed] [c]lass members have instituted separate actions related to the investments at issue here."  (Pl. Class Cert. Mem. at 23–24.)  Defendants counter, among other things, that class litigation is not superior because "many [proposed] class members . . . have already commenced lawsuits against BNY Mellon," and "a class action would be unmanageable because it would involve an examination of the investment expectations and risk tolerances of each [proposed] class member."  (Defs. Class Cert. Opp'n at 8, 22.)

As noted supra p. 17, because numerosity has not been shown and because joinder of nine plans is feasible, class certification is improper.  The Court need not examine whether a class action is superior under Rule 23(b).  Jeffries, 172 F. Supp. 2d at 394.  Even if it were, arguendo, necessary to evaluate "superiority," the Court would likely find that representative litigation is not superior, as follows:

In deciding whether to disregard "the usual rule that litigation is conducted by and on behalf of the individual named parties only," Wal-Mart, 131 S. Ct. at 2550 (internal quotation marks omitted), and whether a class action is superior, the court considers: "(1) the interest of the class members in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation already commenced by or against class members; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) difficulties likely to be encountered in the management of a class action."  See Spagnola v. Chubb Corp.,

264 F.R.D 76, 99 (S.D.N.Y. 2010) (citing Fed. R. Civ. P. 23(b)(3)).  "The greater the number of individual issues [as here], the less likely that superiority can be established." Id. (citation and internal quotation marks omitted).

     First, it would seem that the proposed class members would have a strong interest in individually controlling the prosecution of their own actions because they are sophisticated institutional investors with large claims in the "millions of dollars."  (Pl. Class Cert. Mem. at 2; see Kelly Decl. ¶ 9); Kottler v. Deutsche Bank AG, No. 05 Civ. 7773, 2010 WL 1221809, at *5 (S.D.N.Y. Mar. 29, 2010).  And, such claims are individual in nature, as discussed supra pp. 17–23. See Spagnola, 264 F.R.D at 99.  Second, several plans have already commenced their own lawsuits against Defendants, including Bd. of Trs. of the N.J. Carpenters Annuity & Pension Funds v. Bank of New York Mellon, et al., No. 11 Civ. 1555 (JSR) (S.D.N.Y.); PACE Indus. Union-Mgmt. Pension Fund, et al. v. Bank of New York Mellon, et al., No. 11 Civ. 6292 (JGK) (S.D.N.Y.); and Bd. of Trs. of the Gen. Ret. Sys. of the City of Detroit, et al. v. Bank of New York Mellon, et al., No. 11 Civ. 6345 (RJS) (S.D.N.Y.).  (See Kelly Decl. ¶ 15.)  Third, Plaintiff has not offered any evidence showing that there would be much benefit in concentrating litigation in this forum, and several plans that have instituted their own lawsuits appear to have selected other fora.  See, e.g., CompSource Oklahoma v. BNY Mellon, N.A., No. 08 Civ. 469 (E.D. Okla.); Pac. Select Fund v. Bank of New York Mellon, No. 10 Civ. 198 (C.D. Cal.); (Kelly Decl. ¶ 15.).  Fourth, a class action could become unmanageable because of the above-described need for "mini-trials" to resolve individual issues.  (See supra pp. 17–23); Spagnola, 264 F.R.D at 99; Dunnigan v. Metro. Life Ins. Co., 214 F.R.D. 125, 142 (S.D.N.Y. 2003).

**IV.    Conclusion & Order**

For the foregoing reasons, Plaintiff's motion for class certification [#218] is respectfully

denied.  A settlement/scheduling conference is scheduled for September 10, 2012 at 11:00 a.m.

**The parties are directed to engage in good faith settlement negotiations prior to the**

**conference.**

Dated: New York, New York
        August 16, 2012

_RMB_

RICHARD M. BERMAN, U.S.D.J.
